**Page 1**

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF OHIO
                           EASTERN DIVISION
                            - - - - -


Raymond Gibson,              :

       Plaintiff,            :
                                     Case No. 07-377
       vs.                   : Judge Marbley
                                     Magistrate Judge Abel
The Shelly Company,          :

       Defendant.            :


                            - - - - -

         DEPOSITION OF CANDACE BURKE GALES
                            - - - - -


             Taken at Spectrum Reporting LLC
                 333 East Stewart Avenue
                    Columbus, OH 43206
                  May 14, 2008, 9:49 a.m.


                            - - - - -


                 Spectrum Reporting LLC
         333 Stewart Avenue, Columbus, Ohio 43206
             614-444-1000 or 800-635-9071
                 www.spectrumreporting.com

                            - - - - -
```

**Page 2**

```
                A P P E A R A N C E S


  ON BEHALF OF PLAINTIFF:

       Teresa Cunningham, Esq.
       71 Cavalier Boulevard, Suite 100
       Florence, KY 41042

  ON BEHALF OF DEFENDANT:
       Frantz Ward
       127 Public Square
       Cleveland, OH 44114
       By Brian J. Kelly, Esq.

  ALSO PRESENT:
       Raymond Gibson
       Rob Sharrett
```

**Page 3**

```
1                    Wednesday Morning Session
2                     May 14, 2008, 9:49 a.m.
3                            - - - - -
4               S T I P U L A T I O N S
5                            - - - - -
6        It is stipulated by counsel in attendance that
7   the deposition of Candace Burke Gales, a witness
8   herein, called by the Plaintiff for
9   cross-examination, may be taken at this time by
10  the notary by notice and agreement that said
11  deposition may be reduced to writing in stenotypy
12  by the notary, whose notes may thereafter be
13  transcribed out of the presence of the witness;
14  that proof of the official character and
15  qualification of the notary is waived.
16                           - - - - -
```

**Page 4**

```
                    I N D E X
Examination By                                     Page
Ms. Cunningham - Cross                                5
Deposition Exhibits                                Page
  1 - Letter to Montgomery from Yoakum, 5-17-05      44
  2 - Construction Compliance Review Report,         48
      2-20-03

  3 - On-site Construction Employment Data,          57
      7-30-04
  4 - Revised Federal Aid Highway Construction       60
  5 - Safety Training Class Record, 4-16-04          63
  6 - Shelly's Affirmative Action Plan, 2006         69
  7 - EEO Directors Job Description                  73
  8 - Voluntarily Corrective Actio Plan, 2-1-05      78
  9 - Supplement To Our Affirmative Action           81
      Program For Year 2005

 10 - E-mail from Mowrey, 11-16-04                   84

 11 - City Contract Compliance Review Form,          86
      7-03
 12 - City Contract Compliance Review Form,          89
      1-07

 13 - Input Form 29 (I-29), 2003                     89

 14 - Input Form 29 (I-29), 2004                     91

 15 - Input Form 29 (I-29), 2005                     92

 16 - 2004 EEO Employer Information                  96

(Exhibits attached to the original transcript.)
```

5

1                    CANDACE BURKE GALES
2    being first duly sworn, testifies and says as
3    follows:
4                    CROSS-EXAMINATION
5    BY MS. CUNNINGHAM:
6    Q.        Could you state your name and spell it
7    for the record.
8    A.        My name is Candace Burke Gales.
9    Q.        My name is Teresa Cunningham.  I
10   represent Ray Gibson in a case captioned Gibson
11   vs. Shelly Company.  We're here today for your
12   deposition.  Have you ever been deposed before?
13   A.        Yes, ma'am.
14   Q.        I'll be asking a series of questions.
15   If you don't understand a question or you can't
16   hear me, ask me to repeat it, otherwise I'll
17   assume that you understand the question.
18   A.        Yes, ma'am.
19   Q.        Okay.  Where are you currently
20   employed?
21   A.        The Shelly Company.
22   Q.        And what is your position?
23   A.        I'm the corporate EEO director.
24   Q.        How long have you had that position?

6

1    A.        11 years.
2    Q.        And what are your job duties?
3    A.        My job duties are to protect the rights
4    of minorities and females that work in the
5    construction industry and to monitor the state and
6    federal regulations as far as civil rights and
7    equal opportunity.
8    Q.        What do you do on a daily basis?
9    A.        I monitor all jobs that are awarded as
10   far as the subcontractor participation, making
11   sure that the minorities and female goals on all
12   the projects are filled.  I report to the state,
13   the feds, the Department of Administrative
14   Services as far as the EEO numbers and the --
15            MR. KELLY:  Slow down just a little
16   bit.
17            THE REPORTER:  You're fine.
18   A.        As far as the reports, which are
19   documented -- documents that must go to the
20   Department of Administrative Services, FHWA
21   federal, under the federal guidelines OFPCP and
22   ODOT.
23   Q.        Okay.  You said that you essentially
24   monitor and protect the rights of minorities and

7

1    females, correct?
2    A.        Uh-huh, yes.
3    Q.        Do you get involved with promotions?
4    A.        No, ma'am.
5    Q.        Why not?
6    A.        That goes into a different category
7    that's outside the workforce.  Once -- the
8    promotions are a part of the management.
9    Q.        I don't understand what you mean.  I
10   mean, is it your position that whether or not a
11   minority or a woman is promoted is not protecting
12   their rights or is there someone else in the
13   company that is there to --
14   A.        Well, I --
15   Q.        -- gauge that part of it?
16   A.        There's somebody else in the company
17   that is engaged in that part of it.
18   Q.        Who?
19   A.        That would be the upper management,
20   which would go into the supervisory personnel,
21   such as Rob Sharrett and other office officials.
22   Q.        Okay.  So you only deal with, if it's
23   fair to say, the lower level employees?
24   A.        Workforce that is unionized.

8

1    Q.        The union workforce?
2    A.        Yes, ma'am.
3    Q.        You're familiar with ODOT's evaluation
4    process to see if the company is in compliance --
5    A.        Yes, ma'am.
6    Q.        -- with all the regulations?
7    A.        Yes, ma'am.
8    Q.        That document that ODOT uses discusses
9    promotions, correct?
10   A.        The MP29 that I report on a monthly
11   basis does not.
12   Q.        No.  I'm talking about the document
13   that ODOT uses.
14   A.        Which document?
15   Q.        Are you familiar with it?
16            The first page is called the Compliance
17   Date Report, Ohio Department of Transportation,
18   okay?
19   A.        This is the process that's called the
20   compliance review process.
21   Q.        Okay.
22   A.        And when we receive that document,
23   there are questions that have to be answered.  And
24   it's not just me answering the questions.  I

Candace Burke Gales                                                      May 14, 2008

9

1   sometimes have to go to the VPs, to the payroll or
2   to HR to gather the data.  And they give me the
3   data that I put in the report.
4   Q.        Are you responsible for the information
5   that is given to ODOT in that compliance report?
6   A.        The data is given to me and I give it
7   to ODOT, no.
8   Q.        I understand that.  But are you
9   ultimately responsible?
10  A.        No, no.
11  Q.        No, you're not.
12            Okay.  This document does address
13  promotions, correct?
14  A.        Yes.
15  Q.        Who gives you the information regarding
16  promotions?
17  A.        I get it from payroll and also from the
18  VPs that I interview.
19  Q.        Do you specifically interview the VPs
20  regarding promotions?
21  A.        I send them an e-mail and ask them what
22  promotions they've had in whatever time period
23  that ODOT is reviewing the process for.
24  Q.        Okay.  Can I have that back, please.

10

1             MR. KELLY:  Yeah.
2   Q.        So you send an e-mail and you ask them
3   if there have been any promotions?
4             Yes, ma'am.
5   Q.        Do you ask them if anyone has ever
6   applied for a promotion?
7   A.        I don't believe that question is asked.
8   Q.        But that wasn't the question.  Do you
9   ask them?
10  A.        No.
11  Q.        Have you asked the upper management VPs
12  whether or not there is a formal training
13  program --
14  A.        No.
15  Q.        -- regarding the promotion of
16  minorities or women?
17  A.        No, I have not asked them that.
18  Q.        Why?
19  A.        That's not in my area of expertise.
20  Q.        What do you mean by that?
21  A.        I monitor the workforce, the unionized
22  workforce.  If they would ask me, then I would
23  have to go to the VPs or to someone in management
24  and ask them if anybody has been promoted.

11

1   Q.        Okay.  Do you feel that as part of the
2   EEO laws -- and you're well-versed in those,
3   correct?
4   A.        Yes, ma'am.
5   Q.        -- that a part of those EEO laws is
6   that there's no discrimination regarding
7   promotions?
8             MR. KELLY:  Objection.  Are you asking
9   -- she's here as a fact witness.  Are you asking
10  her opinions?
11            MS. CUNNINGHAM:  Well, she deals in
12  this area.  I'm asking her if EEO laws cover
13  promotions.
14            MR. KELLY:  Okay.  I'm going to object
15  to the question.  If you have an opinion, you can
16  answer it.
17            MS. CUNNINGHAM:  Okay.
18  A.        Yes.
19  Q.        Okay.  But you don't address that?
20  A.        No, ma'am.
21  Q.        Have you ever questioned whether or not
22  minorities and women were being fairly promoted
23  with The Shelly Company?
24  A.        No.

12

1   Q.        Okay.  Why not?
2   A.        I've never had an employee come to me
3   and ask me to be promoted.
4   Q.        Okay.  Do you know what the promotion
5   process is with The Shelly Company?
6   A.        Vaguely.
7   Q.        Tell me what you know.
8   A.        That if there was an employee who would
9   ask to be promoted, he would do that through his
10  supervisory personnel, and it would be passed on
11  to upper management.
12  Q.        Who told you that?
13  A.        It's what I know.
14  Q.        How do you know that?
15  A.        Well, based on what I hear and what I
16  see and we've -- I've had no employee ask me that;
17  but if somebody did, that's what would be my
18  answer.
19  Q.        Okay.  As an EEO officer, have you had
20  a conversation with any upper management regarding
21  the process you should follow if an employee comes
22  to you and asks to be promoted?
23  A.        Not directly, no.
24  Q.        Why not?

3 (Pages 9 to 12)

13

1   A.        It's not my position.
2   Q.        Okay.  Even as EEO officer, and you
3   feel that promotions are a part of the EEO laws,
4   you do not feel it's part of your job to question
5   whether or not minorities or woman have ever been
6   promoted in The Shelly Company?
7   A.        No.
8   Q.        Or the process that's used by The
9   Shelly Company for promotions?
10  A.        I don't get involved in that area.
11  Q.        Okay.  And who does?
12  A.        It would be the vice presidents and
13  upper management.
14  Q.        Okay.  Any other process that you know
15  of for a unionized person -- I'm assuming that's
16  the only people you deal with are unionized
17  individuals?
18  A.        Well, I take complaints from other
19  people if they have complaints if they're internal
20  or external.
21  Q.        Okay.  So would it be fair to say that
22  you deal with hourly employees?
23  A.        Occasionally.
24  Q.        Or low level employees?

14

1   A.        Occasionally.
2   Q.        Certainly not management?
3   A.        Exactly.
4   Q.        Are foremen considered management?
5   A.        Excuse me?
6   Q.        Are foremen considered management?
7   A.        Yes, ma'am.
8   Q.        Okay.  Do you deal with nonmanagement
9   individuals?
10  A.        Yes, ma'am.
11  Q.        Any other process for promotions other
12  than what we've discussed for a lower level
13  employee to go into a foreman position?
14  A.        Will you ask me the question again?
15  Q.        We've discussed this promotion process
16  as you understand it in The Shelly Company.
17  A.        Yes.
18  Q.        Is there any other process for an
19  individual to be promoted other than the process
20  we've talked about?
21  A.        Not that I'm aware of.
22  Q.        Does The Shelly Company offer EEO
23  training?
24  A.        Yes, ma'am.

15

1   Q.        Who do they offer it to?
2   A.        All employees.
3   Q.        Okay.
4   A.        Internal and external.
5   Q.        Okay.  Would this be the lower level
6   people that we talked about?
7   A.        Yes, ma'am.
8   Q.        In that training do they discuss
9   promotions?
10  A.        What happens is there's various people
11  that present presentations which comes from the
12  president on down to the safety people, the EEO
13  people, myself, human resources.  And we talk
14  about various subjects, and my subject is equal
15  employment discrimination harassment.
16  Q.        But during these EEO seminars,
17  conferences, meetings, do they discuss promotions?
18  A.        I don't believe so.
19  Q.        Why not?
20  A.        You would have to ask the vice
21  presidents.
22  Q.        Have you ever questioned it?
23  A.        No.
24  Q.        Why not?

16

1   A.        It's not my area of expertise.
2   Q.        But your area of expertise is EEO,
3   correct?
4   A.        Yes.
5   Q.        Is there any sub area of EEO that's
6   your area of expertise or is it --
7   A.        I've never had an employee approach me
8   in 11 years and ask for a promotion.
9   Q.        Well, that wasn't the question that I
10  was -- is there any sub level of expertise other
11  than the EEO laws?  I mean, you don't just
12  specifically focus on sexual harassment?
13  A.        No.
14  Q.        Okay.
15  A.        I focus on all --
16  Q.        You focus on all of them?
17  A.        -- EEO.
18  Q.        Have you talked to any of the VPs or
19  any of the upper management that we've been
20  talking about regarding if anyone has ever
21  approached them and asked for a promotion?
22  A.        We've reviewed the promotions for the
23  contract compliance review process.  If a review
24  is coming up and I have asked for promotions, a

17

1   list of them.  If there are none, there was none
2   available for that time period, then that's what I
3   document for the compliance review process.
4   Q.        Other than that, have you ever
5   discussed --
6   A.        No.
7   Q.        Okay.  So you don't know how many
8   openings come up --
9   A.        No.
10  Q.        -- for promotions?
11  A.        No.
12  Q.        Have you ever asked?
13  A.        No.
14  Q.        And you've never asked about a training
15  program to be implemented for minorities and women
16  regarding promotions?
17  A.        Not for promotions.
18  Q.        Okay.  You're given this information
19  from the VPs or upper management regarding
20  promotions when ODOT does their compliance review,
21  correct?
22  A.        Uh-huh.  Yes, ma'am.
23  Q.        Correct?
24            This document, and you can turn to the

18

1   page that's marked, if you would like, that
2   discusses promotions.  But it states that they've
3   reviewed documents.
4            MR. KELLY:  It states that who's
5   reviewed documents.
6            MS. CUNNINGHAM:  That the ODOT person.
7            MR. KELLY:  Why don't you -- if you are
8   going to refer to the document --
9            MS. CUNNINGHAM:  Let me finish the
10  question, and I'll -- you know, if she needs
11  clarification, we'll go there.
12  Q.        Do you meet with -- and correct me if
13  I'm wrong, but it appears that Melody Farnsworth,
14  she's now married and it's Conrad.
15  A.        Yes.
16  Q.        She does the compliance reviews for
17  ODOT for the Shelly Company, correct?
18  A.        Yes, ma'am.
19  Q.        How long has she been doing these?
20  A.        At best guess, probably 20-something
21  years.
22  Q.        Okay.  You always get the same person,
23  correct, that comes out from ODOT, it's always
24  Farnsworth?

19

1   A.        Well, it's because that's our central
2   office location for our headquarters.
3   Q.        Okay.  Do you know Melody pretty well?
4   A.        Yes.
5   Q.        Are you friends?
6   A.        Never been to her home, if that's what
7   you're referring to.  No, we're business
8   associates.
9   Q.        Business associates.
10            Have you ever been out to lunch with
11  her?
12  A.        Yes.
13  Q.        Okay.  How often have you been out to
14  lunch with her?
15  A.        I haven't been to lunch with Melanie
16  probably for a year or more.
17  Q.        Okay.  Would it be fair to say you go
18  to lunch with her maybe once a year?
19  A.        No.
20  Q.        Once every other year?
21  A.        Maybe.
22  Q.        Okay.  Do you do that when she comes
23  out and does the review?
24  A.        No.

20

1   Q.        You guys get together at other times?
2   A.        Just if I want to have a meeting with
3   her.
4   Q.        Why would you want to have a meeting
5   with Melody?
6   A.        We talk about subcontractors, primes,
7   my workforce, if I have situations going on, if I
8   have any complaints, if I want to talk about
9   on-site.  But that doesn't mean we've had lunch.
10  We may just meet and talk.
11  Q.        Okay.  Why would --
12  A.        Or I go to the district.
13  Q.        Okay.  Why would you meet Melody or go
14  to the district to address problems that you're
15  having?
16  A.        That's the way EEO officers work
17  together to keep an open line of communication
18  between their central office, ODOT and the
19  contractors.
20  Q.        Okay.  Have you ever discussed
21  promotions --
22  A.        No.
23  Q.        -- with Melody?
24            Okay.  To your knowledge, has anyone in

Candace Burke Gales                                    May 14, 2008

21

1   the company discussed promotions with Melody or
2   anyone from ODOT?
3   A.        Not that I'm aware of, other than the
4   document that's presented at the compliance
5   review.
6   Q.        All right.  We'll get back to that.
7             Are you aware of an evaluation process
8   for the promotion of minorities and women?
9   A.        No, ma'am.
10  Q.        Have you ever discussed the lack of an
11  evaluation process for the promotion of women and
12  minorities with anyone in upper management?
13  A.        Rob Sharrett and I have spoke about
14  evaluating persons if they come forward and ask to
15  be evaluated or want to be made part of the core
16  workforce.
17  Q.        What do you mean by "core workforce"?
18  A.        Well, we're unionized, and we have a
19  core workforce, which are people that work for us
20  traditionally year after year after year after
21  year.
22  Q.        Okay.  So you're including those
23  seasonal people that are referred by the union?
24  A.        Yes, ma'am.

22

1   Q.        Okay.  Okay.  You said you discussed
2   evaluations if they come forward and request
3   information regarding being promoted?
4   A.        Uh-huh.
5   Q.        Are employees formally evaluated?
6   A.        I don't know.  You would have to ask
7   upper management.
8   Q.        Have you ever seen --
9   A.        I don't evaluate anybody.
10  Q.        Have you ever seen an evaluation form?
11  A.        No, ma'am.
12  Q.        So if I'm understanding this correctly,
13  out of your core workforce, your union, your low
14  level employees, if someone comes forward to you
15  and asks to be promoted, then the company may take
16  a look at them for a promotion?
17  A.        I would tell them to go to their
18  foreman or superintendent or notify the VP in
19  their division.
20  Q.        Okay.  Have these job openings ever
21  been posted?
22  A.        They would be, but I don't know of any.
23  Q.        What do you mean "they would be"?
24  A.        We post job openings if it's not

23

1   unionized.
2   Q.        Where do you post it?
3   A.        They're posted on the Internet and in
4   the individual offices on their bulletin boards.
5   Q.        What do you mean by the "individual
6   offices"?
7   A.        We have divisions.
8   Q.        Okay.  So in each division, so if
9   someone is sent in from the union and they're on a
10  road crew out in another county, they would have
11  to drive to -- let's do the Thornville Division.
12  They would have to drive to Thornville to your
13  main office and look at that bulletin board to
14  see --
15            MR. KELLY:  Objection.  She also said
16  Internet.
17            MS. CUNNINGHAM:  I'll get there.
18  A.        They don't have to, they can look on
19  the Internet.
20  Q.        Well, but give me time to finish the
21  question, okay.
22            If they're working out in another
23  county, they would have to drive into the office
24  and look on that bulletin board, correct?

24

1             MR. KELLY:  No.  I mean, you're
2   mischaracterizing her testimony.
3             MS. CUNNINGHAM:  You're not --
4             MR. KELLY:  To the extent you're going
5   to mischaracterize her testimony --
6             MS. CUNNINGHAM:  I'm not -- let me
7   finish my question, and if you want to object, you
8   can object.
9             MR. KELLY:  Sorry.  I thought you had
10  finished your question.
11            MS. CUNNINGHAM:  No, I haven't.
12  Q.        If someone is working in an outside
13  county, they would have to drive to the central
14  office Thornville and look at the bulletin board
15  to see the job posting, correct?
16  A.        Yes, or the Internet.
17  Q.        Okay.  We'll get to that.  Or they have
18  to go to the Internet.  Do you notify employees
19  when they are hired that job openings, promotions
20  are posted on the Internet, and here's the
21  company's website?
22  A.        I wouldn't be advising them of
23  anything, they're unionized.
24  Q.        So there's no notice sent out to the

6 (Pages 21 to 24)

Candace Burke Gales                                                    May 14, 2008

25

1  union as far as you know?  When they come on a job
2  site, they're not handed a slip of paper that says
3  you can check this website for The Shelly Company
4  for any job openings?
5  A.        I don't have any communication with
6  them at all.
7  Q.        To your knowledge, that isn't done,
8  correct?
9  A.        No, not to my knowledge.
10  Q.        Have you ever discussed that with any
11  of upper management?
12  A.        No.
13  Q.        Why not?
14  A.        That's not in my area.
15  Q.        Okay.  It's not in your area.  But your
16  area is protecting the rights of minorities and
17  women?
18            MR. KELLY:  Objection.  She's answered
19  that five times now.
20  Q.        Correct?  Correct?
21  A.        Yes, ma'am.
22  Q.        All right.  What's the difference
23  between a foreman and a superintendent?
24  A.        A superintendent is the person who

26

1  really actually sets up the project, tells you who
2  the foreman is going to be and sets up the
3  project, gives the foremen the bulletin board
4  information, and sometimes does the call outs.
5  Q.        What do you mean by "the bulletin board
6  information"?
7  A.        There's a federal bulletin board with
8  state and federal requirements that must be posted
9  on all federal projects.
10  Q.        In 2003, were you aware if there were
11  any promotions in The Shelly Company?
12  A.        I don't have any idea unless I had
13  files in front of me.
14  Q.        Okay.  How about 2004?
15            MR. KELLY:  Are we talking entire
16  corporate wide because this case is --
17            MS. CUNNINGHAM:  I understand.
18            MR. KELLY:  Our discovery in the case
19  is about the division here, but --
20  A.        I'd have to see the paperwork.
21  Q.        Okay.  You have no idea?
22  A.        It's not that I don't have any idea.  I
23  don't remember.  I don't recall.  It's 2008.  I'd
24  have to see it.

27

1  Q.        Okay.  You just don't remember, okay.
2            What areas does the Thornville Division
3  cover?
4  A.        Thornville, Athens, Hocking, Meigs,
5  Morgan, Noble, Vinton Counties.  There's probably
6  a couple more I missed, but Southeastern Ohio,
7  east.
8  Q.        Thornville is southeastern Ohio?
9  A.        Yes, ma'am.
10  Q.        What area covers central Ohio?
11  A.        That's District 6.
12  Q.        What's District 6?
13  A.        Columbus.
14  Q.        Columbus broke out of the Thornville
15  Division, correct?
16  A.        Yes, ma'am.
17  Q.        In the period between '03 and '05 --
18  was it '05 when Columbus broke out, '05 or '06,
19  correct?
20  A.        I don't know.
21  Q.        Around there, would that be fair to
22  say?
23  A.        I don't recall.
24  Q.        Okay.  Before Columbus broke away from

28

1  Thornville, did Thornville cover all of central
2  Ohio?
3  A.        Yes, ma'am.
4  Q.        In 2003, 2004 and 2005, are you aware
5  of any minority foremen?  To your knowledge were
6  there any minority foremen?
7  A.        Yes.
8  Q.        Who?
9  A.        Donald Mayle.
10  Q.        How do you spell his last name?
11  A.        M-A-Y-L-E.
12  Q.        Where did he work?
13  A.        Thornville.
14  Q.        And how long has he been with the
15  company?
16  A.        He was there before I came there.  I
17  don't know Don's years.
18  Q.        What race?
19  A.        He's black.  And my minority foremen,
20  there's Trevor Small.
21  Q.        What is Mr. Small's race?
22  A.        American Indian.
23  Q.        And when was he promoted, do you
24  remember?

Spectrum Reporting LLC                                                 614-444-1000

Candace Burke Gales                                                May 14, 2008

29

```
 1  A.        Oh, I don't have any idea.
 2  Q.        Before you started?
 3  A.        No.  No.  Not before I started.
 4  Q.        Was he promoted in 2003, 2004?
 5  A.        I don't have any idea.  I wouldn't
 6  know.  I don't do promotions.
 7  Q.        Okay.  Anyone else?
 8  A.        Trevor Small's a superintendent.  And
 9  Jeff Barnes is an American Indian, and I believe
10  his title is foreman.  You'll have to get
11  clarification from the VPs.
12  Q.        Trevor Small is actually a
13  superintendent?
14  A.        I believe that's his title.
15  Q.        So he's not a foreman?
16  A.        I -- I'm not sure what his title is
17  because one of them is a superintendent and one of
18  them is a foreman.
19  Q.        Okay.  So either Jeff Barnes or
20  Mr. Small is a foreman, and the other one is a
21  superintendent?
22  A.        I believe so.
23  Q.        Okay.  What's Ms. Barnes' race?
24  A.        American Indian.
```

30

```
 1  Q.        Do you know what tribe?
 2  A.        No.
 3  Q.        How long has Mr. Barnes worked for the
 4  company?
 5  A.        I have no idea.
 6  Q.        Was he there before you started?
 7  A.        Yes.
 8  Q.        Okay.  And I'm sorry.  Did you say
 9  Mr. Small was there before you started too?
10  A.        Yes.
11  Q.        Okay.  Have any minorities, to your
12  knowledge, been promoted into foreman positions
13  since you've worked for the company?
14  A.        Not that I'm aware of, no.
15  Q.        Does the company maintain personnel
16  files?
17  A.        Yes, ma'am.
18  Q.        Okay.  On which employees?
19  A.        I believe everybody.  It comes from the
20  HR department.
21  Q.        Is there a personnel file for
22  Mr. Gibson?
23  A.        I wouldn't know.
24  Q.        Well, he's worked for the company.  So
```

31

```
 1  it's your understanding there should be a
 2  personnel file for Mr. Gibson?
 3  A.        The HR department just began keeping
 4  personnel files, I believe, last year.
 5  Q.        So prior to 2006, say 2005 back, the
 6  company did not maintain personnel files?
 7  A.        I believe that's right.
 8  Q.        Where do they maintain these incident
 9  reports?  You know what I'm talking about, don't
10  you?
11  A.        Incident reports, no.  I don't know
12  what you're talking about.
13  Q.        There are incident reports when there's
14  a safety -- generally a safety -- some type of
15  violation, there are incident reports that fills
16  out what happened and those go to the safety
17  committee.  And I don't have one with me, or I
18  would show it to you.
19  A.        The legal counsel would have them.
20  Q.        They stay in legal counsel's
21  department?
22  A.        I believe so.
23  Q.        Do you know how they're categorized
24  or --
```

32

```
 1  A.        You would have to ask upper management
 2  or --
 3  Q.        Alphabetically or -- you have no idea?
 4  A.        You would have to ask upper management.
 5  Q.        Prior to -- and let's just focus on
 6  prior to '06, '05 and back.  You said that the
 7  company doesn't keep personnel files?
 8  A.        We did not have an HR department at
 9  that time, yes, ma'am.
10  Q.        Did they maintain any information on
11  employees?
12  A.        If there were issues or complaints, is
13  that what you're asking?
14  Q.        Just any information.
15  A.        If there was a complaint, there would
16  be a file.
17  Q.        So they had a complaint file?
18  A.        If there was an investigation done,
19  yes, ma'am.
20  Q.        Okay.  Any other reason that there
21  would be a file kept for an employee?
22  A.        No, ma'am.
23  Q.        Okay.  And I am sorry, I may have asked
24  you this.  But have you ever seen an evaluation
```

Spectrum Reporting LLC                                            614-444-1000

Candace Burke Gales                                                    May 14, 2008

33

1   form for an employee?
2   A.          No, ma'am.
3   Q.          Okay.  So it would be fair to say
4   employees are not evaluated?
5   A.          I believe that they're in the process
6   in the HR department of creating one.  But I don't
7   know that it exists yet.
8   Q.          Okay.  Just prior to '06?
9   A.          No, ma'am.
10  Q.          There was no evaluation?
11  A.          Not that I'm aware of.
12  Q.          Okay.  Was there ever an evaluation
13  process?
14  A.          You would have to ask upper management.
15  Q.          Okay.  Did you ever question upper
16  management about the lack of an evaluation or an
17  evaluation process?
18  A.          No, ma'am.
19  Q.          Why not?
20  A.          It's not my area of expertise.
21  Q.          So if -- and this may be very
22  simplified terms, but your job is simply to take
23  the numbers and match them up to make sure there
24  is a minimum number of minorities working for The

34

1   Shelly Company to meet the statistics for the
2   federal and state contracts?
3   A.          I do all the reporting for the federal
4   and state requirements, yes.
5   Q.          I mean, that's fair to say that's your
6   job?
7   A.          Part of it, yes.
8   Q.          Okay.  And then you'll take complaints
9   if someone comes in and complains about something?
10  A.          Yes, ma'am.
11  Q.          You investigate those.
12              And what else do you do?
13  A.          That's what I do.
14  Q.          That's it, those two things?
15              So it would be fair to say that if a
16  contract comes in, you look at it and you make
17  sure that there are enough minorities and women
18  working on that specific contract in order to meet
19  the requirements under the state and federal regs?
20  A.          Once the job is awarded, I start
21  looking at the project to make sure the
22  subcontractors have been awarded and that we are
23  in line to meet our goals as far as the state and
24  federal requirements.

35

1   Q.          So if you need a minority to fill a
2   slot to meet the goals, then you -- someone, you
3   or someone calls the union and says, hey, send
4   over a minority to fill them in on whatever job?
5   A.          Yes.  That's done normally by another
6   person.
7   Q.          So they fill that slot and you can put
8   in the numbers to meet --
9   A.          Percentage.
10  Q.          -- the quotas?
11  A.          We don't do quotas.
12  Q.          But it's numbers?
13  A.          It's goals.
14  Q.          Okay.  It's not quotas but it's goals,
15  okay.
16              Have you ever -- has The Shelly Company
17  ever gone out and just recruited and hired more
18  minorities than they actually needed for these
19  jobs?
20  A.          Yes.
21  Q.          When was that?
22  A.          On our on-the-job training program.
23  Based on the 23CFR, we have only minorities and
24  females in our on-the-job training program.

36

1   Q.          Tell me about the on-the-job training
2   program.
3   A.          It's a federal program that's set up by
4   FHWA which is a Federal Highway Administration,
5   which is a program that you train employees on
6   site for a certain period of time, whether it's
7   from first year to journeyman status or through
8   the laborers or through the operators and
9   teamsters, and to see to it that they get
10  on-the-job training so that they can initially
11  become part of the core workforce.
12  Q.          And correct me if I'm wrong, but
13  they're generally laborers who have no training,
14  no experience, and you bring them in and give them
15  training?
16  A.          No, ma'am.
17  Q.          No, I must misunderstand then.  Tell me
18  exactly what the status of these individuals are
19  and what you train them to do.
20  A.          They can be laborers, they can be
21  operators, they can be teamsters.  If they're
22  operators, they're normally in the apprenticeship
23  program that comes through the operators union.
24  They can be apprentices as a first year, second

Spectrum Reporting LLC                                                 614-444-1000

37

1    year, third year, and fourth year through
2    journeymanship status.  If they're laborers, we
3    now participate in the laborers apprenticeship
4    program, which brings out trainees that are going
5    through a specific program with the laborers,
6    which just was authorized as of January 1, '08;
7    and they are given an apprenticeship status so
8    they can come out with the journeymen in the
9    laborers program so they can be trained to get
10   sufficient training before they move into the
11   journeymanship status.  Prior to that, they were
12   recruited through various agencies, entities, such
13   as people who have had no experience and were not
14   part of the apprenticeship program but came out
15   and were given status based on the fact that there
16   wasn't a program in place.
17   Q.        On average, how many people are in this
18   on-the-job training program?
19   A.        I have four per division.
20   Q.        I'm sorry?
21   A.        I have four per division.
22   Q.        Okay.  Four per division, okay.
23             Are you aware of the value of the
24   contracts that Shelly is awarded?

38

1    A.        Am I aware of what?
2    Q.        The value of the contracts?  The --
3    A.        The dollar amount.
4    Q.        Yes.  The contract price?
5    A.        Oh, yes.
6    Q.        Okay.  So to come up with your stats,
7    you look at the number of man-hours and people in
8    the population and that sort of thing to come up
9    with this percentage that should be minorities?
10   A.        The percentage is given to us.
11   Q.        Oh, it's given to you by the state?
12   A.        Yes.
13   Q.        Oh, okay.
14   A.        And the feds.
15   Q.        Okay.  So would it be fair to say,
16   though, that The Shelly Company just meets those
17   figures?
18   A.        We show a good faith effort to achieve
19   the goal or exceed it.
20   Q.        But would it be fair to say that they
21   just meet those stats?
22   A.        It would be fair to say that we exceed
23   it.
24   Q.        Okay.  How much do you exceed it?

39

1    A.        You would have to look at the monthly
2    reports.
3    Q.        By how much do you exceed it?
4    A.        You would have to look at the monthly
5    reports.
6    Q.        Couldn't say on an average?
7    A.        No.
8    Q.        Okay.  Any other -- you've talked about
9    this on-the-job training, and then that's extra
10   people that -- extra minorities that come in and
11   work.  Any other recruitment that is done to bring
12   in minorities, other than just calling the union
13   and saying we need a minority on this job, send
14   them over to meet our stats?
15   A.        There is a process that's utilized.
16   Q.        I'm sorry?
17   A.        There's a process that's utilized.
18   Q.        What's the process?
19   A.        If you are told by the union that if
20   the union does not have a minority or female upon
21   request, we can at that time go off the bank and
22   recruit, if need be, as I do for the OJT training
23   program.
24   Q.        What do you mean "go off the bank"?

40

1    A.        It means if the union doesn't have a
2    person available to fit the job description that I
3    need or the employee that I've requested.  Then
4    it's up to the union to document that, tell me
5    they cannot fill the request for a minority or
6    female, then I do have the option to advise the
7    superintendent that then he must look elsewhere.
8             MR. KELLY:  Teresa, I -- just since you
9    weren't in the first case, I'm not sure one of the
10   documents reviewed, but it may be helpful on this
11   for you to know the company has signed collective
12   bargaining agreements with the union, so it has to
13   hire through the union, it just can't go down to
14   the local high school or whatever it may be.  Are
15   you aware of that?
16            MS. CUNNINGHAM:  Yeah.
17   Q.        Okay.  When a job comes up, new jobs
18   bid, they get it, explain the process to me for
19   getting individuals to fill that, fill the
20   positions.
21   A.        I'm not comfortable going through that
22   process because I don't do that process.  I would
23   be second-guessing what the superintendents'
24   call-out procedure is.

Candace Burke Gales                                          May 14, 2008

---

**41**

1  Q.      But they would have to call the union?

2  A.      Yes, ma'am.

3  Q.      Do you know if it's seniority?

4  A.      They --

5  Q.      By seniority?

6  A.      I don't know.

7  Q.      You have no idea?

8         Okay. Now, back to this document we

9  talked about ODOT and these compliance reviews.

10  On page 8 under Training -- it's going to be

11  Training. And this -- we'll just use this as an

12  example, it's the January I believe -- January

13  25th, 2007 report that was done by Ms. Farnsworth,

14  there is a section that is marked, "Is there an

15  evaluation process conducted annually of at least

16  all minority and female personnel for promotional

17  opportunities to encourage these individual to

18  seek or prepare for such opportunities?"

19         Do you see that marked?

20  A.      Let's see. Voluntary on-the-job

21  training program?

22  Q.      It's down further.

23  A.      This part. Is there an evaluation

24  process and -- okay.

---

**42**

1  Q.      Yes. But there's an X in the "yes"

2  box. Did you provide that information to

3  Ms. Farnsworth?

4  A.      It would have been the information that

5  would have been given to me by the vice

6  presidents.

7  Q.      Okay. So you didn't get involved in

8  that at all?

9  A.      No.

10  Q.      Okay. Can I see the document?

11         And you didn't discuss this evaluation

12  process with anyone, they just gave you -- the

13  upper management gave you the information, you

14  passed it along to Ms. Farnsworth?

15  A.      Yes, ma'am.

16  Q.      Okay. The next section is

17  "Documentation Provided."

18         MR. KELLY: And I'm sorry. What's --

19  what's the date of the document? Obviously, you

20  made a copy so I --

21         MS. CUNNINGHAM: I'm sorry. I didn't

22  plan on --

23         MR. KELLY: It's okay. I just want to

24  know what we're talking about.

---

**43**

1         MS. CUNNINGHAM: I thought you had one

2  of these. They're all the same. This is the

3  January 25th, 2007 one.

4         MR. KELLY: So this is about two years

5  after Ray's last termination?

6         MS. CUNNINGHAM: Right.

7         MR. KELLY: Okay. Just so we're clear

8  for the record.

9         MS. CUNNINGHAM: We can go through the

10  other ones.

11  Q.      "Documentation Provided," it's got

12  copies of EEO officers' job description, records,

13  reports, analysis and diaries relating to

14  monitoring and action taken as a result of

15  monitoring. Do you see that after documentation?

16  A.      Yes, ma'am.

17  Q.      All right. Did you provide any

18  documentation to Ms. Farnsworth?

19  A.      You've got marked "yes," job

20  description, I would have given her that.

21  Documentation of all employee promotions and pay

22  increases, there would have been a section marked

23  for that. List of employees promoted, there

24  should have been a section for that. And copies

---

**44**

1  of the employment evaluation, there would have

2  been -- there's no mark there at all, so there

3  probably wasn't a section. And the CR1 reports,

4  which are now void, we don't even do that report

5  anymore.

6  Q.      Okay. So I'm sorry. You did give her

7  those -- that documentation that you covered?

8  A.      If it's marked there, there should be

9  documentation in the review.

10  Q.      Okay.

11         - - - - -

12         Thereupon, Deposition Exhibit 1 is marked

13  for purposes of identification.

14         - - - - -

15  Q.      I'm handing you what's been marked as

16  Exhibit 1.

17         If I could have the '07 back to make it

18  easier. Take a few minutes and look at that

19  document.

20  A.      I've never even seen this document.

21         MR. KELLY: Okay. Did you -- Teresa,

22  she's indicating she's never seen portions of this

23  document.

24  Q.      Okay. But does she want to take her

---

Spectrum Reporting LLC                                    614-444-1000

Candace Burke Gales                                    May 14, 2008

---

45

1    time and look through all of it?
2              MR. KELLY:  I just wanted you to
3    understand what she was saying.
4    Q.        Okay.  You've had an opportunity to
5    look at Plaintiff's Exhibit 1.  It was your
6    testimony that you've never seen this document
7    before?
8    A.        No.
9    Q.        Okay.  Will you turn to page 8 --
10   A.        I've never seen this page.
11   Q.        Oh, just the first page.  You've seen
12   the rest of it but never the first page?
13   A.        This is the part of the compliance
14   review that I never -- I never receive this whole
15   entire outline complete.
16   Q.        Okay.  I don't understand.  So you've
17   only seen parts of it?
18   A.        Yes.
19   Q.        Okay.  Could you turn to page 8,
20   please.  Now, this is the page that we were
21   talking about in the '07 that talks about
22   documentation provided.
23   A.        Uh-huh.
24   Q.        Now, under the section marked

---

46

1    "Documentation Provided," it's got an X in front
2    of copies EEO officers' job description, records,
3    reports, analysis and diaries relating to
4    monitoring and action taken as a result of
5    monitoring.  Did you physically provide those
6    documents to Ms. Farnsworth?
7    A.        This is from 2005.  I believe so.
8    Q.        So would you have those documents in
9    your office or would someone from upper management
10   give them to you and you would give them to Ms.
11   Farnsworth?
12   A.        Based on my job description, records,
13   reports.  The diaries would have come from upper
14   management.  If I had an on-site where there was
15   an issue or a problem, then she would have had it,
16   it would have been attached.
17   Q.        Okay.  The next section is
18   documentation of all field employees, promotion
19   and our pay increases, and that's marked.  Would
20   you have given Ms. Farnsworth this documentation?
21   A.        I would have given her the
22   documentation, but it wouldn't have come from me.
23   Q.        It would have come from personnel?
24   A.        It would have come from upper

---

47

1    management.
2    Q.        Oh, you didn't have a personnel
3    department then?
4    A.        Yes.
5    Q.        So it would be upper management?
6    A.        Yes.
7    Q.        Okay.  The next one is list of
8    employees promoted, that's marked.  You would have
9    given Ms. Farnsworth documentation of employees
10   that were promoted?
11   A.        If there were any.
12   Q.        Correct, if there were any.  Or you
13   would give her the documentation.  But you didn't
14   come up with that documentation --
15   A.        No.
16   Q.        -- upper management did?
17   A.        Yes, ma'am.
18   Q.        All right.  What about the copies of
19   the CR1 reports, would you have given those to
20   Ms. Farnsworth?
21   A.        Yes, ma'am.
22   Q.        Did you create those or did those come
23   from upper management?
24   A.        They're computerized.

---

48

1    Q.        They're computerized.  But did you
2    create them?
3    A.        I hit a button.
4    Q.        You hit a button?
5              Okay.  You input the information?
6    A.        No, ma'am.
7    Q.        A clerk somewhere does?
8    A.        It comes out of payroll.
9    Q.        Okay.  Do you guys have a copier that I
10   can make copies?  Let's go off the record.
11             (A short recess is taken.)
12             - - - - -
13             Thereupon, Deposition Exhibit 2 is marked
14   for purposes of identification.
15             - - - - -
16   Q.        Okay.  We're back on the record.
17   Before we go there, you talked about this Internet
18   posting of job openings.  When did that start?
19   A.        2008.
20   Q.        2008.
21             So it would be fair to say prior to
22   2006, 2005 backwards, there was no Internet
23   posting of jobs?
24   A.        Prior to?

---

49

```
1    Q.        2006.
2    A.        No.
3    Q.        Prior to 2008 there wasn't?
4    A.        No.
5    Q.        What month of this year did it start?
6    A.        I don't recall.  It comes out of HR.
7    January, December, something like that.
8    Q.        Okay.  In 2003, 2004 and 2005 where
9    were jobs posted?  First of all, were they?
10   A.        They just started the Internet process.
11   They were posted internally through the -- it
12   comes out of HR.  I -- I don't know when they
13   started or even how they did it.
14   Q.        Okay.  If I understood your testimony,
15   though, during those years there wasn't even a
16   personnel department?
17   A.        There wasn't.
18   Q.        So I don't understand how it could come
19   out.  Just focus on 2003, 2004, 2005.  There
20   wasn't a personnel department --
21   A.        There wasn't a personnel department,
22   no.  We --
23   Q.        So were jobs --
24   A.        We just had a person monitoring the
```

50

```
1    activity through payroll, so nothing was going out
2    on the Internet.  I -- I can't answer that
3    question.  I don't know.
4    Q.        So you don't know if jobs were posted
5    in 2003, 2004 or 2005?
6    A.        Well, when you talk about "posting,"
7    like, posted through the Internet?
8    Q.        No.  I mean, you had testified they
9    were posted at the office, the home office or the
10   region's office and on the Internet.  Now I'm
11   asking you during 2003, 2004 and 2005, were job
12   openings posted, albeit, were they put some place
13   so an employee would have access to them?
14   A.        You're giving -- the years, I don't
15   know what the years -- what the dates were.  So if
16   you're going to give me 2003, 2004, 2005, I don't
17   know.  We had a bulletin board in the front of the
18   office where the -- you might call her the manager
19   was putting postings internally in there.  But
20   that was not for construction, it was for
21   internal.
22   Q.        What are you calling "internal"?
23   A.        Nonunion.
24   Q.        Nonunion positions or nonunion
```

51

```
1    employees to have access to?
2    A.        Interoffice.
3    Q.        So you're saying jobs were posted on
4    this bulletin board for positions that were
5    nonunion?
6    A.        Interoffice positions.
7    Q.        What do you mean, like secretaries?
8    A.        I'm construction, yes.
9    Q.        Secretaries, office work?
10   A.        Right.
11   Q.        So there was nothing posted for foreman
12   positions?
13   A.        I don't know.  That would not be my
14   area.
15   Q.        But would it be fair to say to your
16   knowledge there wasn't?
17   A.        To my knowledge.
18   Q.        Okay.  And just so I understand your
19   testimony, that was prior to 2008, because now you
20   have this Internet --
21   A.        Yes, ma'am.
22   Q.        Okay.  How many -- and if you don't
23   remember because it's been several years -- in
24   2005 do you know how many foreman positions there
```

52

```
1    were at The Shelly Company?
2    A.        Were?
3    Q.        Yes.
4    A.        How many foremen do we have in two
5    thousand --
6    Q.        And five.
7              MR. KELLY:  Are we talking companywide
8    or Thornville or what are we talking about?
9    Q.        Well, this -- it's a nebulous issue.
10   A.        I don't monitor those numbers.
11   Q.        So you have no idea?
12   A.        I wouldn't know.
13   Q.        Okay.
14   A.        I don't look at those numbers.
15   Q.        Who would have been looking at those
16   numbers in 2005?
17   A.        The individual division's VPs.
18   Q.        The VPs?
19   A.        Uh-huh.
20   Q.        Okay.  All right.  We've handed you
21   what's been marked Plaintiff's Exhibit 2.  If you
22   could take a look at that document, please.
23   A.        I don't know what this is.
24   Q.        Okay.  I'm going to ask you some
```

53

1  questions about it.  If you could just take a few
2  minutes to look at it.  And if you've never seen
3  the document, that's fine.
4  A.        I've never seen this document.
5  Q.        You've never seen this document, okay.
6          This is a State of Ohio Department of
7  Administrative Services EEO Division Construction
8  Compliance Review Report?
9          MR. KELLY:  Are you representing that
10  to us?
11          MS. CUNNINGHAM:  It's on the document.
12  If you would look at the top of the document, I'm
13  telling her what the document is.
14  Q.        And it's dated 2-20 of '03.
15          MR. KELLY:  I'm sorry.  I understand
16  that's what the title of the document is there.
17  But are you representing for the record that
18  that's what it is?  I mean --
19          MS. CUNNINGHAM:  It's my understanding
20  that's what it is.  I wasn't there, I didn't
21  create it.
22          MR. KELLY:  You're testifying to it.
23          MS. CUNNINGHAM:  No.  I'm telling her
24  what it is.  She said she had no idea what it is.

54

1  I don't know if she didn't see that doc --
2  A.        I've never seen this.
3  Q.        Okay.  That's fine.
4  A.        I read it.  I don't know what it is.
5  Q.        All right.  The review date is
6  2-20 of '03, and there's an EEO officer name of
7  Stacy Wooten.  Do you know Ms. Wooten?
8  A.        Yes.
9  Q.        Okay.  Do you recall her -- okay.  Do
10  you recall meeting with Ms. Wooten in 2003 to do
11  the State of Ohio's compliance review?
12  A.        In 2003.  I can testify that I have
13  talked to her.  What date that I met with her, I
14  don't have any idea.
15  Q.        Okay.
16  A.        I'd have to go back and see my report.
17  Q.        Okay.  That's fine.
18  A.        I've never seen this report.
19  Q.        Would it be fair to say, though, that
20  you met with Ms. Wooten at least once?
21  A.        Well --
22  Q.        I'm sorry.  Was that yes?
23  A.        I would say once.
24  Q.        Did you meet with her more than once?

55

1  A.        Not that I recall.
2  Q.        Okay.  On the second page of that
3  document, it reflects that the review was
4  conducted at The Shelly Company on 2-20-03 at
5  10:30 a.m.  The following persons were in
6  attendance:  Candace Burke Gales and Stacy Wooten.
7  Does that refresh your recollection?
8  A.        I don't know what the date was.
9  Q.        Okay.  So you're not sure if 2-20 of
10  '03 is the correct date?
11  A.        I have no clue without my file --
12  Q.        Okay.
13  A.        -- because I've never seen this.
14  Q.        Are you generally given copies of the
15  State of Ohio's Department of Administrative
16  Services Contract Compliance Review?
17  A.        We get a letter of compliance.
18  Q.        You just get a letter, you never get
19  the actual report?
20  A.        Right.
21  Q.        Okay.  Would it be fair to say that you
22  would have given the information to Ms. Wooten to
23  complete this report just as you had given
24  information to Ms. Farnsworth with ODOT?

56

1  A.        Yes.
2  Q.        Okay.  If you would turn to -- well,
3  these pages aren't numbered.  Turn to page 7,
4  please.
5  A.        Affirmative action program?
6  Q.        No.  The one that's in Section 4,
7  Company Personnel Operation, it's at the top.
8  A.        Okay.
9  Q.        Under 24 it says -- it identifies you
10  as the contract EEO officer.
11  A.        Yes, ma'am.
12  Q.        Okay.  And No. 25 it says, "Does the
13  contractor maintain copies of each employee's
14  performance and other employee evaluations in
15  their personnel files?"  And it's marked "yes."
16  Do you see that?
17  A.        I see it, yes.
18  Q.        Okay.  That would not be a true --
19  A.        I didn't mark --
20  Q.        -- answer, correct?
21  A.        I didn't mark "yes."
22  Q.        I'm not saying that you marked it.  But
23  that's not true, is it?
24  A.        This is 2003.  Mark Shelly, no, that's

57

```
 1   not a correct answer.
 2   Q.        If you could turn to the third page
 3   from the end under Section 7.
 4   A.        Employment Utilization Information?
 5   Q.        Yes.  Do you see you under No. 40,
 6   where you state, "Personnel files for all files
 7   were reviewed on site."  And it's marked "yes."
 8   That would be -- that wouldn't be a true answer
 9   either, would it?
10   A.        I see it.  I didn't mark it.
11   Q.        I'm not saying you marked it.  I'm just
12   saying it's not a true answer?
13   A.        That would be correct, yes.
14   Q.        Okay.  So all you get from the State of
15   Ohio DAS Department is a letter saying you're
16   either in compliance or you're out of compliance?
17   A.        Yes, ma'am.
18   Q.        All right.
19                     - - - - -
20          Thereupon, Deposition Exhibit 3 is marked
21   for purposes of identification.
22                     - - - - -
23   Q.        Let's mark this as Exhibit 3.  I'm
24   handing you what's been marked Plaintiff's Exhibit
```

58

```
 1   No. 3.  If you would like to take a few minutes to
 2   look at that document.  Did you complete this
 3   document?
 4   A.        Yes, ma'am.
 5   Q.        Explain this document to me because I
 6   don't understand it.
 7   A.        It's an on-site construction employment
 8   data report for the period of July 30th, it's a
 9   PR1391.  A PR1391 is a report that's filed to the
10   federal government in Washington, D.C.  It covers
11   only the height of construction season, which is
12   what the feds in Washington consider the height of
13   construction season, which is one week in July
14   that contains the 15th, as per the 23CFR.
15   Q.        Okay.  Is this Shelly overall?
16   A.        No.  It's for the height of
17   construction season for one week only under the
18   PR1391 regulation that covers the week with the
19   15th pay period in it.
20   Q.        No.  I understand that.  But my
21   question is:  Do these statistics cover the entire
22   Shelly Company or one of the divisions?
23   A.        It would have covered all work for that
24   period of time.
```

59

```
 1   Q.        Okay.  So it would cover all of the
 2   construction projects?
 3   A.        For that period of time.
 4   Q.        Yeah, I understand.
 5   A.        Federal.
 6   Q.        I understand.
 7   A.        So not all construction projects.
 8   Q.        Only the federal construction projects,
 9   okay.
10          Would it be fair to say the federal
11   construction projects have foremen?
12   A.        All projects have foremen.
13   Q.        All projects, okay.  That's why I was
14   curious because this form under No. 3 where it
15   says foremen, it doesn't have any numbers in that
16   category.
17   A.        Okay.  This report is pulled off of the
18   payroll.  Those numbers that you're asking for
19   foremen are under management payroll, they do not
20   show up in this particular report.
21   Q.        Okay.  Well, under No. 2 supervisors it
22   does show up.
23   A.        Supervisors are put in by hand because
24   they are listed as supervisors, two per each
```

60

```
 1   division.
 2   Q.        But you don't put the foremen in by
 3   hand?
 4   A.        No, ma'am.
 5   Q.        So the feds weren't told how many
 6   foremen were on the job or what their races were?
 7   A.        For that period of time for that height
 8   of construction season.
 9   Q.        Right.
10          Would it be fair to say that that was
11   not required is why it wasn't done?
12   A.        It's not asked for, so --
13   Q.        It's not asked for.  But --
14   A.        So we don't give it to them.
15   Q.        -- you put the supervisors --
16   A.        Yes, ma'am.
17   Q.        I'm assuming all the supervisors were
18   white, correct?
19          MR. KELLY:  I'm sorry.  Are you asking
20   if --
21   Q.        From this form, I'm assuming all the
22   supervisors were white.
23   A.        It shows there that they are, yes,
24   ma'am.
```

61

1              - - - - -
2              Thereupon, Deposition Exhibit 4 is marked
3    for purposes of identification.
4              - - - - -
5    Q.        I'm handing you what's been marked as
6    Plaintiff's Exhibit No. 4.  If you would take a
7    few minutes and look at that document.
8              Okay.  Now this document says it's
9    "Revised" at the top.  Would it be fair to say
10   that this is just a revision of Exhibit No. 3?
11   A.        For 2004, July 30th, this is Exhibit 1
12   -- Exhibit 3 was part -- went into the review
13   process, and it just -- I believe it had to be
14   transcribed off of this report and put on their
15   report.
16   Q.        Okay.  Is that your signature at the
17   bottom of Exhibit 4?
18   A.        Yes, ma'am.
19   Q.        Okay.  And it -- same reason why
20   foremen or, slash, women was not filled in?  It
21   wasn't hand entered.
22   A.        It was 2004, and I believe at that time
23   it wasn't required.
24   Q.        Okay.  What does that mean foremen,

62

1    slash, women?  Only women that are foremen or does
2    it cover foremen and women?
3    A.        It would -- you break it down in the
4    category, the total number and then whether they
5    were women or not.  And this form has, I believe,
6    since been revised since 2004 to read something
7    different also.
8    Q.        Okay.  Just so I'm understanding, so
9    foremen/women blank wasn't required, and it
10   doesn't mean women that are foremen, it means
11   either women or foremen?
12   A.        Well, you would have to ask ODOT about
13   that.
14   Q.        No.  I'm just trying to understand the
15   form.
16   A.        We have trouble understanding them too.
17   Q.        All right.
18             MR. KELLY:  I would assume it's
19   intended to be gender neutral language, foremen,
20   forewomen.
21             MS. CUNNINGHAM:  Oh, no, it says
22   foremen.
23             MR. KELLY:  Slash, women.
24             MS. CUNNINGHAM:  Oh, I see.  But does

63

1    that mean they're in supervisory positions or does
2    that mean they're actually just women in
3    supervisory positions?
4              MR. KELLY:  I intended -- it's intended
5    to mean some sort of non-offensive gender
6    reference to foremen.
7              MS. CUNNINGHAM:  Oh, okay.
8              MR. KELLY:  Being it breaks out women
9    separately, I would be pretty confident in that
10   analysis.
11   Q.        Are you familiar with the individuals
12   who were foremen in '04?
13   A.        I believe so.
14   Q.        Okay.
15             - - - - -
16             Thereupon, Deposition Exhibit 5 is marked
17   for purposes of identification.
18             - - - - -
19   Q.        I'm handing you what's been marked
20   Plaintiff's Exhibit No. 5.  Would you like to take
21   a few minutes to look at it?  No?  You're familiar
22   with it?
23   A.        Uh-huh.
24   Q.        Okay.  Now, this says it's management

64

1    training and the instructors are Paul, Gales and
2    Nebbergall.  Is Candace Gales -- that's you?
3    A.        Yes, ma'am.
4    Q.        And it's dated 4-16-04.  Of these four
5    pages, can you tell me which individuals were
6    foremen and their races?
7    A.        Oh, no.
8    Q.        Oh, that you can't?
9    A.        No.
10   Q.        Okay.  You're not familiar with who was
11   a foreman in '04?
12   A.        I don't know all their names.
13   Q.        Oh, you only know them by faces?
14   A.        Faces.
15   Q.        So you don't know if Scott Cooperrider
16   was a foreman?
17   A.        Scotty Cooperrider is a foreman.
18   Q.        What's his race?
19   A.        He's white.
20   Q.        Okay.  Any other name you recognize on
21   there that's a foreman and their race?
22   A.        Dale Trainer, I don't know whether he's
23   a foreman or superintendent.  He's white.  He
24   retired.

Candace Burke Gales                                    May 14, 2008

```
                                              65
1   Q.        When did he retire?
2   A.        A couple years ago.  I don't recall.
3   Q.        Okay.
4   A.        Ed Wilson is a superintendent.  He does
5   call-outs.  He's white.  Richey Boring, foreman,
6   white.  Tony Barnes is the vice president, white.
7   Q.        I'm sorry.  He's the VP?
8   A.        He's the VP.
9   Q.        How about Richard Boring?
10  A.        He's on here twice.
11  Q.        Oh, Richey is the same as Richard?
12        MR. SHARRETT:  Son and father.
13  A.        I don't know who the -- I don't know
14  why he's on there twice.  I don't know -- if I see
15  Richey Boring, I know Richey.  I don't know
16  Richard.
17  Q.        Okay.
18  A.        Unless that's the surname for Dick, and
19  he would be a foreman, white.
20            This is 2004.  Reagan Sharrett,
21  foreman.
22  Q.        Is he related to Rob Sharrett?
23  A.        Yes.
24  Q.        Son?
```

```
                                              66
1   A.        Brother.
2   Q.        Brother.
3   A.        Kevin West, white, foreman.  Donald
4   Mayle, black, foreman.
5   Q.        Hold on a second.  You're going too
6   fast for me.  Kevin West, where is this name?
7   What page?
8   A.        Three above page 3 above Donald Mayle.
9   Q.        Oh, okay.  Jeremy West?
10  A.        No.  Kevin.
11  Q.        I'm sorry?
12  A.        Page 2 --
13  Q.        I'm on page 3.
14  A.        -- on the bottom.
15  Q.        I'm on page 3.  Oh, okay.  He's a
16  foreman, he's white?
17  A.        Yes.  And then Donald Mayle.  Donnie
18  Mayle is the bottom one, black.  Tim Anderson is
19  the superintendent.
20  Q.        Is he white?
21  A.        Yes.
22            Jeff Barnes, foreman, American Indian.
23  Ben Koehler is the vice president.  Ron Sharrett
24  is a vice president.  Doug Radabaugh is a chief ex
```

```
                                              67
1   -- I mean, a chief financial officer.  Mark Cox,
2   vice president, I think white.  And Dan Montgomery
3   would have been the president.  Off the top of my
4   head, that's -- I don't know some of these
5   gentleman's title.
6   Q.        You don't know them?
7   A.        Some of these gentleman's titles.
8   Q.        Okay.
9   A.        If I haven't read their names, I don't
10  know what their titles are.
11  Q.        Okay.  Would it be fair to say out of
12  all the people on this list that the only
13  minorities were Donald -- is it Maley?
14  A.        Mayle.
15  Q.        Mayle and Jeff Barnes?
16  A.        I'm on there.
17  Q.        Okay.  You don't count, though.  You're
18  the instructor.
19  A.        No, we weren't the instructors.
20  Q.        Oh, it says instructor up here Paul,
21  Gales and Nebbergall.  You didn't teach?
22  A.        We were the management sponsoring the
23  event.  It was a Fred Pryor class.
24  Q.        Okay.
```

```
                                              68
1   A.        Fred Pryor came in and conducted the
2   class.
3   Q.        Oh, it doesn't say that.
4   A.        They were hired by us to come in and do
5   a management class.  We were also part of the
6   audience, but we were the welcoming committee that
7   stood there and said thank you for coming.  Fred
8   Pryor taught the class, their representative.  We
9   were also part of the audience.
10  Q.        Okay.  It doesn't say that.  Sorry for
11  the misunderstanding.
12  A.        But that's what it was, that's --
13  Q.        That's --
14  A.        -- why I put Fred Pryor down there, so
15  we would know when we pulled these what happened
16  at that meeting.  It was a Fred Pryor class, which
17  we had arranged over the Internet with Fred Pryor
18  to come in and conduct these management classes.
19  Q.        Okay.  So it would be fair to say out
20  of all the people listed on here including you
21  there were three minorities?
22  A.        Yes, ma'am.
23  Q.        Okay.
24  A.        To the best of my knowledge, unless I'm
```

Candace Burke Gales                                                          May 14, 2008

69

1   missing somebody that I don't know.
2   Q.       Okay.  Are you involved in The Shelly
3   Company's affirmative action plan?
4   A.       I assist in putting it together.
5   Q.       All right.  Is it one of your job
6   duties to see that The Shelly Company complies
7   with its affirmative action plan?
8   A.       Yes, ma'am.
9   Q.       Okay.  Exhibit 6.
10                  - - - - -
11             Thereupon, Deposition Exhibit 6 is marked
12  for purposes of identification.
13                  - - - - -
14  Q.       I'm handing you what's been marked
15  Plaintiff's Exhibit 6.  Would you like to take a
16  few minutes and look through that document?
17             Would it be fair to say that one of the
18  goals of the affirmative action plan is to promote
19  without regard to race?
20  A.       Yes, ma'am.
21  Q.       Okay.  In your opinion has Shelly
22  Company met that goal?
23             MR. KELLY:  Objection.
24  Q.       You may answer.

70

1   A.       It has been left up to upper management
2   to comply with that part of the affirmative action
3   plan, and if there's been an opening.
4   Q.       But the question was:  In your opinion
5   have they met the goals of the plan?
6             MR. KELLY:  Objection.
7   A.       Yes.  I believe they've attempted to.
8   Q.       They've attempted to or have they met
9   it?
10  A.       Uh-huh.  I think they've met it.
11  Q.       How have they met it?
12  A.       Well, we do not discriminate.  If
13  there's an opening, I'm sure that the upper
14  management has attempted to fill those positions
15  with whoever the best qualified people were.  I
16  don't participate in that process.
17  Q.       And you've never discussed it with
18  them?
19  A.       I have talked to the vice presidents
20  about certain areas before, but I don't get into
21  that area.  If somebody comes to me, I will refer
22  it to them; and I let them know every construction
23  season that I will do that if somebody asks me
24  about it.

71

1   Q.       Okay.  So you've never gone to them and
2   gone over the number of foremen that there are or
3   the number that's minorities and whether there are
4   any openings and who they are considering?
5   A.       I do not monitor those numbers.
6   Q.       Okay.  But it's your opinion they're in
7   compliance?
8   A.       Yes, ma'am.
9   Q.       Would it be fair to say that you hold
10  an annual foreman's back-to-work meeting?
11  A.       Yes, ma'am.
12  Q.       Okay.  So you're pretty familiar with
13  all the foremen?
14  A.       No.  The foremen come to the meeting
15  just like the employees do.  I do not monitor the
16  employee -- the employment of the foremen and
17  they're not part of my numbers.
18  Q.       It's one of your job duties to hold
19  annual foremen's meetings, correct?
20  A.       It's part of several peoples' duties,
21  yes.
22  Q.       So I'm assuming if you would hold the
23  meetings, you would be familiar with who the
24  foremen are?

72

1   A.       I walk into the room --
2             MR. KELLY:  That's actually not a
3   question.  I mean, she's just telling you what she
4   assumes.  Wait for her question.
5   Q.       Is that a correct assumption?
6   A.       That I would know them by name?
7   Q.       Yes.
8   A.       No.
9   Q.       Okay.  How many foremen does -- between
10  2003 and 2005 did The Shelly Company employee?
11  A.       Oh, I don't have a clue.
12  Q.       When you have these meetings, were they
13  large meetings?
14  A.       Yes, ma'am.
15  Q.       Were there 100 people there?
16  A.       500.
17  Q.       There were 500 foremen working for The
18  Shelly Company?
19  A.       No.  Everybody comes to the
20  back-to-work meetings.
21  Q.       Oh, okay.  So it would be incorrect
22  then to say that you hold an -- one of your job
23  duties is to hold an annual foremen's meeting?
24  A.       We -- the group that are responsible

Spectrum Reporting LLC                                                       614-444-1000

73

1  for it, like the people that are on this list,
2  hold a back-to-work meeting. Annual foreman's
3  meetings are held by upper management.
4  Q.        So it's not one of your job duties?
5  A.        And I don't attend those meetings
6  because they're at my back to work meeting with
7  all the other employees. There are two separate
8  meetings.
9  Q.        Okay. Let's mark this as Exhibit 7.
10                    - - - - -
11            Thereupon, Deposition Exhibit 7 is marked
12  for purposes of identification.
13                    - - - - -
14  Q.        Have you seen this document before?
15  A.        Uh-huh.
16  Q.        Okay. Would it be correct to say that
17  that outlines your job duties?
18  A.        Yes, ma'am.
19  Q.        So we're halfway down the page where
20  it's got holds annual foreman's meetings back to
21  work meetings. It's -- you're saying that there
22  are two separate meetings, you don't handle the
23  foreman's meetings, or they're all combined?
24  A.        I would say that that "holds annual

74

1  foreman's meetings back to work meetings" is a
2  sentence that needs to be corrected. The foremen
3  are at the manual back to work meeting.
4  Q.        Oh, okay. So you just --
5  A.        And there could be foremen that would
6  walk in the door and I wouldn't have any idea that
7  they're even foremen.
8  Q.        So there's no separate meeting for
9  foremen?
10  A.        Yes.
11  Q.        Okay. When The Shelly Company has the
12  union send over an individual, do they fill out an
13  application?
14  A.        No.
15  Q.        Who fills out applications?
16  A.        The general workforce.
17  Q.        But not a union employee?
18  A.        They come from the union. They filled
19  out their application at the union.
20  Q.        Oh, okay. I'm --
21  A.        At the union hall, because we're --
22  Q.        I understand.
23  A.        Oh, okay.
24  Q.        I understand.

75

1            You said that there's now a personnel
2  department and they've started keeping personnel
3  files. Is it your understanding they now have
4  personnel files on union employees?
5  A.        I -- no.
6  Q.        They still don't?
7  A.        They wouldn't have them on the union
8  people because the union's personnel file is at
9  the union.
10  Q.        Okay. So if a union employee comes to
11  the job site, there's a problem, whatever reason,
12  and they're fired, they're just fired and there's
13  no documentation reflecting that?
14  A.        Yes. The legal department would keep
15  that documentation.
16  Q.        So there's just documentation on being
17  fired, there's no documentation on being hired or
18  rates of pay or promotions or anything like that?
19  A.        We would have it in our payroll system.
20  Q.        You would just have the rates of pay in
21  the payroll system?
22  A.        Dates, times.
23  Q.        But any other documentation wouldn't
24  exist?

76

1            MR. KELLY: Other than what she has
2  described to you.
3            MS. CUNNINGHAM: Right.
4            MR. KELLY: Again --
5  Q.        I just want to know what documentation
6  the company has on union employees. And it seems
7  you don't have any, other than if there's a
8  problem and they're terminated, you've got
9  probably one piece of paper or whatever --
10            MR. KELLY: Other than what she has
11  already described to you.
12  Q.        Well, she hasn't described any other
13  for union employees that I understand.
14  A.        The union would have --
15  Q.        I mean payroll --
16  A.        -- a file, payroll --
17  Q.        I'm talking about what would go in a
18  personnel file. As I understand it, the payroll
19  would have all of the salary information --
20  A.        Right.
21  Q.        -- in the computer?
22  A.        Right, dates, termination dates.
23  Q.        Right. Just --
24  A.        Just promotional dates.

Candace Burke Gales                         May 14, 2008

77

```
1   Q.        -- salary information?
2   A.        Salary changes.
3   Q.        Right.
4   A.        And if you file a complaint, then we
5   would create a file.
6   Q.        Oh, okay.  So --
7   A.        But that's through the legal
8   department.
9   Q.        Okay.  So if I understand this, then,
10  the payroll department would have all information
11  regarding employees' rates of pay and promotion?
12  A.        That's what's pulled into those
13  reports, that's how the reports are generated.
14  Once they're promoted or become management,
15  they're not in the payroll system anymore.
16  Q.        But the payroll system should be able
17  to track individuals from when they were hired,
18  the rates of pay, whether or not they got a
19  promotion, and the new rate of pay?
20  A.        Yes, ma'am.
21  Q.        Would it also be able to track their
22  race?
23  A.        Yes.  It comes out on that report you
24  just gave me.
```

78

```
1   Q.        Let's mark this as Exhibit 7.
2             MR. KELLY:  8.
3             THE REPORTER:  8.
4                  - - - - -
5             Thereupon, Deposition Exhibit 8 is marked
6   for purposes of identification.
7                  - - - - -
8   Q.        Have you seen this document before?
9   A.        Uh-huh.  Yes, ma'am.
10  Q.        Are you familiar with it?
11            If you could turn to the fifth page.
12  A.        This page?
13  Q.        Yes.
14  A.        Okay.
15  Q.        In the column marked
16  Foreman/Supervisors, are you familiar with these
17  individuals?
18  A.        Yes.
19  Q.        Okay.  Scott Cooperrider, we've
20  discussed him, he's Caucasian, correct?
21  A.        Yes, ma'am.
22  Q.        Do you recall when he became a foreman?
23  A.        Oh, I have no idea.
24  Q.        Okay.  Dave Scott, is he Caucasian?
```

79

```
1   A.        Yes.
2   Q.        Do you know when he became a foreman?
3   A.        No.
4   Q.        David Gentil, is he a foreman or a
5   supervisor?
6   A.        He's a foreman.
7   Q.        He's a foreman.  He's Caucasian?
8   A.        Yes.
9   Q.        Do you recall when he became a foreman?
10  A.        No.
11  Q.        Lambert, is that a first or last name?
12  A.        That would be Thomas.
13  Q.        Thomas, is he Caucasian?
14  A.        Yes.
15  Q.        When did he become a foreman?
16  A.        I don't know.
17  Q.        James McManaway, is he Caucasian?
18  A.        To the best of my knowledge, yes.
19  Q.        Do you know when he became a foreman?
20  A.        No.
21  Q.        Shane Novark, is he Caucasian?
22  A.        Yes.
23  Q.        Do you know when he became a foreman?
24  A.        No.
```

80

```
1   Q.        Regan Sharrett, he's Caucasian?
2   A.        Yes.
3   Q.        Do you know when he became a foreman?
4   A.        No.
5   Q.        Richey Boring, he's Caucasian?
6   A.        Yes.
7   Q.        Do you know when he became a foreman?
8   A.        No.
9   Q.        Mark Potts, is he Caucasian?
10  A.        Yes.
11  Q.        Do you know when he became a foreman?
12  A.        No.
13  Q.        Explain this document, this whole group
14  of documents.  Is this -- if you turn to the
15  previous page, it's got county and it looks like
16  "Fair."  Do you know what that stands for?
17  A.        It would be Fairfield County.
18  Q.        Fairfield, Coshocton, I'm assuming?
19  A.        Yes.
20  Q.        And then is it Licking County?
21  A.        Licking County.
22  Q.        Are those in the Thornville Division?
23  A.        Yes.
24  Q.        This is dated 2-8 of '05.  Are these
```

81

1   all the projects that were in the Thornville
2   Division?
3   A.        With the review, I believe those are
4   the three projects that were targeted.
5   Q.        Oh, just targeted.  So there are other
6   projects?
7   A.        Yes.
8   Q.        Okay.  Do you know how many projects
9   there were during this time period?
10  A.        No.
11  Q.        Okay.
12                       - - - - -
13            Thereupon, Deposition Exhibit 9 is marked
14  for purposes of identification.
15                       - - - - -
16  Q.        I'm handing you what's been marked
17  Plaintiff's Exhibit No. 9.  Are you familiar with
18  this document?
19  A.        Yes.
20  Q.        Is this your signature on the second
21  page?
22  A.        Yes.
23  Q.        Does this mean that you created the
24  document?

82

1   A.        No.
2   Q.        What does your signature mean?
3   A.        It means that I was part of the
4   process.  Each year it has to be copied and mailed
5   to the various state and federal agencies.  It was
6   actually written before I ever came to The Shelly
7   Company.  And it just gets updated with
8   information year to year.
9   Q.        Oh, okay.  And then they change it,
10  supplement to affirmative action plan, change the
11  years?
12  A.        Yes.
13  Q.        Okay.  At the bottom of the first page
14  it reads, "Where possible, we will participate in
15  programs such as 'Training Incentive Program' to
16  improve the management skills of minority and
17  women firms."
18            Does this mean you will only work --
19  The Shelly Company works only to improve the
20  management skills of minority and women firms or
21  employees?
22  A.        They're subcontractors that we're
23  referring to.
24  Q.        So you are talking about subcontractors

83

1   there?
2   A.        Right.
3   Q.        Okay.  On the second page, the first
4   partial paragraph says, "We will -- I don't know
5   if you can -- if you found that.  It says, "We
6   will continue our company and union programs to
7   train and upgrade minorities and females."
8            What company programs are there to
9   train and upgrade minorities and females?
10  A.        Our on-the-job training program.
11  Q.        Is that it?
12  A.        Yes, because these people come from the
13  union.
14  Q.        Right.  Those are the four slots we
15  talked about?
16  A.        Right.
17  Q.        There are no other programs?
18  A.        No.
19  Q.        Okay.  The next paragraph reads, "We
20  will maintain a file of all applicants applying
21  for work with our company."
22            To your knowledge, does the company
23  maintain a file of all applicants?
24  A.        In 2005?

84

1   Q.        Yes.
2   A.        No, we weren't.
3   Q.        No.  Okay.
4            MR. KELLY:  Thank you.
5                       - - - - -
6            Thereupon, Deposition Exhibit 10 is marked
7   for purposes of identification.
8                       - - - - -
9   Q.        I'm handing you what's been marked as
10  Plaintiff's Exhibit No. 10.  And this is an e-mail
11  and it's got from Beth Mowrey to, and there's a
12  number of people and your name is mentioned in
13  there.  The subject is a Draft Agenda for the 2005
14  foreman's meeting.  Did you recall that 2005
15  foreman's meeting?
16  A.        This e-mail was written in 2004.  I
17  don't have a clue.
18  Q.        I'm sorry.  2004.  You don't recall --
19  was there a -- oh, I see.  This is the same
20  foreman's meeting we discussed, it's that large
21  meeting, there's still no separate meeting?
22  A.        There is a back-to-work meeting where
23  all employees and the foremen attend per each
24  division.  And then the vice presidents have their

85

1  own foreman's meeting per their divisions.
2  Q.       So this was one of the VPs foreman's
3  meetings, not yours?
4  A.       Based on the date of 2004, I'd have to
5  go back and look at my notes to see if it was an
6  actual foreman's meeting or it was an all out
7  employees back to work.
8  Q.       Okay.  Where it says "to" and all of
9  these people are copied, are any of those people
10 in there foremen?
11 A.       No.
12 Q.       Are they all VPs?
13 A.       No.
14 Q.       We know who Dan Montgomery and Paul
15 Rice are.  What about Jim Tharp, I think we've
16 discussed him, too, already today, haven't we?
17 A.       No.  No.
18 Q.       No, we haven't.  What position is Jim
19 Tharp in?
20 A.       He used to be the vice president of the
21 Cincinnati Division, which is now -- it no longer
22 exists.  And I believe he's the vice president of
23 liquid.
24 Q.       Okay.  What about Paul, is it,

86

1  Prottengeier?
2  A.       Paul Prottengeier.
3  Q.       Prottengeier?
4  A.       He is -- I don't know Paul's job title.
5  Q.       Are these all upper level people?
6  A.       Yes.
7  Q.       Higher than foreman?
8  A.       Yes.
9  Q.       Okay.
10                  - - - - -
11        Thereupon, Deposition Exhibit 11 is marked
12 for purposes of identification.
13                  - - - - -
14        MR. KELLY:  Thank you.
15 Q.       I'm handing you what's been marked
16 Plaintiff's Exhibit No. 11.  This is a City
17 Contract Compliance Review Form.  Have you ever
18 seen this form before?
19 A.       I -- yes.
20 Q.       Okay.  Did you enter all the figures or
21 provide the numbers for the first page for the
22 statistics, or did you just give them to the
23 compliance officer and they prepared all of this?
24 A.       We contact payroll, this is a report,

87

1  interoffice report that was written and the
2  numbers come up on my screen from payroll.
3  Q.       Okay.  When it's got under the number
4  of employees, it doesn't have a section for --
5  unless it's under officials and managers for
6  foremen.  Are foremen included in the officials
7  and managers box?
8  A.       I need to explain this report.
9  Q.       Okay.  Go ahead.
10 A.       Because this is not the data that
11 you're looking at.
12 Q.       Oh, okay.
13 A.       This is 162.
14 Q.       Oh, okay.  Explain.
15 A.       This report is normally only done for
16 cities and where we have private work, and they
17 require you list officials, managers,
18 professionals, similar to the EEO1 report.  We
19 wrote this report internally to give cities such
20 as City of Cambridge, City of Zanesville, the City
21 of Toledo that data because they would not accept
22 the federal and the state required reports, so we
23 created our own report.  These numbers are coming
24 from part of construction and part of the plants

88

1  in the quarries that furnish the material that go
2  to the jobs.  So the numbers will be skewed from
3  the official final report, because that's not
4  where the data comes from.
5  Q.       Okay.  But would it be fair to say that
6  the foremen are included in officials and
7  managers?
8  A.       Yes, it would.  But it's coming from
9  also the plants' and the quarries' operations,
10 which is a different payroll.  And --
11 Q.       Are you talking -- plants and quarries
12 then be a different part of Shelly?
13 A.       Yes.
14 Q.       Okay.  So it's not just construction?
15 A.       Yes, ma'am.
16 Q.       Okay.  So would it be fair to say that
17 the numbers would be higher than just for
18 construction or either the same?
19 A.       These numbers could be lower.
20 Q.       They could be lower?
21 A.       Depending on the time period of -- that
22 it was requested.
23 Q.       Okay.
24 A.       Because the majority workforce is

Candace Burke Gales                                        May 14, 2008

89

1    construction.
2    Q.        Right.  So is it your testimony, then,
3    that the numbers here, they're skewed, is it that
4    they're not accurate as far as construction?
5    A.        Yes.
6    Q.        Okay.
7                      - - - - -
8              Thereupon, Deposition Exhibit 12 is marked
9    for purposes of identification.
10                     - - - - -
11   Q.        I'm handing you what's been marked
12   Plaintiff's Exhibit No. 12.  Would it be fair to
13   say that the numbers are skewed on that document
14   also?
15   A.        Yes.
16   Q.        Okay.
17                     - - - - -
18             Thereupon, Deposition Exhibit 13 is marked
19   for purposes of identification.
20                     - - - - -
21             MR. KELLY:  Thank you.
22   Q.        I'm handing you what's been marked
23   Plaintiff's Exhibit No. 13.  Are you familiar with
24   this form?

91

1    Q.        Well, if I had it, I'd let you see it.
2    How's that?  Let's see.  Here we go.  Let's do
3    2004.  Let's mark this.
4                      - - - - -
5              Thereupon, Deposition Exhibit 14 is marked
6    for purposes of identification.
7                      - - - - -
8    Q.        I'm handing you what's been marked
9    Plaintiff's Exhibit number 14.  Did you prepare
10   this document?
11   A.        Yes.
12   Q.        Explain this document to me.
13   A.        It's the Input 29 report for 2004 from
14   January 1, 2004 to December 30th for 2004.  It
15   only covers all variable accounts for the
16   Thornville Division, and it covers all work under
17   the pay period of 1 -- under the payroll of 161.
18   Q.        What's the payroll of 161?
19   A.        Construction.
20   Q.        Okay.  So it's all the payroll of 161.
21   What do you mean by "all variables"?
22   A.        Everything that's charged to
23   construction.
24   Q.        Oh, okay.

90

1    A.        Yes.  But where's page 1 and 2?
2    Q.        I don't know.  This is the way I was
3    provided unless -- maybe Bates stamped page 81 and
4    82.  I don't know.
5              Anyway, did you prepare these figures?
6    A.        If I saw page 1 and 2, I could say I
7    did.
8    Q.        These were copied in the way that they
9    were provided, perhaps there was a mistake.  But
10   so -- but you can't say if you prepared them or
11   not, you've never seen it?
12   A.        I see all these reports.
13   Q.        Okay.
14   A.        I need to see page 1 and 2.
15   Q.        Okay.  Did you prepare it, though?  Do
16   you mean reports like this?
17   A.        Yes.
18   Q.        Okay.  All right.  Are you familiar
19   with any of the projects that are on here?
20   A.        I push a button and it tells me.
21   Q.        And these were for the Thornville
22   Division, correct?
23   A.        No.  Is says all variables.  I need to
24   see page 1 and 2.

92

1              All right.  So is it fair to say that
2    during this time period the Thornville Division
3    had this many contracts?
4    A.        What's listed, these would be all the
5    contracts that were awarded to Thornville for that
6    period of 2004.
7    Q.        Okay.
8                      - - - - -
9              Thereupon, Deposition Exhibit 15 is marked
10   for purposes of identification.
11                     - - - - -
12   Q.        I'm handing you what's been marked
13   Plaintiff's Exhibit No. 15.
14   A.        It's the -- again, it's the Input 29
15   from January 1 until December 30th, '05, all
16   variable Thornville paving for all work under 161.
17   Q.        Okay.  So it would be accurate to say
18   that this reflects the number of contracts that
19   Shelly had during the time period in the
20   construction?
21   A.        For Thornville.
22   Q.        For Thornville?
23   A.        Yes.
24   Q.        Okay.  Let's take a break and go over

Spectrum Reporting LLC                                     614-444-1000

Candace Burke Gales                                                    May 14, 2008

93

1   everything.

2          (A short recess is taken.)

3          MR. KELLY:  You had asked a question

4   about Plaintiff's Exhibit 9.

5          MS. CUNNINGHAM:  Okay.  Hold on a sec.

6   Let's go back to 9.  Okay.

7          MR. KELLY:  There's a question on

8   page 2 about maintaining a file of all applicants

9   applying for work.

10         MS. CUNNINGHAM:  Uh-huh.

11         MR. KELLY:  And I -- I don't want to

12  speak for Candace.  I think there's a distinction

13  between maintaining a file on each specific

14  applicant and a file about applicants with data

15  generally.  But I -- I don't -- I'm, obviously,

16  not to testify here.  I think there was some

17  confusion about it.  And if you want to ask

18  Candace about it while she's here, it would

19  probably be good so you don't -- you're not

20  surprised if you get an affidavit down the road.

21  Q.       Okay.  Ms. Gales --

22         MR. KELLY:  We can do it either way.

23  I'm trying to do it as a favor to you.

24         MS. CUNNINGHAM:  I understand.  I would

94

1   rather for her to explain.

2   A.       When people walk into the office prior

3   to the HR department being formed, the

4   receptionist would just have them fill out an

5   application, and it would just go, if there was no

6   openings, into the file and -- which would be her

7   file just at the front desk.  And the supervisor

8   in that department would be notified, oh, by the

9   way, I have a woman who's interested in a

10  secretarial job if you ever have one open.  But we

11  never kept a file on, like, take this person's

12  file and create a file in the HR department or --

13  Q.       Just because --

14  A.       To be kept -- we just kept the

15  application.

16  Q.       Okay.  I understand that.

17  A.       And then the tear off, the confidential

18  sheet, would have been put in the book in my file

19  which are kept for three years.

20  Q.       What did you mean, the tear off

21  confidential file?

22  A.       The -- well, the way you identify your

23  race and sex, that's never kept with the

24  application.

95

1   Q.       Okay.  So if one walks in -- this was

2   prior to '06 -- fills out an application, they

3   would give it to the secretary?

4   A.       Receptionist, whoever gave them the

5   application.  It's the lady who sits there.

6   Q.       Right.  Give them the application, they

7   would fill it out, give it back to her.  She would

8   put it in her file?

9   A.       Right.

10  Q.       And there would be a tear-off section

11  that would be sent to your office that would

12  reflect the --

13  A.       Race.

14  Q.       -- race?

15  A.       OCRC requires you to do that in Ohio.

16  Q.       Okay.  So did this secretary --

17  secretary's files or receptionist's files of

18  applicants, is that maintained?

19  A.       Not now, no.  Because we have a

20  different process.

21  Q.       What about then, though?  I mean, if

22  they --

23  A.       That was kept there in case anybody --

24  if you found you needed a secretary or a part-time

96

1   person for six weeks or eight weeks, you would go

2   to that file and see if you had anybody in there

3   that was looking for a job or qualified for that

4   part-time position or whatever.

5   Q.       How long were they kept?

6   A.       To be honest about it, I don't know.

7   Q.       Okay.  But they stuck the applications

8   in a secretary's file --

9   A.       Right.

10  Q.       -- somewhere?

11  A.       If you want to call it a file, it was

12  just a notebook.

13  Q.       Or a notebook, whatever you want to

14  call it.

15  A.       Uh-huh.

16  Q.       So that was kept, but you don't know

17  how long they kept it?

18  A.       No.

19  Q.       Or what happened to it?

20  A.       No.

21  Q.       Okay.  Let's go off the record a

22  second?

23         (A short recess is taken.)

24              - - - - -

24 (Pages 93 to 96)

Candace Burke Gales                                                    May 14, 2008

97

1           Thereupon, Deposition Exhibit 16 is marked
2    for purposes of identification.
3                - - - - -
4    Q.         I'm handing you what's been marked as
5    Exhibit No. 16.  Have you seen this document
6    before?
7    A.         Yes.
8    Q.         Okay.  Is this your signature?
9    A.         Yes.
10   Q.         It's dated 9-1-04?
11   A.         Yes.
12   Q.         Tell me what this document reflects.
13   A.         It's an EEO1 report that is supposed to
14   reflect the overall numbers statewide for The
15   Shelly Company.
16   Q.         Okay.  This document -- and correct me
17   if I'm wrong -- does not reflect foremen, correct?
18   A.         It does not reflect the company's
19   numbers at all.
20   Q.         What do you mean?  Explain.
21   A.         In 2005 and 2004 going into 2005, FHWA
22   in Washington, D.C. decided that the EEO1 reports
23   were not reflecting the data statewide for
24   contractors in the State of Ohio, so all the

98

1    reports were basically pulled and revamped to give
2    us a new process and procedure.  These reports
3    were considered, I believe, at the time null and
4    void.  And we had to go to a new process because
5    our data wasn't polling the correct information.
6    So in 2005 and 2006, The Shelly Company along with
7    all contractors in the State of Ohio received new
8    regulations and rules on polling data for the EEO1
9    reports.  They're now polled by individual
10   addresses, which include all the plants and
11   quarries and your construction units together.
12   And I would say that this 2004 data is not
13   reflective of our numbers in any way, shape and
14   form.
15   Q.         Why is this?
16   A.         Because we weren't polling the correct
17   numbers I guess the feds wanted to be polled.  It
18   comes out of our computer system.  The programs
19   had to be all rewritten and revamped, and it's
20   done completely different now.  I think if you
21   would look at an EEO -- this EEO1 report based on
22   a Input 29 or a CR2 or even if I polled the
23   numbers from my cities of construction reports, it
24   would give you completely different data.

99

1    Q.         Okay.  But on September the 1st of '04,
2    these were the correct numbers for The Shelly
3    Company, correct?
4    A.         This is what we polled.  But we found
5    that they weren't polling all the numbers based on
6    all the divisions.  Are we polling Thornville?
7    Did they poll Cleveland?  Did they poll Columbus?
8    Did we poll Findlay?  At this time, I can't
9    accurately say, because we found out the polls
10   were incorrect.
11   Q.         Would that make all of the figures for
12   '04 incorrect or just this document?
13   A.         Just this document because of the
14   status layout.  With officials, managers,
15   professional, sales workers, your clerical staff,
16   normally those people are not polled when you poll
17   construction numbers.
18   Q.         Right.
19   A.         You poll the craft workers and the
20   operators and laborers.
21   Q.         Right.
22   A.         Those workers are probably more correct
23   than the above-named occupations.
24   Q.         Oh, okay.  So that's where you have

100

1    questions, office and clerical sales workers,
2    professionals, officials and managers?
3    A.         Yes, ma'am, because of the codes.
4    Q.         Would foremen be considered managers?
5    A.         Yes.
6    Q.         So according to this form, it appears
7    there's one black official and manager, assuming
8    these figures are correct?
9              MR. KELLY:  Which, obviously, we've
10   established is not something you should assume.
11             MS. CUNNINGHAM:  Well, I'm just asking
12   her.
13             MR. KELLY:  Well, she has told you the
14   numbers are not correct.
15             MS. CUNNINGHAM:  Is that a one?  I'm
16   just asking her.
17   Q.         So you don't think that the numbers for
18   the officials and managers are correct?
19   A.         No, ma'am.
20   Q.         I mean, I understand the clericals --
21   A.         Anything above the craft workers I
22   don't believe is correct, based on the numbers and
23   the codes that had to be polled.
24   Q.         So you did not know how many officials

Spectrum Reporting LLC                                                614-444-1000

Candace Burke Gales                                                May 14, 2008

101

1   and managers were in the company on September the
2   1st of '04?
3   A.        The construction workforce is polled by
4   a code called 161.
5   Q.        Uh-huh.
6   A.        Just like the plants are polled by code
7   162.  And then managers, officials, anybody that
8   holds a management level is polled from management
9   payroll, that is done by hand because of the
10  confidentiality.  And now you take all those
11  figures and attempt to add them together with the
12  computer system, it wasn't being done properly.
13  Q.        Do you have a corrected form?
14  A.        Not for 2004.
15  Q.        Okay.  So is it your testimony that
16  incorrect figures were submitted to the state and
17  federal government and those were never corrected?
18  A.        It wasn't reported to the state/ it was
19  reported to the feds.
20  Q.        Okay.  So it was reported to the feds
21  and it was incorrect and it was never corrected in
22  '04?
23  A.        No, it was corrected the following year
24  and brought up to date.

103

1   know.
2   Q.        Okay.
3   A.        I couldn't do it.
4   Q.        Would you check and then get back with
5   your counsel on providing the correct figures for
6   '04?
7   A.        On the EEO1 report?
8   Q.        Yes.
9   A.        Sure.
10  Q.        Okay.  I have no further questions.
11  Thank you for coming in.
12  A.        You're quite welcome.
13            (Signature is reserved.)
14            - - - - -
15            Thereupon, the foregoing proceedings
16            concluded at 11:49 a.m.
17            - - - - -
18
19
20
21
22
23
24

102

1   Q.        Oh, okay.  But '04 --
2   A.        And the forms are even -- was rechanged
3   for last year for 2008.  We have a brand-new
4   report coming out this year.
5   Q.        No, I understand that.  So it's your
6   testimony that the figures given to the feds for
7   '04 were incorrect?
8   A.        For the office and the clerical and
9   above.
10  Q.        Right.
11  A.        The craft workers, the operators and
12  the laborers are probably as close as you're going
13  to get.
14  Q.        Okay.  Do you have any form for '04
15  that correctly reflects the stats on the officials
16  and managers?
17  A.        Not with me today.
18  Q.        Can The Shelly Company get them?
19  A.        Based on the revamping of this report,
20  no.
21  Q.        No.  So why were they taken out of the
22  computer?  I don't understand.  If you --
23  A.        I'm not a computer person.  I -- I'm
24  going to say no, but maybe they could.  I don't

104

1   State of Ohio      :      C E R T I F I C A T E
2   County of Franklin: SS
3       I, Stacy M. Upp, a Notary Public in and for the
4   State of Ohio, certify that Candace Burke Gales was
5   by me duly sworn to testify to the whole truth in
6   the cause aforesaid; testimony then given was
7   reduced to stenotype in the presence of said
8   witness, afterwards transcribed by me; the
9   foregoing is a true record of the testimony so
10  given; and this deposition was taken at the time
11  and place specified on the title page.
12      Pursuant to Rule 30(e) of the Fed. R. Civ. P.,
13  the witness and/or the parties have not waived
14  review of the deposition transcript.
15      I certify I am not a relative, employee,
16  attorney or counsel of any of the parties hereto,
17  and further I am not a relative or employee of any
18  attorney or counsel employed by the parties hereto,
19  or financially interested in the action.
20      IN WITNESS WHEREOF, I have hereunto set my hand
21  and affixed my seal of office at Columbus, Ohio, on
22  _____, 2008.
23  _____
24  Stacy M. Upp, Notary Public - State of Ohio

26 (Pages 101 to 104)

Candace Burke Gales                                                                May 14, 2008

105
Witness Errata and Signature Sheet

Spectrum Reporting LLC                          Correction or Change Reason Code

   333 East Stewart Avenue                      1 - Misspelling  2 - Word Omitted

   Columbus, Ohio 43206                         3 - Wrong Word  4 - Clarification

   Phone - 614-444-1000   Fax - 614-444-3340    5 - Other Correction (Please explain)

   Email - admin@spectrumreporting.com          R        Sheet _____ of _____

Page/Line        Correction, Addition, or Change        Reason Code
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____
_____     _____          _____

     I, Candace Burke Gales, have read the entire transcript of my deposition taken in this
     matter, or the same has been read to me.  I request that the changes noted on my errata sheet(s)
     be entered into the record for the reasons indicated.
     Date _____  Signature _____

     The witness has failed to sign her deposition within the time allowed.
     Date _____  Signature _____

Spectrum Reporting LLC                                                             614-444-1000

Candace Burke Gales

May 14, 2008

**A**

Abel 1:7
able 77:16,21
above-named
  99:23
accept 87:21
access 50:13
  51:1
accounts 91:15
accurate 89:4
  92:17
accurately 99:9
achieve 38:18
Actio 4:13
action 4:11,14
  43:14 46:4
  56:5 69:3,7,18
  70:2 82:10
  104:19
activity 50:1
actual 55:19
  85:6
add 101:11
Addition 105:7
address 9:12
  11:19 20:14
addresses 98:10
Administration
  36:4
Administrative
  6:13,20 53:7
  55:15
admin@spectru...
  105:5
advise 40:6
advising 24:22
affidavit 93:20
affirmative 4:11
  4:14 56:5 69:3
  69:7,18 70:2
  82:10
affixed 104:21
aforesaid 46:6
agencies 37:12
  82:5
Agenda 84:13
ago 65:2
agreement 3:10
agreements 40:12
ahead 87:9
Aid 4:9
albeit 50:12
allowed 105:30
Alphabetically
  32:3
American 28:22
  29:9,24 66:22
amount 38:3
analysis 43:13
  46:3 63:10
Anderson 66:18

and/or 104:13
annual 71:10,19
  72:23 73:2,20
  73:24
annually 41:15
answer 11:16
  12:18 50:2
  56:20 57:1,8
  57:12 69:24
answered 8:23
  25:18
answering 8:24
anybody 10:24
  22:9 95:23
  96:2 101:7
anymore 44:5
  77:15
Anyway 90:5
appears 18:13
  100:6
applicant 93:14
applicants 83:20
  83:23 93:8,14
  95:18
application
  74:13,19 94:5
  94:15,24 95:2
  95:5,6
applications
  74:15 96:7
applied 10:6
applying 83:20
  93:9
apprentices
  36:24
apprenticeship
  36:22 37:3,7
  37:14
approach 16:7
approached 16:21
area 10:19 11:12
  13:10 16:1,2,5
  16:6 25:14,15
  25:16 27:10
  33:20 51:14
  70:21
areas 27:2 70:20
aren't 56:3
arranged 68:17
asked 10:7,11,17
  16:21,24 17:12
  17:14 32:23
  60:12,13 93:3
asking 5:14 11:8
  11:9,12 32:13
  50:11 59:18
  60:19 100:11
  100:16
asks 12:22 22:15
  70:23
assist 69:4

associates 19:8
  19:9
assume 5:17
  62:18 100:10
assumes 72:4
assuming 13:15
  60:17,21 71:22
  80:18 100:7
assumption 72:5
Athens 27:4
attached 4:23
  46:16
attempt 101:11
attempted 70:7,8
  70:14
attend 73:5
  84:23
attendance 3:6
  55:6
attorney 104:16
  104:18
audience 68:6,9
authorized 37:6
available 17:2
  40:2
Avenue 1:14,20
  105:2
average 37:17
  39:6
awarded 6:9
  34:20,22 37:24
  92:5
aware 14:21 21:3
  21:7 26:10
  28:4 30:14
  33:11 37:23
  38:1 40:15
a.m 1:15 3:2
  55:5 103:16

**B**

back 9:24 21:6
  31:5 32:6 41:8
  44:17 48:16
  54:16 73:6,20
  74:1,3 85:5,7
  93:6 95:7
  103:4
backwards 48:22
back-to-work
  71:10 72:20
  73:2 84:22
bank 39:21,24
bargaining 40:12
Barnes 29:9,19
  29:23 30:3
  65:6 66:22
  67:15
based 12:15
  35:23 37:15
  46:12 85:4

98:21 99:5
  100:22 102:19
basically 98:1
basis 6:8 8:11
Bates 90:3
began 31:3
BEHALF 2:2,6
believe 10:7
  15:18 29:9,14
  29:22 30:19
  31:4,7,22 33:5
  41:12 46:7
  61:13,22 62:5
  63:13 70:7
  81:3 85:22
  98:3 100:22
Ben 66:23
best 18:20 68:24
  70:15 79:18
Beth 84:11
bid 40:18
bit 6:16
black 28:19 66:4
  66:18 100:7
blank 62:9
board 23:13,24
  24:14 26:3,5,7
  50:17 51:4
boards 23:4
book 94:18
Boring 65:5,9,15
  80:5
bottom 61:17
  66:14,18 82:13
Boulevard 2:4
box 42:2 87:7
brand-new 102:3
break 62:3 92:24
breaks 63:8
Brian 2:8
bring 36:14
  39:11
brings 37:4
broke 27:14,18
  27:24
Brother 66:1,2
brought 101:24
bulletin 23:4,13
  23:24 24:14
  26:3,5,7 50:17
  51:4
Burke 1:11 3:7
  5:1,8 55:6
  104:4 105:25
business 19:7,9
button 48:3,4
  90:20

**C**

C 2:1 104:1,1
call 26:4 41:1

50:18 96:11,14
called 3:8 8:16
  8:19 101:4
calling 39:12
  50:22
calls 35:3
call-out 40:24
call-outs 65:5
Cambridge 87:20
Candace 1:11 3:7
  5:1,8 55:6
  64:2 93:12,18
  104:4 105:25
can't 5:15 40:13
  50:2 64:8
  90:10 99:8
captioned 5:10
case 1:6 5:10
  26:16,18 40:9
  95:23
categorized
  31:23
category 7:6
  59:16 62:4
Caucasian 78:20
  78:24 79:7,13
  79:17,21 80:1
  80:5,9
cause 104:6
Cavalier 2:4
central 19:1
  20:18 24:13
  27:10 28:1
certain 36:6
  70:20
Certainly 14:2
certify 104:4,15
change 82:9,10
  105:1,7
changes 77:2
  105:26
character 3:14
charged 91:22
check 25:3 103:4
chief 66:24 67:1
Cincinnati 85:21
cities 87:16,19
  98:23
City 4:16,18
  86:16 87:20,20
  87:20
Civ 104:12
civil 6:6
clarification
  18:11 29:11
  105:4
class 4:10 67:23
  68:2,5,8,16
classes 68:18
clear 43:7
clerical 99:15

Candace Burke Gales

May 14, 2008

100:1 102:8
**clericals** 100:20
**clerk** 48:7
**Cleveland** 2:8
  99:7
**close** 102:12
**clue** 55:11 72:11
  84:17
**code** 101:4,6
  105:2,7
**codes** 100:3,23
**collective** 40:11
**Columbus** 1:14,20
  27:13,14,18,24
  99:7 104:21
  105:3
**column** 78:15
**combined** 73:23
**come** 12:2 17:8
  21:14 22:2
  25:1 37:8 38:6
  38:8 39:10
  46:13,22,23,24
  47:14,22 49:18
  68:4,18 71:14
  74:18 83:12
  87:2
**comes** 12:21
  15:11 18:23
  19:22 22:14
  30:19 34:9,16
  36:23 40:17
  48:8 49:6,12
  70:21 72:19
  75:10 77:23
  88:4 98:18
**comfortable**
  40:21
**coming** 16:24
  68:7 87:23
  88:8 102:4
  103:11
**committee** 31:17
  68:6
**communication**
  20:17 25:5
**company** 1:7 5:11
  5:21 7:13,16
  8:4 11:23 12:5
  13:6,9 14:16
  14:22 18:17
  21:1 22:15
  25:3 26:11
  28:15 30:4,13
  30:15,24 31:6
  32:7 34:1
  35:16 38:16
  40:11 52:1
  55:4 56:7
  58:22 69:6,22
  72:10,18 74:11

76:6 82:7,19
  83:6,8,21,22
  97:15 98:6
  99:3 101:1
  102:18
**companywide** 52:7
**company's** 24:21
  69:3 97:18
**complains** 34:9
**complaint** 32:15
  32:17 77:4
**complaints** 13:18
  13:19 20:8
  32:12 34:8
**complete** 45:15
  55:23 58:2
**completely** 98:20
  98:24
**compliance** 4:6
  4:16,18 8:4,16
  8:20 9:5 16:23
  17:3,20 18:16
  21:4 41:9
  45:13 53:8
  54:11 55:16,17
  57:16,16 71:7
  86:17,23
**complies** 69:6
**comply** 70:2
**computer** 76:21
  98:18 101:12
  102:22,23
**computerized**
  47:24 48:1
**concluded** 103:16
**conduct** 68:18
**conducted** 41:15
  55:4 68:1
**conferences**
  15:17
**confident** 63:9
**confidential**
  94:17,21
**confidentiality**
  101:10
**confusion** 93:17
**Conrad** 18:14
**consider** 58:12
**considered** 14:4
  14:6 98:3
  100:4
**considering** 71:4
**construction** 4:6
  4:7,9 6:5
  50:20 51:8
  53:7 58:7,11
  58:13,17 59:2
  59:7,8,11 60:8
  70:22 87:24
  88:14,18 89:1
  89:4 91:19,23

92:20 98:11,23
  99:17 101:3
**contact** 56:10
  86:24
**contains** 58:14
**continue** 83:6
**contract** 4:16,18
  16:23 34:16,18
  38:4 55:16
  86:17
**contractor** 56:13
**contractors**
  20:19 97:24
  98:7
**contracts** 34:2
  37:24 38:2
  92:3,5,18
**conversation**
  12:20
**Cooperrider**
  64:15,17 78:19
**copied** 82:4 85:9
  90:8
**copier** 48:9
**copies** 43:12,24
  46:2 47:18
  48:10 55:14
  56:13
**copy** 42:20
**core** 21:15,17,19
  22:13 36:11
**corporate** 5:23
  26:16
**correct** 7:1 8:9
  9:13 11:3 16:3
  17:21,23 18:12
  18:17,23 23:24
  24:15 25:8,20
  25:20 27:15,19
  36:12 47:12
  55:10 56:20
  57:1,13 60:18
  71:19 72:5
  73:16 78:20
  90:22 97:16,17
  98:5,16 99:2,3
  99:22 100:8,14
  100:18,22
  103:5
**corrected** 74:2
  101:13,17,21
  101:23
**Correction** 105:1
  105:4,7
**Corrective** 4:13
**correctly** 22:12
  102:15
**Coshocton** 80:18
**couldn't** 39:6
  103:3
**counsel** 3:6

31:19 103:5
  104:16,18
**counsel's** 31:20
**count** 67:17
**Counties** 27:5
**county** 23:10,23
  24:13 80:15,17
  80:20,21 104:2
**couple** 27:6 65:2
**COURT** 1:1
**cover** 11:12 27:3
  28:1 58:21
  59:1 62:2
**covered** 44:7
  58:23
**covers** 27:10
  58:10,18 91:15
  91:16
**Cox** 67:1
**craft** 99:19
  100:21 102:11
**create** 47:22
  48:2 53:21
  77:5 94:12
**created** 81:23
  87:23
**creating** 33:6
**crew** 23:10
**Cross** 4:3
**cross-examina...**
  3:9 5:4
**CR1** 44:3 47:19
**CR2** 98:22
**Cunningham** 2:3
  4:3 5:5,9
  11:11,17 18:6
  18:9 23:17
  24:3,6,11
  26:17 40:16
  42:21 43:1,6,9
  53:11,19,23
  62:21,24 63:7
  76:3 93:5,10
  93:24 100:11
  100:15
**curious** 59:14
**currently** 5:19

---
 **D**
---
**D** 4:1
**daily** 6:8
**Dale** 64:22
**Dan** 67:2 85:14
**DAS** 57:15
**data** 4:7 9:2,3,6
  58:8 87:10,21
  88:4 93:14
  97:23 98:5,8
  98:12,24
**date** 8:17 42:19
  54:5,13 55:8

55:10 85:4
  101:24 105:28
  105:31
**dated** 53:14 64:4
  80:24 97:10
**dates** 50:15
  75:22 76:22,22
  76:24
**Dave** 78:24
**David** 79:4
**deal** 7:22 13:16
  13:22 14:8
**deals** 11:11
**December** 49:7
  91:14 92:15
**decided** 97:22
**Defendant** 1:8
  2:6
**department** 6:13
  6:20 8:17
  30:20 31:3,21
  32:8 33:6 47:3
  49:16,20,21
  53:6 55:15
  57:15 75:2,14
  77:8,10 94:3,8
  94:12
**Depending** 88:21
**deposed** 5:12
**deposition** 1:11
  3:7,11 4:4
  5:12 44:12
  48:13 57:20
  61:2 63:16
  69:11 73:11
  78:5 81:13
  84:6 86:11
  89:8,18 91:5
  92:9 97:1
  104:10,14
  105:25,30
**described** 76:2
  76:11,12
**description** 4:12
  40:2 43:12,20
  46:2,12
**desk** 94:7
**diaries** 43:13
  46:3,13
**Dick** 65:18
**didn't** 42:7,11
  42:21 47:2,13
  53:20 54:1
  56:19,21 57:10
  67:21
**difference** 25:22
**different** 7:6
  62:7 88:10,12
  95:20 98:20,24
**directly** 12:23
**director** 5:23

Candace Burke Gales

May 14, 2008

| | | | | |
|---|---|---|---|---|
| **Directors** 4:12 | 46:6,8 80:14 | **Ed** 65:4 | 100:10 | **fact** 11:9 37:15 |
| **discovery** 26:18 | **doesn't** 20:9 | **EEO** 4:12,22 5:23 | **evaluate** 22:9 | **failed** 105:30 |
| **discriminate** | 32:7 40:1 | 6:14 11:2,5,12 | **evaluated** 21:15 | **fair** 7:23 13:21 |
| 70:12 | 59:15 62:10 | 12:19 13:2,3 | 22:5 33:4 | 19:17 27:21 |
| **discrimination** | 68:3,10 87:4 | 14:22 15:12,16 | **evaluating** 21:14 | 33:3 34:5,15 |
| 11:6 15:15 | **doing** 18:19 | 16:2,5,11,17 | **evaluation** 8:3 | 38:15,20,22 |
| **discuss** 15:8,17 | **dollar** 38:3 | 20:16 43:12 | 21:7,11 22:10 | 48:21 51:15 |
| 42:11 | **Donald** 28:9 66:3 | 46:2 53:7 54:6 | 32:24 33:10,12 | 54:19 55:21 |
| **discussed** 14:12 | 66:8,17 67:13 | 56:10 98:21 | 33:16,17 41:15 | 59:10 60:10 |
| 14:15 17:5 | **Donnie** 66:17 | **EEO1** 87:18 97:13 | 41:23 42:11 | 61:9 67:11 |
| 20:20 21:1,10 | **Don's** 28:17 | 97:22 98:8,21 | 44:1 | 68:19 69:17 |
| 22:1 25:10 | **don't** 5:15 7:9 | 103:7 | **evaluations** 22:2 | 71:9 80:16 |
| 70:17 78:20 | 10:7 11:19 | **effort** 38:18 | 56:14 | 88:5,16 89:12 |
| 84:20 85:16 | 13:10 15:18 | **eight** 96:1 | **event** 67:23 | 92:1 |
| **discusses** 8:8 | 16:11 17:7 | **either** 29:19 | **everybody** 30:19 | **Fairfield** 80:17 |
| 18:2 | 18:7 22:6,9,22 | 57:9,16 62:11 | 72:19 | 80:18 |
| **distinction** | 23:18 25:5 | 88:18 93:22 | **ex** 66:24 | **fairly** 11:22 |
| 93:12 | 26:12,22,23,23 | **Email** 105:5 | **exactly** 14:3 | **faith** 38:18 |
| **district** 1:1,1 | 27:1,20,23 | **employed** 5:20 | 36:18 | **familiar** 8:3,15 |
| 20:12,14 27:11 | 28:17 29:1,5,6 | 104:18 | **Examination** 4:2 | 63:11,21 64:10 |
| 27:12 | 31:9,11,17 | **employee** 12:2,8 | **example** 41:12 | 71:12,23 78:10 |
| **division** 1:2 | 33:6 35:11 | 12:16,21 14:13 | **exceed** 38:19,22 | 78:16 81:17 |
| 22:19 23:8,11 | 40:22 41:6 | 16:7 32:21 | 38:24 39:3 | 89:23 90:18 |
| 26:19 27:2,15 | 44:4 45:16 | 33:1 40:3 | **Excuse** 14:5 | **far** 6:6,10,14,18 |
| 37:19,21,22 | 49:6,12,18 | 43:21 50:13 | **Exhibit** 44:12,16 | 25:1 34:23 |
| 53:7 60:1 | 50:3,4,14,16 | 56:14 71:16 | 45:5 48:13 | 89:4 |
| 80:22 81:2 | 51:13,22 52:10 | 72:10 74:17 | 52:21 57:20,23 | **Farnsworth** 18:13 |
| 84:24 85:21 | 52:14,23 54:1 | 75:10 104:15 | 57:24 61:2,6 | 18:24 41:13 |
| 90:22 91:16 | 54:4,14 55:8 | 104:17 | 61:10,11,12,17 | 42:3,14 43:18 |
| 92:2 | 58:6 60:2,14 | **employees** 7:23 | 63:16,20 69:9 | 46:6,11,20 |
| **divisions** 23:7 | 64:12,15,22 | 13:22,24 15:2 | 69:11,15 73:9 | 47:9,20 55:24 |
| 58:22 85:1 | 65:2,13,13,14 | 22:5,14 24:18 | 73:11 78:1,5 | **fast** 66:6 |
| 99:6 | 65:15 67:4,6,9 | 30:18 32:11 | 81:13,17 84:6 | **father** 65:12 |
| **division's** 52:17 | 67:17 69:1 | 33:4 36:5 | 84:10 86:11,16 | **favor** 93:23 |
| **doc** 54:1 | 70:16,20 72:11 | 43:23 46:18 | 89:8,12,18,23 | **Fax** 105:4 |
| **document** 8:8,12 | 73:5,22 75:6 | 47:8,9 51:1 | 91:5,9 92:9,13 | **Fed** 104:12 |
| 8:14,22 9:12 | 76:7 79:16 | 71:15 73:7 | 93:4 97:1,5 | **federal** 4:9 6:6 |
| 17:3,24 18:8 | 83:4 84:17,18 | 75:4 76:6,13 | **Exhibits** 4:4,23 | 6:21,21 26:7,8 |
| 21:4 40:4 41:8 | 86:4 90:2,4 | 77:11 82:21 | **exist** 75:24 | 26:9 34:2,3,19 |
| 42:10,19 44:19 | 93:11,15,19 | 84:23 85:7 | **exists** 33:7 | 34:24 36:3,4 |
| 44:20,23 45:6 | 96:6,16 100:17 | 87:4 | 85:22 | 58:10 59:5,8 |
| 52:22 53:3,4,5 | 100:22 102:22 | **employee's** 56:13 | **experience** 36:14 | 59:10 82:5 |
| 53:11,12,13,16 | 102:24 | **Employer** 4:22 | 37:13 | 87:22 101:17 |
| 55:3 58:2,3,5 | **door** 74:6 | **employment** 4:7 | **expertise** 10:19 | **feds** 6:13 38:14 |
| 61:7,8 69:16 | **Doug** 66:24 | 15:15 44:1 | 16:1,2,6,10 | 58:12 60:5 |
| 73:14 78:8 | **Draft** 84:13 | 57:4 58:7 | 33:20 | 98:17 101:19 |
| 80:13 81:18,24 | **drive** 23:11,12 | 71:16 | **explain** 40:18 | 101:20 102:6 |
| 89:13 91:10,12 | 23:23 24:13 | **encourage** 41:17 | 58:5 80:13 | **feel** 11:1 13:3,4 |
| 97:5,12,16 | **duly** 5:2 104:5 | **engaged** 7:17 | 87:8,14 91:12 | **female** 6:11 |
| 99:12,13 | **duties** 6:2,3 | **enter** 86:20 | 94:1 97:20 | 39:20 40:6 |
| **documentation** | 69:6 71:18,20 | **entered** 61:21 | 105:5 | 41:16 |
| 42:17 43:11,15 | 72:23 73:4,17 | 105:27 | **extent** 24:4 | **females** 6:4 7:1 |
| 43:18,21 44:7 | **D.C** 58:10 97:22 | **entire** 26:15 | **external** 13:20 | 35:24 83:7,9 |
| 44:9 45:22 | | 45:15 58:21 | 15:4 | **FHWA** 6:20 36:4 |
| 46:1,18,20,22 | ——————— | 105:25 | **extra** 39:9,10 | 97:21 |
| 47:9,13,14 | **E** | **entities** 37:12 | **e-mail** 4:15 9:21 | **field** 46:18 |
| 75:13,15,16,17 | **E** 2:1,1 4:1 | **equal** 6:7 15:14 | 10:2 84:10,16 | **fifth** 78:11 |
| 75:23 76:5 | 104:1,1 | **errata** 105:1,26 | | **figures** 38:17 |
| **documented** 6:19 | **easier** 44:18 | **Esq** 2:3,8 | ——————— | 86:20 90:5 |
| **documents** 6:19 | **east** 1:14 27:7 | **essentially** 6:23 | **F** | 99:11 100:8 |
| 18:3,5 40:10 | 105:2 | **established** | **F** 104:1 | 101:11,16 |
| | **EASTERN** 1:2 | | **faces** 64:13,14 | |

Candace Burke Gales

May 14, 2008

102:6 103:5
**file** 30:21 31:2
  32:16,17,21
  55:11 75:8
  76:16,18 77:4
  77:5 83:20,23
  93:8,13,14
  94:6,7,11,12
  94:12,18,21
  95:8 96:2,8,11
**filed** 58:9
**files** 26:13
  30:16 31:4,6
  32:7 56:15
  57:6,6 75:3,4
  95:17,17
**fill** 35:1,4,7
  40:5,19,19
  70:14 74:12
  94:4 95:7
**filled** 6:12
  61:20 74:18
**fills** 31:15
  74:15 95:2
**final** 88:3
**financial** 67:1
**financially**
  104:19
**Findlay** 99:8
**fine** 6:17 53:3
  54:3,17
**finish** 18:9
  23:20 24:7
**finished** 24:10
**fired** 75:12,12
  75:17
**firms** 82:17,20
**first** 5:2 8:16
  36:7,24 40:9
  45:11,12 49:9
  79:11 82:13
  83:3 86:21
**fit** 40:2
**five** 25:19 52:6
**Florence** 2:4
**focus** 16:12,15
  16:16 32:5
  49:19
**follow** 12:21
**following** 55:5
  101:23
**follows** 5:3
**foregoing** 103:15
  104:9
**foreman** 14:13
  22:18 25:23
  26:2 29:10,15
  29:18,20 30:12
  51:11,24 64:11
  64:16,17,21,23
  65:5,19,21

66:3,4,16,22
  78:22 79:2,4,6
  79:7,9,15,19
  79:23 80:3,7
  80:11 86:7
**foreman's** 71:10
  73:2,20,23
  74:1 84:14,15
  84:20 85:1,2,6
**Foreman/Super...**
  78:16
**foremen** 14:4,6
  26:3 28:5,6,19
  52:4 59:11,12
  59:15,19 60:2
  60:6 61:20,24
  62:1,2,10,11
  62:19,22 63:6
  63:12 64:6
  71:2,13,14,16
  71:24 72:9,17
  74:2,5,7,9
  84:23 85:10
  87:6,6 88:6
  97:17 100:4
**foremen's** 71:19
  72:23
**foremen/women**
  62:9
**forewomen** 62:20
**form** 4:16,18,19
  4:20,21 22:10
  33:1 59:14
  60:21 62:5,15
  86:17,18 89:24
  98:14 100:6
  101:13 102:14
**formal** 10:12
**formally** 22:5
**formed** 94:3
**forms** 102:2
**forward** 21:14
  22:2,14
**found** 83:5 95:24
  99:4,9
**four** 37:19,21,22
  64:4 83:14
**fourth** 37:1
**Franklin** 104:2
**Frantz** 2:7
**Fred** 67:23 68:1
  68:7,14,16,17
**friends** 19:5
**front** 26:13 46:1
  50:17 94:7
**furnish** 88:1
**further** 41:22
  103:10 104:17

---
**G**
---

**Gales** 1:11 3:7

5:1,8 55:6
  64:1,2 67:21
  93:21 104:4
  105:25
**gather** 9:2
**gauge** 7:15
**gender** 62:19
  63:5
**general** 74:16
**generally** 31:14
  36:13 55:14
  93:15
**generated** 77:13
**Gentil** 79:4
**gentleman's** 67:5
  67:7
**getting** 40:19
**Gibson** 1:4 2:11
  5:10,10 30:22
  31:2
**give** 9:2,6 23:20
  36:14 44:6
  46:10,10 47:13
  50:16 60:14
  86:22 87:19
  95:3,6,7 98:1
  98:24
**given** 9:5,6
  17:18 37:7,15
  38:10,11 42:5
  43:20 46:20,21
  47:9,19 55:14
  55:22,23 102:6
  104:6,10
**gives** 9:15 26:3
**giving** 50:14
**go** 6:19 7:20 9:1
  10:23 14:13
  18:11 19:17
  20:12,13 22:17
  24:18 31:16
  39:21,24 40:13
  43:9 48:10,17
  54:16 76:17
  85:5 87:9 88:1
  91:2 92:24
  93:6 94:5 96:1
  96:21 98:4
**goal** 38:19 69:22
**goals** 6:11 34:23
  35:2,13,14
  69:18 70:5
**goes** 7:6
**going** 11:14 18:8
  20:7 24:4 26:2
  37:4 40:21
  41:10 50:1,16
  52:24 66:5
  97:21 102:12
  102:24
**good** 38:18 93:19

**government** 58:10
  101:17
**group** 72:24
  80:13
**guess** 18:20
  98:17
**guidelines** 6:21
**guys** 20:1 48:9

---
**H**
---

**halfway** 73:19
**hall** 74:21
**hand** 59:23 60:3
  61:21 101:9
  104:20
**handed** 25:2
  52:20
**handing** 44:15
  57:24 61:5
  63:19 69:14
  81:16 84:9
  86:15 89:11,22
  91:8 92:12
  97:4
**handle** 73:22
**happened** 31:16
  68:15 96:19
**happens** 15:10
**harassment** 15:15
  16:12
**hasn't** 76:12
**haven't** 19:15
  24:11 67:9
  85:16,18
**head** 67:4
**headquarters**
  19:2
**hear** 5:16 12:15
**height** 58:11,12
  58:16 60:7
**held** 73:3
**helpful** 40:10
**hereto** 104:16,18
**hereunto** 104:20
**here's** 24:20
**hey** 35:3
**he's** 28:19 29:15
  30:24 64:19,22
  64:23 65:5,7,8
  65:10,14 66:15
  66:16 78:20
  79:6,7,7 80:1
  80:5 85:22
**high** 40:14
**higher** 86:7
  88:17
**Highway** 4:9 36:4
**hire** 40:13
**hired** 24:19
  35:17 68:4
  75:17 77:17

**hit** 48:3,4
**Hocking** 27:4
**hold** 66:5 71:9
  71:18,22 72:22
  72:23 73:2
  93:5
**holds** 73:20,24
  101:8
**home** 19:6 50:9
**honest** 96:6
**hourly** 13:22
**How's** 91:2
**HR** 9:2 30:20
  31:3 32:8 33:6
  49:6,12 94:3
  94:12
**human** 15:13

---
**I**
---

**idea** 26:12,21,22
  29:1,5 30:5
  32:3 41:7
  52:11 53:24
  54:14 74:6
  78:23
**identification**
  44:13 48:14
  57:21 61:3
  63:17 69:12
  73:12 78:6
  81:14 84:7
  86:12 89:9,19
  91:6 92:10
  97:2
**identifies** 56:9
**identify** 94:22
**implemented**
  17:15
**improve** 82:16,19
**Incentive** 82:15
**incident** 31:8,11
  31:13,15
**include** 98:10
**included** 87:6
  88:6
**including** 21:22
  68:20
**incorrect** 72:21
  99:10,12
  101:16,21
  102:7
**increases** 43:22
  46:19
**Indian** 28:22
  29:9,24 66:22
**indicated** 105:27
**indicating** 44:22
**individual** 14:19
  23:4,5 41:17
  52:17 74:12
  98:9

Candace Burke Gales

May 14, 2008

**individuals**
13:17 14:9
36:18 40:19
63:11 64:5
77:17 78:17
**industry** 6:5
**information** 4:22
9:4,15 17:18
22:3 26:4,6
32:10,14 42:2
42:4,13 48:5
55:22,24 57:4
76:19 77:1,10
82:8 98:5
**initially** 36:10
**input** 4:19,20,21
48:5 91:13
92:14 98:22
**instructor** 67:18
67:20
**instructors** 64:1
67:19
**intended** 62:19
63:4,4
**interested** 94:9
104:19
**internal** 13:19
15:4 50:21,22
**internally** 49:11
50:19 87:19
**Internet** 23:3,16
23:19 24:16,18
24:20 48:17,22
49:10 50:2,7
50:10 51:20
68:17
**interoffice** 51:2
51:6 87:1
**interview** 9:18
9:19
**investigate**
34:11
**investigation**
32:18
**involved** 7:3
13:10 42:7
69:2
**isn't** 25:7
**issue** 46:15 52:9
**issues** 32:12
**it's** 7:22 8:24
12:13 13:1,4
16:1 18:14,23
19:1 22:24
25:15 26:22,23
31:1 33:20
35:12,13,14,14
36:3,6 38:11
40:4 41:3,10
41:12,22 42:23
43:11 44:8

46:1 51:23
52:9 53:11,14
53:19 56:7,15
57:7,12 58:7,8
58:16 60:12,13
61:8 62:18
63:4,24 64:4
71:6,18,20
73:4,20,21
80:15 84:11,20
87:3,5 88:8,14
91:13,20 92:14
92:14 95:5
97:10,13 98:19
102:5
**I'd** 26:20,23
54:16 85:4
91:1
**I'll** 5:14,16
18:10 23:17
**I'm** 5:23 8:12
11:12,14 13:15
14:21 18:13
21:3 22:12
24:6 29:16
30:8,14 31:9
33:11 36:12
37:20 39:16
40:9,21 42:18
42:21 44:6,15
50:10 51:8
52:24 53:12,15
53:23 54:22
56:22 57:11,11
57:23 60:17,19
60:21 61:5
62:8,14 63:19
65:7 66:11,13
66:15 67:16
68:24 69:14
70:13 71:22
74:20 76:17
80:18 81:16
84:9,18 86:15
89:11,22 91:8
92:12 93:15,23
97:4,17 100:11
100:15 102:23
102:23
**I've** 12:2,16
16:7 40:3
44:20 45:10
53:4 54:2,18
55:13
**I-29** 4:19,20,21

_____
**J**
_____
**J** 2:8
**James** 79:17
**January** 37:6
41:12,12 43:3

49:7 91:14
92:15
**Jeff** 29:9,19
66:22 67:15
**Jeremy** 66:9
**Jim** 85:15,18
**job** 4:12 6:2,3
13:4 22:20,24
24:15,19 25:1
25:4 33:22
34:6,20 35:4
39:13 40:2,17
43:12,19 46:2
46:12 48:18
50:11 60:6
69:5 71:18
72:22 73:4,17
75:11 86:4
94:10 96:3
**jobs** 6:9 35:19
40:17 48:23
49:9,23 50:4
51:3 88:2
**journeyman** 36:7
**journeymanship**
37:2
**journeymen** 37:8
**journeymenship**
37:11
**Judge** 1:6,7
**July** 58:8,13
61:11

_____
**K**
_____
**keep** 20:17 32:7
75:14
**keeping** 31:3
75:2
**Kelly** 2:8 6:15
10:1 11:8,14
18:4,7 23:15
24:1,4,9 25:18
26:15,18 40:8
42:18,23 43:4
43:7 44:21
45:2 52:7 53:9
53:15,22 60:19
62:18,23 63:4
63:8 69:23
70:6 72:2 76:1
76:4,10 78:2
84:4 86:14
89:21 93:3,7
93:11,22 100:9
100:13
**kept** 32:21 94:11
94:14,14,19,23
95:23 96:5,16
96:17
**Kevin** 66:3,6,10
**know** 12:4,7,13

12:14 13:14
17:7 18:10
19:3 22:6,22
25:1 27:20
28:17 29:6
30:1,23 31:9
31:11,23 33:7
40:11 41:3,6
42:24 49:12
50:3,4,15,17
51:13,24 52:12
52:23 54:1,4,7
55:8 64:12,13
64:15,22 65:13
65:13,14,15,15
67:4,6,10
68:15 69:1
70:22 72:6
76:5 79:2,16
79:19,23 80:3
80:7,11,16
81:8 83:4
85:14 86:4
90:2,4 96:6,16
100:24 103:1
**knowledge** 20:24
25:7,9 28:5
30:12 51:16,17
68:24 79:18
83:22
**Koehler** 66:23
**KY** 2:4

_____
**L**
_____
**L** 3:4
**laborers** 36:8,13
36:20 37:2,3,5
37:9 99:20
102:12
**lack** 21:10 33:16
**lady** 95:5
**Lambert** 79:11
**language** 62:19
**large** 72:13
84:20
**laws** 11:2,5,12
13:3 16:11
**layout** 99:14
**left** 70:1
**legal** 31:19,20
75:14 77:7
**letter** 4:5 55:17
55:18 57:15
**let's** 23:11 32:5
41:20 48:10
57:23 73:9
78:1 91:2,2,3
92:24 93:6
96:21
**level** 7:23 13:24
14:12 15:5

16:10 22:14
86:5 101:8
**Licking** 80:20,21
**line** 20:17 34:23
**liquid** 85:23
**list** 17:1 43:23
47:7 67:12
73:1 87:17
**listed** 59:24
68:20 92:4
**little** 6:15
**LLC** 1:13,19
105:1
**local** 40:14
**location** 19:2
**long** 5:24 18:19
28:14 30:3
96:5,17
**longer** 85:21
**look** 22:16 23:13
23:18,24 24:14
34:16 38:7
39:1,4 40:7
44:18 45:1,5
52:14,22 53:2
53:12 58:2
61:7 63:21
69:16 85:5
98:21
**looking** 34:21
52:15 87:11
96:3
**looks** 80:15
**low** 13:24 22:13
**lower** 7:23 14:12
15:5 88:19,20
**lunch** 19:10,14
19:15,18 20:9

_____
**M**
_____
**M** 104:3,24
**Magistrate** 1:7
**mailed** 82:4
**main** 32:13
**maintain** 30:15
31:6,8 32:10
56:13 83:20,23
**maintained** 95:18
**maintaining** 93:8
93:13
**majority** 88:24
**making** 6:10
**Maley** 67:13
**management** 7:8
7:19 10:11,23
12:11,20 13:13
14:2,4,6 16:19
17:19 21:12
22:7 25:11
32:1,4 33:14
33:16 42:13

Candace Burke Gales

May 14, 2008

46:9,14 47:1,5
47:16,23 59:19
63:24 67:22
68:5,18 70:1
70:14 73:3
77:14 82:16,20
101:8,8
**manager** 50:18
100:7
**managers** 87:5,7
87:17 88:7
99:14 100:2,4
100:18 101:1,7
102:16
**manual** 74:3
**man-hours** 38:7
**Marbley** 1:6
**mark** 44:2 56:19
56:21,24 57:10
57:23 67:1
73:9 78:1 80:9
91:3
**marked** 18:1
41:14,19 43:19
43:22 44:8,12
44:15 45:24
46:19 47:8
48:13 52:21
56:15,22 57:7
57:11,20,24
61:2,5 63:16
63:19 69:11,14
73:11 78:5,15
81:13,16 84:6
84:9 86:11,15
89:8,11,18,22
91:5,8 92:9,12
97:1,4
**married** 18:14
**match** 33:23
**material** 88:1
**matter** 105:26
**Mayle** 28:9 66:4
66:8,17,18
67:14,15
**ma'am** 5:13,18
7:4 8:2,5,7
10:4 11:4,20
14:7,10,24
15:7 17:22
18:18 21:9,24
22:11 25:21
27:9,16 28:3
30:17 32:9,19
32:22 33:2,9
33:18 34:10
36:16 41:2
42:15 43:16
47:17,21 48:6
51:21 56:11
57:17 58:4

60:4,16,24
61:18 64:3
68:22 69:8,20
71:8,11 72:14
73:18 77:20
78:9,21 88:15
100:3,19
**McManaway** 79:17
**mean** 7:9,10
10:20 16:11
20:9 21:17
22:23 23:5
24:1 26:5 34:5
39:24 50:8
51:7 53:18
61:24 62:10
63:1,2,5 67:1
72:3 76:15
81:23 82:2,18
90:16 91:21
94:20 95:21
97:20 100:20
**means** 40:1 62:10
82:3
**meet** 18:12 20:10
20:13 34:1,18
34:23 35:2,8
38:21 39:14
54:24
**meeting** 20:2,4
54:10 68:16
71:10,14 72:23
73:2,6 74:3,8
84:14,15,20,21
84:21,22 85:1
85:6
**meetings** 15:17
71:19,23 72:12
72:13,20 73:3
73:5,8,20,21
73:22,23 74:1
74:1 85:3
**meets** 38:16
**Meigs** 27:4
**Melanie** 19:15
**Melody** 18:13
19:3 20:5,13
20:23 21:1
**mentioned** 84:12
**met** 54:13,20
69:22 70:5,8
70:10,11
**minimum** 33:24
**minorities** 6:4
6:11,24 10:16
11:22 13:5
17:15 21:8,12
25:16 30:11
33:24 34:17
35:18,23 38:9
39:10,12 67:13

68:21 71:3
83:7,9
**minority** 7:11
28:5,6,19 35:1
35:4 39:13,20
40:5 41:16
82:16,20
**minutes** 44:18
53:2 58:1 61:7
63:21 69:16
**mischaracterize**
24:5
**mischaracteri...**
24:2
**missed** 27:6
**missing** 69:1
**Misspelling**
105:2
**mistake** 90:9
**misunderstand**
36:17
**misunderstanding**
68:11
**monitor** 6:5,9,24
10:21 52:10
71:5,15
**monitoring** 43:14
43:15 46:4,5
49:24
**Montgomery** 4:5
67:2 85:14
**month** 49:5
**monthly** 8:10
39:1,4
**Morgan** 27:5
**Morning** 3:1
**move** 37:10
**Mowrey** 4:15
84:11
**MP29** 8:10
**M-A-Y-L-E** 28:11

_____

**N**

N 2:1 3:4 4:1
**name** 5:6,8,9
28:10 54:6
64:20 66:6
72:6 79:11
84:12
**names** 64:12 67:9
**Nebbergall** 64:2
67:21
**nebulous** 52:9
**need** 35:1 39:13
39:22 40:3
87:8 90:14,23
**needed** 35:18
95:24
**needs** 18:10 74:2
**neutral** 62:19
**never** 12:2 16:7

17:14 19:6
44:20,22 45:6
45:10,12,14,14
53:2,4,5 54:2
54:18 55:13,18
70:17 71:1
90:11 94:11,23
101:17,21
**new** 40:17 77:19
98:2,4,7
**Noble** 27:5
**nonmanagement**
14:8
**nonunion** 50:23
50:24,24 51:5
**non-offensive**
63:5
**normally** 35:5
36:22 87:15
99:16
**notary** 3:10,12
3:15 104:3,24
**notebook** 96:12
96:13
**noted** 105:26
**notes** 3:12 85:5
**notice** 3:10
24:24
**notified** 94:8
**notify** 22:18
24:18
**Novark** 79:21
**null** 98:3
**number** 33:24
38:7 62:4 71:2
71:3 84:12
87:3 91:9
92:18
**numbered** 56:3
**numbers** 6:14
33:23 35:8,12
52:10,14,16
59:15,18 71:5
71:17 86:21
87:2,23 88:2
88:17,19 89:3
89:13 97:14,19
98:13,17,23
99:2,5,17
100:14,17,22

_____

**O**

O 3:4
**object** 11:14
24:7,8
**Objection** 11:8
23:15 25:18
69:23 70:6
**obviously** 42:19
93:15 100:9
**Occasionally**

13:23 14:1
**occupations**
99:23
**OCRC** 95:15
**ODOT** 6:22 8:8,13
9:5,7,23 17:20
18:6,17,23
20:18 21:2
41:9 55:24
62:12
**ODOT's** 8:3
**offer** 14:22 15:1
**office** 7:21 19:2
20:18 23:13,23
24:14 46:9
50:9,9,10,18
51:9 94:2
95:11 100:1
102:8 104:21
**officer** 12:19
13:2 54:6
56:10 67:1
86:23
**officers** 20:16
43:12 46:2
**offices** 23:4,6
**official** 3:14
88:3 100:7
**officials** 7:21
87:5,6,17 88:6
99:14 100:2,18
100:24 101:7
102:15
**OFPCP** 6:21
**oh** 1:14 2:8 29:1
38:5,11,13
45:11 47:2
62:21,24 63:7
64:7,8,13
65:11 66:9,15
67:20 68:3
72:11,21 74:4
74:20,23 77:6
78:23 81:5
82:9 84:19
87:12,14 91:24
94:8 99:24
102:1
**Ohio** 1:1,20 8:17
27:6,8,10 28:2
53:6 57:15
95:15 97:24
98:7 104:1,4
104:21,24
105:3
**Ohio's** 54:11
55:15
**OJT** 39:22
**okay** 5:19 6:23
7:22 8:18,21
9:12,24 11:1

Spectrum Reporting LLC

614-444-1000

Candace Burke Gales

May 14, 2008

| | | | | |
|---|---|---|---|---|
| 11:14,17,19 | 99:1,24 101:15 | 104:11 | 56:14 | 96:4 |
| 12:1,4,19 13:2 | 101:20 102:1 | **pages** 56:3 64:5 | **period** 9:22 17:2 | **positions** 30:12 |
| 13:11,14,21 | 102:14 103:2 | **Page/Line** 105:7 | 27:17 36:6 | 40:20 50:24 |
| 14:8 15:3,5 | 103:10 | **paper** 25:2 76:9 | 58:8,19,24 | 51:4,6,12,24 |
| 16:14 17:7,18 | **Omitted** 105:3 | **paperwork** 26:20 | 59:3 60:7 81:9 | 63:1,3 70:14 |
| 18:22 19:3,13 | **once** 7:7 19:18 | **paragraph** 83:4 | 88:21 91:17 | **possible** 82:14 |
| 19:17,22 20:11 | 19:20 34:20 | 83:19 | 92:2,6,19 | **post** 22:24 23:2 |
| 20:13,20,24 | 54:20,23,24 | **part** 7:8,15,17 | **person** 13:15 | **posted** 22:21 |
| 21:22 22:1,1 | 77:14 | 11:1,5 13:3,4 | 18:6,22 25:24 | 23:3 24:20 |
| 22:20 23:8,21 | **ones** 43:10 | 21:15 34:7 | 35:6 40:2 | 26:8 49:9,11 |
| 24:17 25:15 | **on-site** 4:7 20:9 | 36:11 37:14 | 49:24 96:1 | 50:4,7,9,12 |
| 26:14,21 27:1 | 46:14 58:7 | 41:23 45:13 | 102:23 | 51:3,11 |
| 27:1,24 29:7 | **on-the-job** 35:22 | 61:12 68:5,9 | **personnel** 7:20 | **posting** 24:15 |
| 29:19,23 30:8 | 35:24 36:1,10 | 70:2 71:17,20 | 12:10 30:15,21 | 48:18,23 50:6 |
| 30:11,18 32:20 | 37:18 39:9 | 82:3 87:24,24 | 31:2,4,6 32:7 | **postings** 50:19 |
| 32:23 33:3,8 | 41:20 83:10 | 88:12 | 41:16 46:23 | **Potts** 80:9 |
| 33:12,15 34:8 | **open** 20:17 94:10 | **partial** 83:4 | 47:2 49:16,20 | **prepare** 41:18 |
| 35:14,15 37:22 | **opening** 70:3,13 | **participate** 37:3 | 49:21 56:7,15 | 90:5,15 91:9 |
| 37:22 38:6,13 | **openings** 17:8 | 70:16 82:14 | 57:6 75:1,2,4 | **prepared** 86:23 |
| 38:15,24 39:8 | 22:20,24 24:19 | **participation** | 75:8 76:18 | 90:10 |
| 40:17 41:8,24 | 25:4 48:18 | 6:10 | **persons** 21:14 | **presence** 3:13 |
| 42:7,10,16,23 | 50:12 71:4 | **particular** 59:20 | 55:5 | 104:7 |
| 43:7 44:6,10 | 94:6 | **parties** 104:13 | **person's** 94:11 | **present** 2:10 |
| 44:21,24 45:4 | **Operation** 56:7 | 104:16,18 | **Phone** 105:4 | 15:11 |
| 45:9,16,19 | **operations** 88:9 | **parts** 45:17 | **physically** 46:5 | **presentations** |
| 46:17 47:7 | **operators** 36:8 | **part-time** 95:24 | **piece** 76:9 | 15:11 |
| 48:5,9,16 49:8 | 36:21,22,23 | 96:4 | **place** 37:16 | **presented** 21:4 |
| 49:14 51:18,22 | 99:20 102:11 | **passed** 12:10 | 50:12 104:11 | **president** 15:12 |
| 52:13,20,24 | **opinion** 11:15 | 42:14 | **Plaintiff** 1:5 | 65:6 66:23,24 |
| 53:5 54:3,5,9 | 69:21 70:4 | **Paul** 64:1 67:20 | 2:2 3:8 | 67:2,3 85:20 |
| 54:9,15,17 | 71:6 | 85:14,24 86:2 | **Plaintiff's** 45:5 | 85:22 |
| 55:2,9,12,21 | **opinions** 11:10 | **Paul's** 86:4 | 52:21 57:24 | **presidents** 13:12 |
| 56:2,8,12,18 | **opportunities** | **paving** 92:16 | 61:6 63:20 | 15:21 42:6 |
| 57:14 58:15 | 41:17,18 | **pay** 43:21 46:19 | 69:15 81:17 | 70:19 84:24 |
| 59:1,9,13,17 | **opportunity** 6:7 | 58:19 75:18,20 | 84:10 86:16 | **pretty** 19:3 63:9 |
| 59:21 61:8,16 | 45:4 | 77:11,18,19 | 89:12,23 91:9 | 71:12 |
| 61:19,24 62:8 | **option** 40:6 | 91:17 | 92:13 93:4 | **previous** 80:15 |
| 63:7,14,24 | **order** 34:18 | **payroll** 9:1,17 | **plan** 4:11,13 | **price** 38:4 |
| 64:10,20 65:3 | **original** 4:23 | 48:8 50:1 | 42:22 69:3,7 | **primes** 20:6 |
| 65:17 66:9,15 | **outline** 45:15 | 59:18,19 75:19 | 69:18 70:3,5 | **prior** 31:5 32:5 |
| 67:8,11,17,24 | **outlines** 73:17 | 75:21 76:15,16 | 82:10 | 32:6 33:8 |
| 68:10,19,23 | **outs** 26:4 | 76:18 77:10,15 | **plants** 87:24 | 37:11 48:21,24 |
| 69:2,9,21 71:1 | **outside** 7:7 | 77:16 86:24 | 88:9,11 98:10 | 49:3 51:19 |
| 71:6,12 72:9 | 24:12 | 87:2 88:10 | 101:6 | 94:2 95:2 |
| 72:21 73:9,16 | **overall** 58:15 | 91:17,18,20 | **please** 9:24 | **private** 87:16 |
| 74:4,11,20,23 | 97:14 | 101:9 | 45:20 52:22 | **probably** 18:20 |
| 75:10 77:6,9 | | **people** 13:16,19 | 56:4 105:4 | 19:16 27:5 |
| 78:14,19,24 | ——————————— | 15:6,10,12,13 | **poll** 99:7,7,8,16 | 44:3 76:9 |
| 81:8,11 82:9 | **P** | 21:19,23 37:13 | 99:19 | 93:19 99:22 |
| 82:13 83:3,19 | **P** 2:1,1 3:4 | 37:17 38:7 | **polled** 98:9,17 | 102:12 |
| 84:3 85:8,24 | 104:12 | 39:10 67:12 | 98:22 99:4,16 | **problem** 46:15 |
| 86:9,20 87:3,9 | **page** 4:2,4 8:16 | 68:20 70:15 | 100:23 101:3,6 | 75:11 76:8 |
| 87:12,14 88:5 | 18:1 41:10 | 72:15 73:1 | 101:8 | **problems** 20:14 |
| 88:14,16,23 | 45:9,10,11,12 | 75:8 83:12 | **polling** 98:5,8 | **procedure** 40:24 |
| 89:6,16 90:13 | 45:19,20 55:2 | 84:12 85:9,9 | 98:16 99:5,6 | 98:2 |
| 90:15,18 91:20 | 56:3 57:2 66:7 | 86:5 94:2 | **polls** 99:9 | **proceedings** |
| 91:24 92:7,17 | 66:8,12,13,15 | 99:16 | **population** 38:8 | 103:15 |
| 92:24 93:5,6 | 73:19 78:11,12 | **peoples** 71:20 | **portions** 44:22 | **process** 8:4,19 |
| 93:21 94:16 | 80:15 81:21 | **percentage** 35:9 | **position** 5:22,24 | 8:20 9:23 12:5 |
| 95:1,16 96:7 | 82:13 83:3 | 38:9,10 | 7:10 13:1 | 12:21 13:8,14 |
| 96:21 97:8,16 | 86:21 90:1,3,6 | **performance** | 14:13 85:18 | 14:11,15,18,19 |
| | 90:14,24 93:8 | | | |

Spectrum Reporting LLC

Candace Burke Gales

May 14, 2008

16:23 17:3
21:7,11 33:5
33:13,17 39:15
39:17,18 40:18
40:22,22 41:15
41:24 42:12
49:10 61:13
70:16 82:4
95:20 98:2,4
**professional**
99:15
**professionals**
87:18 100:2
**program** 4:14
10:13 17:15
35:22,24 36:2
36:3,5,23 37:4
37:5,9,14,16
37:18 39:23
41:21 56:5
82:15 83:10
**programs** 82:15
83:6,8,17
98:18
**project** 26:1,3
34:21
**projects** 6:12
26:9 59:2,7,8
59:11,12,13
81:1,4,6,8
90:19
**promote** 69:18
**promoted** 7:11
10:24 11:22
12:3,9,22 13:6
14:19 22:3,15
28:23 29:4
30:12 43:23
47:8,10 77:14
**promotion** 10:6
10:15 12:4
14:15 16:8,21
21:8,11 22:16
46:18 77:11,19
**promotional**
41:16 76:24
**promotions** 7:3,8
8:9 9:13,16,20
9:22 10:3 11:7
11:13 13:3,9
14:11 15:9,17
16:22,24 17:10
17:16,17,20
18:2 20:21
21:1 24:19
26:11 29:6
43:21 75:18
**proof** 3:14
**properly** 101:12
**protect** 6:3,24
**protecting** 7:11

25:16
**Prottengeier**
86:1,2,3
**provide** 42:2
43:17 46:5
86:21
**provided** 42:17
43:11 45:22
46:1 90:3,9
**providing** 103:5
**Pryor** 67:23 68:1
68:8,14,16,17
**PR139** 58:9,9,18
**Public** 2:7 104:3
104:24
**pulled** 59:17
68:15 77:12
98:1
**purposes** 44:13
48:14 57:21
61:3 63:17
69:12 73:12
78:6 81:14
84:7 86:12
89:9,19 91:6
92:10 97:2
**Pursuant** 104:12
**push** 90:20
**put** 9:3 35:7
50:12 59:23
60:2,15 61:14
68:14 94:18
95:8
**putting** 50:19
69:4

---

**Q**

**qualification**
3:15
**qualified** 70:15
96:3
**quarries** 88:1,9
88:11 98:11
**question** 5:15,17
10:7,8 11:15
13:4 14:14
16:9 18:10
23:21 24:7,10
33:15 50:3
58:21 70:4
72:3,4 93:3,7
**questioned** 11:21
15:22
**questions** 5:14
8:23,24 53:1
100:1 103:10
**quite** 103:12
**quotas** 35:10,14
**quotes** 35:11

---

**R**

**R** 2:1 104:1,12
105:5
**race** 28:18,21
29:23 64:18,21
69:19 77:22
94:23 95:13,14
**races** 60:6 64:6
**Radabaugh** 66:24
**rate** 77:19
**rates** 75:18,20
77:11,18
**Ray** 5:10
**Raymond** 1:4 2:11
**Ray's** 43:5
**read** 54:4 62:6
67:9 105:25,26
**reads** 82:14
83:19
**Reagan** 65:20
**really** 26:1
**reason** 32:20
61:19 75:11
105:1,7
**reasons** 105:27
**recall** 26:23
27:23 49:6
54:9,10 55:1
65:2 78:22
79:9 84:14,18
**receive** 8:22
45:14
**received** 98:7
**receptionist**
94:4 95:4
**receptionist's**
95:17
**recess** 48:11
93:2 96:23
**rechanged** 102:2
**recognize** 64:20
**recollection**
55:7
**record** 4:10 5:7
43:8 48:10,16
53:17 96:21
104:9 105:27
**records** 43:12
46:2,12
**recruit** 39:22
**recruited** 35:17
37:12
**recruitment**
39:11
**reduced** 3:11
104:7
**refer** 18:8 70:21
**reference** 63:6
**referred** 21:23
**referring** 19:7
82:23
**reflect** 95:12

97:14,17,18
**reflecting** 75:13
97:23
**reflective** 98:13
**reflects** 55:3
92:18 97:12
102:15
**refresh** 55:7
**Regan** 80:1
**regard** 69:19
**regarding** 9:15
9:20 10:15
11:6 12:20
16:20 17:16,19
22:3 77:11
**region's** 50:10
**regs** 34:19
**regulation** 58:18
**regulations** 6:6
8:6 98:8
**related** 65:22
**relating** 43:13
46:3
**relative** 104:15
104:17
**remember** 26:23
27:1 28:24
51:23
**repeat** 5:16
**report** 4:6 6:12
8:10,17 9:3,5
41:13 44:4
53:8 54:16,18
55:19,23 58:8
58:9 59:17,20
61:14,15 77:23
86:24 87:1,8
87:15,18,19,23
88:3 91:13
97:13 98:21
102:4,19 103:7
**reported** 101:18
101:19,20
**REPORTER** 6:17
78:3
**reporting** 1:13
1:19 34:3
105:1
**reports** 6:18
31:9,11,13,15
39:2,5 43:13
44:3 46:3,13
47:19 77:13,13
87:22 90:12,16
97:22 98:1,2,9
98:23
**represent** 5:10
**representative**
68:8
**representing**
53:9,17

**request** 22:2
39:21 40:5
105:26
**requested** 40:3
88:22
**require** 87:17
**required** 60:11
61:23 62:9
87:22
**requirements**
26:8 34:4,19
34:24
**requires** 95:15
**reserved** 103:3
**resources** 15:13
**responsible** 9:4
9:9 72:24
**rest** 45:12
**result** 43:14
46:4
**retire** 65:1
**retired** 64:24
**revamped** 98:1,19
**revamping** 102:19
**review** 4:6,16,18
8:20 16:23,23
17:3,20 19:23
21:5 44:9
45:14 53:8
54:5,11 55:3
55:16 61:12
81:3 86:17
104:14
**reviewed** 16:22
18:3,5 40:10
57:7
**reviewing** 9:23
**reviews** 18:16
41:9
**revised** 4:9 61:9
62:6
**revision** 61:10
**rewritten** 98:19
**Rice** 85:15
**Richard** 65:9,11
65:16
**Richey** 65:5,11
65:15,15 80:5
**right** 21:6 25:22
31:7 43:6,17
47:18 51:10
52:20 54:5
55:20 57:18
60:9 62:17
69:5 76:3,20
76:22,23 77:3
83:2,14,16
89:2 90:18
92:1 95:6,9
96:9 99:18,21
102:10

Spectrum Reporting LLC

614-444-1000

Candace Burke Gales

May 14, 2008

Page 114

**rights** 6:3,6,24
  7:12 25:16
**road** 23:10 93:20
**Rob** 2:11 7:21
  21:13 65:22
**Ron** 66:23
**room** 72:1
**Rule** 104:12
**rules** 98:8

---

**S**

**S** 2:1 3:4,4
**safety** 4:10
  15:12 31:14,14
  31:16
**salary** 76:19
  77:1,2
**sales** 99:15
  100:1
**saw** 90:6
**saying** 39:13
  45:3 51:3
  56:22 57:11,12
  57:15 73:21
**says** 5:2 25:2
  35:3 56:9,12
  59:15 61:8
  62:21 63:24
  67:20 83:4,5
  85:8 90:23
**school** 40:14
**Scott** 64:15
  78:19,24
**Scotty** 64:17
**screen** 87:2
**seal** 104:21
**season** 58:11,13
  58:17 60:8
  70:23
**seasonal** 21:23
**sec** 93:5
**second** 36:24
  55:2 66:5
  81:20 83:3
  96:22
**second-guessing**
  40:23
**secretarial**
  94:10
**secretaries** 51:7
  51:9
**secretary** 95:3
  95:16,24
**secretary's**
  95:17 96:8
**section** 41:14
  42:16 43:22,24
  44:3 45:24
  46:17 56:6
  57:3 87:4
  95:10

**see** 8:4 12:16
  23:14 24:15
  26:20,24 36:9
  41:19,20 42:10
  43:15 54:1,16
  56:16,17 57:5
  57:10 62:24
  65:14 69:6
  84:19 85:5
  90:12,14,24
  91:1,2 96:2
**seek** 41:18
**seen** 22:8,10
  32:24 44:20,22
  45:6,10,11,17
  53:2,4,5 54:2
  54:18 55:13
  73:14 78:8
  86:18 90:11
  97:5
**seminars** 15:16
**send** 9:21 10:2
  35:3 39:13
  74:12
**seniority** 41:3,5
**sent** 23:9 24:24
  95:11
**sentence** 74:2
**separate** 73:7,22
  74:8 84:21
**separately** 63:9
**September** 99:1
  101:1
**series** 5:14
**Services** 6:14,20
  53:7 55:16
**Session** 3:1
**set** 36:3 104:20
**sets** 26:1,2
**sex** 94:23
**sexual** 16:12
**Shane** 79:21
**shape** 98:13
**Sharrett** 2:11
  7:21 21:13
  65:12,20,22
  66:23 80:1
**sheet** 94:18
  105:1,5
**sheet(s)** 105:26
**Shelly** 1:7 5:11
  5:21 11:23
  12:5 13:6,9
  14:16,22 18:17
  25:3 26:11
  34:1 35:16
  37:24 38:16
  52:1 55:4
  56:24 58:15,22
  69:2,6,21
  72:10,18 74:11

  82:6,19 88:12
  92:19 97:15
  98:6 99:2
  102:18
**Shelly's** 4:11
**she's** 11:9 18:14
  25:18 44:22,22
  72:3 93:18
**short** 48:11 93:2
  96:23
**show** 31:18 38:18
  59:20,22
**shows** 60:23
**sign** 105:30
**signature** 61:16
  81:20 82:2
  97:8 103:13
  105:1,28,31
**signed** 40:11
**similar** 87:18
**simplified** 33:22
**simply** 33:22
**site** 25:2 36:6
  57:7 75:11
**sits** 95:5
**situations** 20:7
**six** 96:1
**skewed** 88:2 89:3
  89:13
**skills** 82:16,20
**slash** 61:20 62:1
  62:23
**slip** 25:2
**slot** 35:2,7
**slots** 83:14
**Slow** 6:15
**Small** 28:20
  29:12,20 30:9
**Small's** 28:21
  29:8
**somebody** 7:16
  12:17 69:1
  70:21,23
**Son** 65:12,24
**sorry** 24:9 30:8
  32:23 37:20
  39:16 42:18,21
  44:6 53:15
  54:22 60:19
  65:7 66:11
  68:10 84:18
**sort** 38:8 63:5
**southeastern**
  27:6,8
**SOUTHERN** 1:1
**speak** 93:12
**specific** 34:18
  37:5 93:13
**specifically**
  9:19 16:12
**specified** 104:11

**Spectrum** 1:13,19
  105:1
**spell** 5:6 28:10
**spoke** 21:13
**sponsoring** 67:22
**Square** 2:7
**SS** 104:2
**Stacy** 54:7 55:6
  104:3,24
**staff** 99:15
**stamped** 90:3
**stands** 80:16
**start** 34:20
  48:18 49:5
**started** 29:2,3
  30:6,9 49:10
  49:13 75:2
**state** 5:6 6:5,12
  26:8 34:2,4,19
  34:23 38:11
  53:6 54:11
  55:15 57:6,14
  82:5 87:22
  97:24 98:7
  101:16,18
  104:1,4,24
**states** 1:1 18:2
  18:4
**statewide** 97:14
  97:23
**statistics** 34:1
  58:21 86:22
**stats** 38:6,21
  39:14 102:15
**status** 36:7,18
  37:2,7,11,15
  99:14
**stay** 31:20
**stenotype** 104:7
**stenotypy** 3:11
**Stewart** 1:14,20
  105:2
**stipulated** 3:6
**stood** 68:7
**stuck** 96:7
**sub** 16:5,10
**subcontractor**
  6:10
**subcontractors**
  20:6 34:22
  82:22,24
**subject** 15:14
  84:13
**subjects** 15:14
**submitted** 101:16
**sufficient** 37:10
**Suite** 2:4
**superintendent**
  22:18 25:23,24
  29:8,13,17,21
  40:7 64:23

**65:4 66:19
superintendents**
  40:23
**supervisor** 79:5
  94:7
**supervisors**
  59:21,23,24
  60:15,17,22
**supervisory** 7:20
  12:10 63:1,3
**supplement** 4:14
  82:10
**supposed** 97:13
**sure** 6:11 29:16
  33:23 34:17,21
  40:9 55:9
  70:13 103:9
**surname** 65:18
**surprised** 93:20
**sworn** 5:2 104:5
**system** 75:19,21
  77:15,16 98:18
  101:12

---

**T**

**T** 3:4,4 104:1,1
**take** 13:18 22:15
  33:22 34:8
  44:18,24 52:22
  53:1 58:1 61:6
  63:20 69:15
  92:24 94:11
  101:10
**taken** 1:13 3:9
  43:14 46:4
  48:11 93:2
  96:23 102:21
  104:10 105:25
**talk** 15:13 20:6
  20:8,10 50:6
**talked** 14:20
  15:6 16:18
  39:8 41:9
  48:17 54:13
  70:19 83:15
**talking** 8:12
  16:20 26:15
  31:9,12 42:24
  45:21 52:7,8
  76:17 82:24
  88:11
**talks** 45:21
**targeted** 81:4,5
**taught** 68:8
**teach** 67:21
**teamsters** 36:9
  36:21
**tear** 94:17,20
**tear-off** 95:10
**tell** 12:7 22:17
  36:1,17 40:4

Candace Burke Gales

May 14, 2008

64:5 97:12
**telling** 53:13,23
72:3
**tells** 26:1 90:20
**Teresa** 2:3 5:9
40:8 44:21
**terminated** 76:8
**termination** 43:5
76:22
**terms** 33:22
**testified** 50:8
**testifies** 5:2
**testify** 59:12
93:16 104:5
**testifying** 53:22
**testimony** 24:2,5
45:6 49:14
51:19 89:2
101:15 102:6
104:6,9
**thank** 68:7 84:4
86:14 89:21
103:11
**Tharp** 85:15,19
**that's** 7:7 8:19
10:19 12:17
13:8,15 16:5
17:2 18:1 19:1
19:6 20:16
21:4 25:14
27:11 29:14
31:7 34:5,5,13
34:14 35:5
36:3 39:9,15
39:17 46:19
47:8 53:3,16
53:18,20 54:3
54:17 56:6,23
56:24 58:9
59:13 64:2,21
65:18 67:4
68:12,12,13
71:3 72:2 77:7
77:12,13 88:3
91:22 94:23
99:24
**there's** 7:16
11:6 15:10
24:24 26:7
27:5 28:20
31:13 39:17
42:1 44:2 54:6
70:3,13 74:8
75:1,11,12,16
75:17 76:7
84:11,21 93:7
93:12 100:7
**they're** 13:19
23:3,9,22
24:23 25:2
31:23 33:5

36:13,21,22
37:2 43:2
47:24 48:1
63:1,2 71:6,17
73:6,23 74:7
75:12,12 76:8
77:14,15 82:22
89:3,4 98:9
**they've** 9:22
18:2 70:7,8,10
75:2
**thing** 38:8
**things** 34:14
**think** 67:2 70:10
85:15 93:12,16
98:20 100:17
**third** 37:1 57:2
**Thomas** 79:12,13
**Thornville** 23:11
23:12 24:14
27:2,4,8,14
28:1,1,13 52:8
80:22 81:1
90:21 91:16
92:2,5,16,21
92:22 99:6
**thought** 24:9
43:1
**thousand** 52:5
**three** 66:8 68:21
81:4 94:19
**Tim** 66:18
**time** 3:9 9:22
17:2 23:20
32:9 36:6
39:21 45:1
58:24 59:3
60:7 61:22
81:9 88:21
92:2,19 98:3
99:8 104:10
105:30
**times** 20:1 25:19
75:22
**title** 29:10,14
29:16 53:16
67:5 86:4
104:11
**titles** 67:7,10
**today** 5:11 85:16
102:17
**told** 12:12 39:19
60:5 100:13
**Toledo** 87:21
**Tony** 65:6
**top** 53:12 56:7
61:9 67:3
**total** 62:4
**track** 77:17,21
**traditionally**
21:20

**train** 36:5,19
83:7,9
**trained** 37:9
**trainees** 37:4
**Trainer** 64:22
**training** 4:10
10:12 14:23
15:8 17:14
35:22,24 36:1
36:10,13,15
37:10,18 39:9
39:22 41:10,11
41:21 64:1
82:15 83:10
**transcribed** 3:13
61:14 104:8
**transcript** 4:23
104:14 105:25
**Transportation**
8:17
**Trevor** 28:20
29:8,12
**tribe** 30:1
**trouble** 62:16
**true** 56:18,23
57:8,12 104:9
**truth** 104:5
**trying** 62:14
93:23
**turn** 17:24 45:9
45:19 56:2,3
57:2 78:11
80:14
**twice** 65:10,14
**two** 34:14 43:4
52:4 59:24
73:7,22
**type** 31:14

___

**U**

**U** 3:4
**Uh-huh** 7:2 17:22
22:4 45:23
52:19 63:23
70:10 73:15
78:9 93:10
96:15 101:5
**ultimately** 9:9
**understand** 5:15
5:17 7:9 9:8
14:16 26:17
45:3,16 49:18
51:18 53:15
58:6,20 59:4,6
62:14 74:22,24
76:13,18 77:9
93:24 94:16
100:20 102:5
102:22
**understanding**
22:12 31:1

53:19 62:8,16
75:3
**understood** 49:14
**union** 8:1 21:23
22:13 23:9
25:1 35:3
36:23 39:12,19
39:20 40:1,4
40:12,13 41:1
74:12,17,18,19
74:21 75:4,7,9
75:10 76:6,13
76:14 83:6,13
**unionized** 7:24
10:21 13:15,16
21:18 23:1
24:23
**union's** 75:8
**UNITED** 1:1
**units** 98:11
**updated** 82:7
**upgrade** 83:7,9
**Upp** 104:3,24
**upper** 7:19 10:11
12:11,20 13:13
16:19 17:19
21:12 22:7
25:11 32:1,4
33:14,15 42:13
46:9,13,24
47:5,16,23
70:1,13 73:3
86:5
**use** 41:11
**uses** 8:8,13
**Utilization** 57:4
**utilized** 39:15
39:17

___

**V**

**Vaguely** 12:6
**value** 37:23 38:2
**variable** 91:15
92:16
**variables** 90:23
91:21
**various** 15:10,14
37:12 82:5
**vice** 13:12 15:20
42:5 65:6
66:23,24 67:2
70:19 84:24
85:20,22
**Vinton** 27:5
**violation** 31:15
**void** 44:4 98:4
**Voluntarily** 4:13
**Voluntary** 41:20
**VP** 22:18 65:7,8
**VPs** 9:1,18,19
10:11,23 16:18

17:19 29:11
52:17,18 85:2
85:12
**vs** 1:6 5:11

___

**W**

**Wait** 72:4
**waived** 3:15
104:13
**walk** 72:1 74:6
94:2
**walks** 95:1
**want** 20:2,4,8
21:15 24:7
42:23 44:24
76:5 93:11,17
96:11,13
**wanted** 45:2
98:17
**Ward** 2:7
**Washington** 58:10
58:12 97:22
**wasn't** 10:8 16:9
37:16 44:3
49:3,15,17,20
49:21 51:16
53:20 60:11
61:21,23 62:9
98:5 101:12,18
**way** 20:16 90:2,8
93:22 94:9,22
98:13
**website** 24:21
25:3
**Wednesday** 3:1
**week** 58:13,17,18
**weeks** 96:1,1
**welcome** 103:12
**welcoming** 68:6
**well-versed** 11:2
**went** 61:12
**weren't** 40:9
60:5 67:19
84:2 98:16
99:5
**West** 66:3,6,9
**we'll** 18:11 21:6
24:17 41:11
**we're** 5:11 19:7
21:18 42:24
43:7 48:16
73:19 74:21
82:22
**we've** 12:16
14:12,15,20
16:19,22 20:9
52:20 78:19
85:15 100:9
**what's** 25:22
27:12 29:23
39:18 42:18,19

Spectrum Reporting LLC

614-444-1000

Candace Burke Gales

May 14, 2008

| | | | | |
|---|---|---|---|---|
| 44:15 52:21 | **writing** 3:11 | 99:1,12 101:2 | 50:5,11,16 | 57 4:7 |
| 57:24 61:5 | **written** 82:6 | 101:22 102:1,7 | 61:11,22 62:6 | |
| 63:19 64:18 | 84:16 87:1 | 102:14 103:6 | 65:20 84:16,18 | **6** |
| 69:14 77:12 | **wrong** 18:13 | 05 27:17,18,18 | 85:4 91:3,13 | 6 4:11 27:11,12 |
| 81:16 84:9 | 36:12 97:17 | 32:6 80:24 | 91:14,14 92:6 | 69:9,11,15 |
| 86:15 89:11,22 | 105:3 | 92:15 | 97:21 98:12 | 60 4:9 |
| 91:8,18 92:4 | **wrote** 87:19 | 06 27:18 32:6 | 101:14 | 614-444-1000 |
| 92:12 97:4 | **www.spectrumr...** | 33:8 95:2 | 2005 4:14,21 | 1:21 105:4 |
| **WHEREOF** 104:20 | 1:22 | 07 44:17 45:21 | 28:4 31:5 46:7 | 614-444-3340 |
| **where's** 90:1 | | 07-377 1:6 | 48:22 49:8,19 | 105:4 |
| **white** 60:18,22 | **X** | 08 37:6 | 50:5,11,16 | 63 4:10 |
| 64:19,23 65:5 | X 4:1 42:1 46:1 | | 51:24 52:16 | 69 4:11 |
| 65:6,6,19 66:3 | | **1** | 72:10 83:24 | |
| 66:16,20 67:2 | **Y** | 1 4:5 37:6 44:12 | 84:13,14 97:21 | **7** |
| **who's** 18:4 94:9 | **Yeah** 10:1 40:16 | 44:16 45:5 | 97:21 98:6 | 7 4:12 56:3 57:3 |
| **wide** 26:16 | 59:4 | 61:11 90:1,6 | 2006 4:11 31:5 | 73:9,11 78:1 |
| **Wilson** 65:4 | **year** 4:14 19:16 | 90:14,24 91:14 | 48:22 49:1 | 7-03 4:17 |
| **witness** 3:7,13 | 19:18,20 21:20 | 91:17 92:15 | 98:6 | 7-30-04 4:8 |
| 11:9 104:8,13 | 21:20,20,21 | 105:2 | 2007 41:13 43:3 | 71 2:4 |
| 104:20 105:1 | 31:4 36:7,24 | 1st 99:1 101:2 | 2008 1:15 3:2 | 73 4:12 |
| 105:30 | 37:1,1,1 49:5 | 1-07 4:18 | 26:23 48:19,20 | 78 4:13 |
| **woman** 7:11 13:5 | 82:4,8,8 | 10 4:15 84:6,10 | 49:3 51:19 | |
| 94:9 | 101:23 102:3,4 | 10:30 55:5 | 102:3 104:22 | **8** |
| **women** 10:16 | **years** 6:1 16:8 | 100 2:4 72:15 | 23CFR 35:23 | 8 4:13 41:10 |
| 11:22 17:15 | 18:21 28:17 | 11 4:16 6:1 16:8 | 58:14 | 45:9,19 78:2,3 |
| 21:8,11 25:17 | 43:4 49:15 | 86:11,16 | 24 56:9 | 78:5 |
| 34:17 61:20 | 50:14,15 51:23 | 11-16-04 4:15 | 25 56:12 | 800-635-9071 |
| 62:1,1,2,5,10 | 65:2 82:11 | 11:49 103:16 | 25th 41:13 43:3 | 1:21 |
| 62:11,23 63:2 | 94:19 | 124:18 89:8,12 | 29 4:19,20,21 | 81 4:14 90:3 |
| 63:8 82:17,20 | **Yoakum** 4:5 | 127 2:7 | 91:13 92:14 | 82 90:4 |
| **Wooten** 54:7,7,10 | **you'll** 29:10 | 13 4:19 89:18,23 | 98:22 | 84 4:15 |
| 54:20 55:6,22 | 34:8 | 14 1:15 3:2 4:20 | | 86 4:16 |
| **Word** 105:2,3 | **you're** 6:17 8:3 | 91:5,9 | **3** | 89 4:18,19 |
| **work** 6:4 20:16 | 9:11 11:2 | 15 4:21 92:9,13 | 3 4:7 57:20,23 | |
| 21:19 28:12 | 17:18 19:7 | 15th 58:14,19 | 58:1 59:14 | **9** |
| 39:11 51:9 | 20:14 21:22 | 16 4:22 97:1,5 | 61:10,12 66:8 | 9 4:14 81:13,17 |
| 58:23 73:6,21 | 24:1,3,4 31:12 | 161 91:17,18,20 | 66:13,15 105:3 | 93:4,6 |
| 74:1,3 82:18 | 32:13 50:14,16 | 92:16 101:4 | 30th 58:8 61:11 | 9-1-04 97:10 |
| 83:21 85:7 | 51:3 53:22 | 162 87:13 101:7 | 91:14 92:15 | 9:49 1:15 3:2 |
| 87:16 91:16 | 55:9 57:15,16 | | 30(e) 104:12 | 91 4:20 |
| 92:16 93:9 | 59:18 63:21 | **2** | 333 1:14,20 | 92 4:21 |
| **worked** 30:3,13 | 64:10 66:5 | 2 4:6 48:13 | 105:2 | 96 4:22 |
| 30:24 | 67:17 71:12 | 52:21 59:21 | | |
| **workers** 99:15,19 | 73:21 87:11 | 66:12 90:1,6 | **4** | |
| 99:22 100:1,21 | 93:19 102:12 | 90:14,24 93:8 | 4 4:9 56:6 61:2 | |
| 102:11 | 103:12 | 105:2 | 61:6,17 105:3 | |
| **workforce** 7:7,24 | **you've** 17:14 | 2-1-05 4:13 | 4-16-04 4:10 | |
| 8:1 10:21,22 | 30:13 39:8 | 2-20 53:14 54:6 | 64:4 | |
| 20:7 21:16,17 | 43:19 45:4,6 | 55:9 | 40 57:5 | |
| 21:19 22:13 | 45:11,16 53:2 | 2-20-03 4:6 55:4 | 410 42:4 | |
| 36:11 74:16 | 53:5 70:17 | 2-8 80:24 | 43206 1:14,20 | |
| 88:24 101:3 | 71:1 76:8 | 20-something | 105:3 | |
| **working** 23:22 | 90:11 | 18:20 | 44 4:5 | |
| 24:12 33:24 | | 2003 4:19 26:10 | 44114 2:8 | |
| 34:18 72:17 | **Z** | 28:4 29:4 49:8 | 48 4:6 | |
| **works** 82:19 | **Zanesville** 87:20 | 49:19 50:5,11 | | |
| **wouldn't** 24:22 | | 50:16 54:10,12 | **5** | |
| 29:5 30:23 | **0** | 56:24 72:10 | 5 4:3,10 63:16 | |
| 46:22 52:12 | 03 27:17 53:14 | 2004 4:20,22 | 63:20 105:4 | |
| 57:8 74:6 75:7 | 54:6 55:10 | 26:14 28:4 | 5-17-05 4:5 | |
| 75:23 | 04 63:12 64:11 | 29:4 49:8,19 | 500 72:16,17 | |

Spectrum Reporting LLC

614-444-1000