Robin Sharrett                                          May 14, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Raymond Gibson,                    :

        Plaintiff,                 :
                                        Case No. 07-377
        vs.                        : Judge Marbley
                                     Magistrate Judge Abel
The Shelly Company,                :

        Defendant.                 :


- - - - -

DEPOSITION OF ROBIN SHARRETT
- - - - -



Taken at Spectrum Reporting LLC
333 East Stewart Avenue
Columbus, OH 43206
May 14, 2008, 11:59 a.m.



- - - - -


Spectrum Reporting LLC
333 Stewart Avenue, Columbus, Ohio 43206
614-444-1000 or 800-635-9071
www.spectrumreporting.com


- - - - -

Page 2

```
 1                    A P P E A R A N C E S

 2

      ON BEHALF OF PLAINTIFF:

 3

           Teresa Cunningham, Esq.
 4         71 Cavalier Boulevard, Suite 100
           Florence, KY 41042

 5

 6    ON BEHALF OF DEFENDANT:

 7         Frantz Ward
           127 Public Square
 8         Cleveland, OH 44114
           By Brian J. Kelly, Esq.

 9

10

      ALSO PRESENT:

11

           Raymond Gibson

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1                    Wednesday Morning Session

 2                     May 14, 2008, 11:59 a.m.

 3                         - - - - -

 4                  S T I P U L A T I O N S

 5                         - - - - -

 6        It is stipulated by counsel in attendance that

 7   the deposition of Robin Sharrett, a witness

 8   herein, called by the Plaintiff for

 9   cross-examination, may be taken at this time by

10   the notary by notice and agreement that said

11   deposition may be reduced to writing in stenotypy

12   by the notary, whose notes may thereafter be

13   transcribed out of the presence of the witness;

14   that proof of the official character and

15   qualification of the notary is waived.

16                         - - - - -

17

18

19

20

21

22

23

24
```

Robin Sharrett                                                    May 14, 2008

```
                                                          Page 4
 1                        I N D E X

 2    Examination By                                    Page

 3    Ms. Cunningham - Cross                             5

 4

      Deposition Exhibits                               Page

 5

        17 - Statement by Steve Conklin                 33

 6

        18 - Four statements                            35

 7

        19 - Letter to Gales from Sharrett, 12-18-06    42

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22    (Exhibits attached to the original transcript.)

23

24
```

1                    ROBIN SHARRETT

2    being first duly sworn, testifies and says as

3    follows:

4                    CROSS-EXAMINATION

5    BY MS. CUNNINGHAM:

6    Q.          Could you state your name for the

7    record and spell your last name.

8    A.          It's Robin M. Sharrett,

9    S-H-A-R-R-E-T-T.

10   Q.          My name is Teresa Cunningham, and I

11   represent Raymond Gibson in a case captioned

12   Gibson vs. The Shelly Company.  We're here for

13   your deposition.  Have you ever been deposed

14   before?

15   A.          Yes.

16   Q.          I'll be asking you a series of

17   questions.  If you don't understand the question,

18   please ask me to repeat it or I'll assume you

19   understand it and you can hear me.

20   A.          Fine.

21   Q.          You currently work for The Shelly

22   Company?

23   A.          Correct.

24   Q.          When were you first employed?

Robin Sharrett                                                    May 14, 2008

```
 1    A.          June of '94.

 2    Q.          In what position were you hired?

 3    A.          Superintendent.

 4    Q.          And you were promoted?

 5    A.          Correct.

 6    Q.          What year were you promoted?

 7    A.          I'm not certain of the date, but I'm

 8    going to speculate.

 9    Q.          Ballpark.

10    A.          A couple years after that I took on the

11    estimator's role, a few years after --

12    Q.          Go ahead.

13    A.          A few years after that I took on chief

14    estimator's role.  And probably in -- I'm not

15    certain when I took the general manager's

16    position, but it would have been in the past four

17    years, I believe.

18    Q.          What are your duties as general

19    manager?

20    A.          I'm ultimately responsible for all

21    facets of the division, which would include

22    safety, profits, management, staffing, quality.

23    Q.          Are you responsible --

24    A.          Pricing.
```

Page 7

1   Q.          I'm sorry.  Go ahead.

2   A.          Pricing, customer relations, employee

3   relations to the extent that it involves the

4   Thornville Division, implement the policies, be it

5   EEO or other employee facets.

6   Q.          Anything else?

7   A.          I'm sure there is, but --

8   Q.          Okay.  Are you responsible -- let's put

9   it this way:  Do you choose individuals who are to

10  be promoted in construction?

11  A.          Can you specify what level?  At what

12  level?

13  Q.          We're only concerned here about into

14  foreman positions.

15  A.          I usually would delegate that to the

16  operations managers for the specific product lines

17  that they were in charge of.

18  Q.          Could you explain what you mean by

19  that?

20  A.          Sure.  I have operations managers that

21  would -- or supervisors, managers in specific

22  departments or product lines which would be

23  potentially asphalt, aggregates, construction, and

24  those individual managers would select or bring to

Robin Sharrett                                          May 14, 2008

Page 8

1    me and make the selection of the promotion that

2    they deem appropriate.

3    Q.         Okay.  First of all, let's talk about

4    the -- what is the geographic region of the

5    Thornville Division from '03 through '05?

6    A.         It would have gone as far northeast as

7    Coshocton, as far south as Portsmouth, as far west

8    as Hillsboro, and as far north as Delaware.

9    Q.         Okay.  So there was no Columbus

10   Division, then?

11   A.         Yes.  There was.

12   Q.         There was?

13   A.         Well, I'm sorry.  The Columbus was a

14   separate division for aggregates.  I was

15   responsible for the construction, and that

16   included the Columbus area geographics.

17   Q.         So in construction, then, the

18   Thornville Division was over the Columbus area?

19   A.         That is correct.

20   Q.         Okay.  So for all intents and purposes,

21   what we're here for today, the geographic area

22   included the Columbus region from '03 to '05?

23   A.         Fine, yes.

24   Q.         Okay.  Okay.  Now, during the time

Robin Sharrett                                          May 14, 2008

Page 9

1    period -- excuse me.  I'm only focusing on between

2    '03 and '05.  Tell me the procedure for an

3    individual to be promoted into a foreman position.

4    A.        We would have -- on a -- weekly,

5    periodically, monthly, we have constant

6    interaction with the operations managers.  They

7    have constant interactions with the

8    superintendents, which oversee several foremen.

9    And their communication between them and the

10   foreman would be to evaluate potential needs and

11   capabilities of the people that were foreman that

12   might have some -- that we deem would be

13   successful in taking on the responsibilities of a

14   foreman.

15   Q.        So if I'm understanding this correctly,

16   these operation managers, who are they?  I haven't

17   seen anything that talks about an operations

18   manager.  I've seen foreman.  I've seen

19   superintendents.  Where does operations manager

20   come in?

21   A.        The superintendents would report to the

22   operations manager.  And the one for Thornville

23   construction would be Tim Anderson.

24   Q.        Okay.  Now, who are superintendents?

Robin Sharrett                                          May 14, 2008

1    A.          They are supervising several foremen.

2    Q.          Okay.  And then we have foreman below

3    them?

4    A.          Correct.

5    Q.          So we have foreman, superintendent,

6    operations manager?

7    A.          Correct.

8    Q.          So if I understand your testimony

9    correctly, you're saying that the foreman, the

10   superintendent, and the operations manager look at

11   these hourly workers, if you will, they observe

12   them?

13   A.          Correct.

14   Q.          And then if they determine that there's

15   someone who may qualify as a foreman, then they

16   come to you with that name?

17   A.          First we would need to identify a -- a

18   need, and then there would be conversation between

19   superintendents, the foremen themselves,

20   operations managers, myself, as to what that need

21   is and then once it's identified who might be the

22   best qualified applicant for that position.

23   Q.          Are those positions ever posted?

24   A.          They have been, yes.

Robin Sharrett                                                    May 14, 2008

Page 11

1    Q.          Let's only focus on the time period

2    between '03 and '05.

3    A.          Again, there was a transition where we

4    weren't posting them, and I can't be clear as to

5    when we did.  I know some of the divisions --

6    Twinsburg and Findlay were probably ahead of the

7    curve and were posting them earlier, they -- but

8    Thornville, I can't definitively say.

9    Q.          Were those positions posted after

10   Mr. Gibson left the company's employment?

11   A.          They have been.

12   Q.          Were they posted prior to Mr. Gibson

13   leaving the company?

14   A.          I believe they were, but I can't be

15   certain of that.

16   Q.          You're not certain.  How were they

17   posted?

18   A.          They would have been written and posted

19   at the shop and at the office.

20   Q.          What is the shop?

21   A.          That's where we repair the equipment or

22   the laydown yard where a lot of the field

23   operations would meet or coordinate.

24   Q.          And the office is the Thornville

Page 12

1    division's central office, if you will?

2    A.          Correct.

3    Q.          Their business office.

4                Union employees, were they ever at the

5    shop?

6    A.          Many times.

7    Q.          Many times.

8                On a daily basis does a union employee

9    go to the shop and then out to the job, or do they

10   report directly to the job?

11   A.          They're usually throughout assigned to

12   a job, but then there's periodic -- they may need

13   materials, they may need to exchange equipment.

14   So there's a lot of need for them to go to the

15   shop.

16   Q.          Okay.  But you can't say for certain

17   that every union employee that goes and works at a

18   certain construction site is going to be at the

19   shop?

20   A.          No, I can't.

21   Q.          No.

22                So it would be fair to say in some

23   instances union employee may never be at the shop?

24   A.          True.

Page 13

1    Q.          And there may be some instances where

2    they may be there periodically?

3    A.          Correct.

4    Q.          Would the foreman on a job select the

5    individual who would go to the shop to pick up

6    these supplies?

7    A.          Again, he wouldn't select those

8    persons.

9    Q.          Who would just go, then?  I don't

10   understand.  If you have a foreman, he's in charge

11   of a crew, correct?

12   A.          Correct.

13   Q.          You have someone on crew and some

14   supply is needed where they would have to go to

15   the shop.  Wouldn't the foreman select who would

16   leave the job site?

17   A.          Yes.

18   Q.          Okay.  So in that instance, the foreman

19   would select which crew member would go to the

20   shop to pick up whatever?

21   A.          True.

22   Q.          Correct?

23               And it is only there at the shop that

24   they would see these posted?

Robin Sharrett                                                May 14, 2008

Page 14

1    A.         The only written notification, yes.

2    Q.         Okay.  Or they could go to the central

3    office?

4    A.         Yes.

5    Q.         Would it be fair to say that union

6    employees were rarely or if ever at the central

7    office?

8    A.         No, I don't think that would be fair to

9    say.

10   Q.         Oh, okay.  Union members are routinely

11   at central office?

12   A.         Not routinely.  But you said -- you

13   characterized it as almost never.  And I would say

14   that's a mischaracterization.

15   Q.         Okay.  Well, how often would they be at

16   the central office?

17   A.         I'd say several times per year.

18   Q.         Per year?

19   A.         Either to pick up their check or get

20   training or meet with their foreman, to drop off

21   their car.  There's a lot of coordination.

22   Q.         Okay.  How are checks generally

23   distributed?

24   A.         They're mailed or passed out.

Robin Sharrett                                                    May 14, 2008

Page 15

```
 1   Q.          Passed out at the job site?

 2   A.          Yes.

 3   Q.          Or mailed.  So as a general rule, a

 4   crew member, a union employee, if you will,

 5   doesn't drive to central office to pick up their

 6   check on a weekly basis?

 7   A.          You would be surprised.  A lot do

 8   towards the end of the season, if they need --

 9   they want timely or they've been laid off, that

10   would be a typical -- because basically they're

11   not at the job site where you can hand it to them,

12   and a lot do receive their check in hand.  So if

13   they've been laid off, they would show up at the

14   office.

15   Q.          Oh, that's after they've been laid off?

16   A.          For that season.

17   Q.          Right.  Okay.  But during the season

18   we're just going full tilt, beginning of the

19   season, would it be fair to say that crew members,

20   union members, are not at central office on a

21   weekly basis?

22   A.          Correct.

23   Q.          Would it be fair to say that union

24   members are not at central office on a biweekly
```

Page 16

1   basis?

2   A.          Correct.

3   Q.          Would it be fair to say that union

4   members are not at the central office on a monthly

5   basis?

6   A.          Correct.

7   Q.          Would it be fair to say that union

8   members are not at the central office on a

9   bimonthly basis?

10  A.          Correct.

11  Q.          Would it be fair to say that union

12  members are not at central office every three

13  months?

14  A.          I'd say there's where you're probably

15  drawing the line.

16  Q.          Okay.  So they might be there once

17  every three months?

18  A.          A few times per season I would expect

19  most do.

20  Q.          Okay.  Would it be fair to say also

21  that not every union member who is at a job site

22  would be selected by a foreman to go to the shop

23  to pick up whatever supplies?

24  A.          Correct.

Robin Sharrett                                      May 14, 2008

Page 17

1   Q.          Okay.  All right.  And also just as I

2   recall your testimony, you were not certain

3   whether or not any foreman positions were posted

4   during -- from 2002 to 2005?

5   A.          Correct.

6   Q.          Okay.  You're not sure when this

7   posting started?

8   A.          I've written them before.  I can't tell

9   you.  It's been several years ago, so I can't tell

10  you before or after Ray, definitively.

11  Q.          Okay.  All right.  So other than what

12  we've talked about with this process of the

13  operations managers, the superintendents and the

14  foremen getting together and talking about who may

15  be a good foreman and then getting with you on a

16  name once a position is identified, is there any

17  other process that an employee can go through to

18  be promoted into a foreman's position?

19  A.          He certainly could request to be

20  promoted into a foreman's position.

21  Q.          Okay.

22  A.          Through their supervisor, through

23  myself, through the operations manager, any number

24  of employees or supervisors.

1    Q.        What do you mean by "request"?

2    A.        Show some interest either verbally or

3    written.

4    Q.        Are union members when they're hired,

5    are they told that they can submit a request for a

6    promotion?

7    A.        They're told that they're certainly

8    open to request or communicate in any manner that

9    would be appropriate.  If they have a problem, we

10   tell them to contact us, contact Candace Gales.

11   Q.        Okay.  Focus on the time period '03 to

12   '05.

13   A.        Uh-huh.

14   Q.        Were union employees told when they

15   were hired that they could submit a request for a

16   promotion?

17   A.        No.

18   Q.        When union members were hired between

19   '03 and '05 -- and I know that you said you can't

20   really remember when this posting occurred.  But

21   if there was a posting, were they told that

22   openings are posted?

23   A.        I can say with certainty they are now.

24   I can't say with certainty that they were.

Page 19

1    Q.          Okay.  All right.  So this request for

2    information would just be a show in interest

3    verbally or in writing with their foreman?

4    A.          Usually if they want -- someone wants

5    something they would request it.

6    Q.          Okay.

7    A.          That's generally how it works.

8    Q.          Okay.  Any other process than the two

9    we've talked about for an individual to be

10   promoted?

11   A.          Well, I think you skimmed over the fact

12   that that conversation -- those folks talk daily

13   as to what the capabilities, they make site visits

14   weekly, probably the operations visits.  A manager

15   visits each site at least a couple times a month.

16   He would talk to the foreman, get feedback not

17   only on people but equipment, quality.  There

18   would be numerous conversations, and there would

19   be a conversation about how individuals are doing,

20   how are their work performances.

21   Q.          Is any of this documented?

22   A.          No.

23   Q.          Because we've discussed the personnel

24   files with Ms. Gales, and you were here.  And as I

Page 20

1    understand it, Shelly does not keep personnel

2    files on union members, correct?

3    A.        I'm not even sure that -- you would

4    have to talk to our legal department.  But we are

5    under a collective bargaining agreement, and I'm

6    not sure that we can nor -- I'm not sure that we

7    can even request them to solicit -- solicit them

8    for promotions.  I would say that's probably

9    contrary to what the union would find appealing.

10   Q.        I'm not asking whether or not Shelly

11   solicits for promotions.  I'm talking about

12   opportunities for individuals where they can

13   become aware of promotions and they can take steps

14   to obtain promotions.  So you're talking about

15   these operations managers, these superintendents

16   and foremen discussing individuals on the job

17   site, their qualifications, so on and so forth,

18   but yet you're telling me there's no documentation

19   reflecting that?

20   A.        It would fill this room.  They have

21   conversations hourly, daily.  It would be

22   insurmountable to document all their conversation.

23   Q.        Well, I'm not asking about every

24   conversation about every subject.  I'm simply

Page 21

1    focusing on promotions here.

2    A.          Well, you've identified one.  We don't

3    deem it necessary, as we don't deem it necessary

4    to talk about what the quality was yesterday or

5    the schedule was a week ago.  It doesn't really

6    enter into why we would want that information.

7    Q.          I guess I don't understand your

8    response.  You're saying that you're -- you don't

9    think it's important to document union members'

10   interest in promotions?

11   A.          I don't think it's important to

12   document what is known.

13   Q.          Okay.  So just to be fair, then,

14   there's no documentation reflecting these

15   superintendents, operation managers or foremen's

16   discussions about so-and-so, be it whoever, is

17   interested in a promotion?

18   A.          Correct.

19   Q.          Okay.  It's all in their heads?

20   A.          Like many other things, yes.

21   Q.          Okay.  Now, what about the

22   qualifications.  Tell me the qualifications for a

23   foreman's position.

24   A.          I'd say he needs to demonstrate

1    leadership, a significant propensity for safety

2    and the safety of his workers, selflessness,

3    highly motivated to get to work on time, diligent,

4    articulate, needs to have a significant -- or some

5    math skills, be able to calculate tonnage,

6    understanding the nuances of personalities and

7    what motivates individual crew members to get the

8    most performance from them.

9    Q.        Okay.  How much do foremen make?

10   A.        I guess that would vary by company.

11   Q.        By company?

12   A.        Like Shelly & Sands -- you said

13   foreman.

14   Q.        Oh, no, I'm just focused on the

15   Thornville Division from 2002 to 2005 and then

16   current as far as the wages.  Do you remember?

17   A.        Would you talk base rate, fringes?

18   Q.        Let's talk about it all.

19   A.        Okay.  Base rates vary by experience.

20   Q.        Give me the ranges.

21   A.        Oh, 50 -- I would say 48,000 up to

22   65,000.

23   Q.        Okay.  What about your fringes?

24   A.        They would be enrolled in a retirement

Page 23

1    plan.  And I should qualify.  These are Thornville

2    foremen who are salaried.

3    Q.          That's all I care about.

4    A.          Okay.  You have --

5    Q.          Do you have Thornville foremen who are

6    hourly?

7    A.          Union hourly.

8    Q.          Okay.  We'll talk about that in a

9    minute.

10   A.          We don't have them in Thornville.  We

11   have them in Findlay and Twinsburg.

12   Q.          Okay.  I'm not allowed to ask about

13   Findlay and -- and the other division.

14              So let's just focus on Thornville.  So

15   they're all salaried, right?

16   A.          Correct, managers.

17   Q.          Okay.  We talked about retirement

18   plans.  Is that 401(k)?

19   A.          No.  It's a profit-sharing plan.

20   Q.          Okay.

21   A.          Medical benefits.

22   Q.          Vacation?

23   A.          Vacation.

24   Q.          Sick days?

Page 24

```
 1   A.          There is a policy.

 2   Q.          Okay.  What is it?

 3   A.          Five days or something.

 4   Q.          Okay.  Any other benefits?

 5   A.          Company vehicle for the period of time

 6   they're working.

 7   Q.          Okay.  May -- April through September?

 8   A.          Lodging --

 9   Q.          Lodging.

10   A.          -- while they're working, travel

11   expenses.  I think that pretty much summarizes it.

12   Q.          Have you ever calculated the cost of

13   the benefits?

14   A.          No.  I haven't individually, no.

15   Q.          Okay.  All right.  Now, let's get back

16   to these qualifications.  You discussed a laundry

17   list of qualifications for a foreman position.

18   A.          Uh-huh.

19   Q.          Are those in writing?

20   A.          We have a 1945 manual, foremen's manual

21   that the company's culture was bore out of.  I've

22   read it; the foremen have read it.  I've

23   disseminated it.  It pretty much identifies what

24   -- what we're looking for and what is necessary to
```

Robin Sharrett                                                May 14, 2008

Page 25

```
 1   be a good foreman.
 2   Q.          This was created in 1945?
 3   A.          That's correct.
 4   Q.          Have it ever been updated?
 5   A.          I've read it.  And to be honest with
 6   you, the values and the requirements haven't
 7   changed from then to now.
 8   Q.          Okay.  So you hand this out to foremen
 9   once they're promoted?
10   A.          I've handed it out to others.
11   Q.          Who else have you handed it out to?
12   A.          I've handed it out to all the foremen.
13   Q.          Okay.  But to all the foremen?
14   A.          Yes.  Supervision, superintendents.  I
15   found it unusual how succinct it was and how
16   applicable it was 50 years ago.  So I would say
17   that probably if you were looking for a written
18   characterization of a foreman's position, that's
19   probably what I would give you a copy of.
20   Q.          Could you provide a copy of that to
21   your counsel?
22   A.          I certainly could.
23   Q.          What is this called, the 1945 foreman's
24   manual?
```

Page 26

1   A.        I think it's called the Shelly Asphalt

2   Foreman's Description or what have you.

3   Q.        Does it say, "Foreman's Description"?

4   A.        It does say "Foreman's" on there

5   somewhere.

6   Q.        Okay.  So this is disseminated to

7   individuals once they're promoted.  It's not

8   disseminated to individuals who are not promoted?

9   A.        It's not -- to be honest with you, I'm

10  not sure it's been disseminated to every foreman.

11  I explained that the culture of what's required as

12  a foreman has bore out of that.

13  Q.        Okay.  I'm just asking for any

14  documentation.  Often companies have notices and

15  post job openings and say, here is the position

16  and here are the qualifications.

17  A.        We do that.

18  Q.        Now you do that?

19  A.        We do.

20  Q.        Did you do that between 2002 and 2005?

21  A.        Again, I would have to -- I can't be

22  definitive on that.  When Ray's tenure was, I

23  can't definitively say that we had a written

24  posting for that position.

Page 27

1    Q.          Okay.  This posting that you are

2    posting now, did that have the qualifications of a

3    foreman on it?

4    A.          Yes.

5    Q.          Okay.  It had the opening and the

6    qualifications, and you're not sure when that came

7    out?

8    A.          Correct.

9    Q.          Okay.  Do you think it was 2006 or

10   sooner?

11   A.          Not certain.

12   Q.          Okay.  All right.  Okay.  So we talked

13   about foreman qualifications and we talked about

14   these individuals who would get together and

15   present, I guess, a name to you, if you will.

16              How are foremen selected for

17   promotions, individuals selected for promotion

18   into foremen positions?

19   A.          We would identify a need and then look

20   for internal candidates first and foremost.

21   Q.          And this is when you get back to these

22   individuals?

23   A.          I don't understand the question.

24   Q.          Okay.  Well, how do you look for

Page 28

1    internal candidates?

2    A.          We identify them through the -- the

3    process that we discussed.

4    Q.          Okay.  What's next?

5    A.          That's how we identify them.

6    Q.          Okay.  Who makes the decision?

7    A.          Who makes the decision?  Usually the

8    operations manager, superintendents and myself are

9    included in a conversation who would -- and then

10   the operations manager.  If we saw a need, we

11   would ask that individual that we see as a

12   promising candidate.  Through an interview

13   process, get his input, his concerns, his interest

14   level, and then decide if -- if they have to take

15   it any further.

16   Q.          Okay.  So once you identify a position,

17   then essentially you and the operations managers,

18   the superintendents and the foremen come up with a

19   candidate?

20   A.          Are we talking about -- you told me

21   when we started that we were going to go 2003 to

22   2005.  That's the policy I'm describing.

23   Q.          Right.  That's fine.

24   A.          Okay.  Because it has changed.

Page 29

1   Q.          Oh, I don't care about how it's

2   changed.  That's fine.

3   A.          Okay.

4   Q.          That was the process then?

5   A.          Yes.

6   Q.          So essentially it would be fair to say

7   that potential candidates, union workers, didn't

8   know about openings but once that management

9   identified an opening and they had a discussion

10  about potential candidates, then management as a

11  group, being the operations managers, the

12  superintendents and the foremen and you would

13  discuss who you wanted to be a candidate and then

14  approach that individual?

15  A.          That's part of our job requirements is

16  to identify and staff the division, yes.

17  Q.          Okay.  From 2003 to 2005, how many

18  minority foremen did the Thornville Division have?

19  A.          As a percentage or in raw numbers?

20  Q.          No.  Raw numbers.

21  A.          Three.  Two or three.

22  Q.          Two or three.

23              How many crews were going?  And we can

24  take 2003.

Page 30

1  A.        Can I give a rough estimate?

2  Q.        Yeah.  You can ball park.

3  A.        18 or 20.

4  Q.        18 or 20 crews?

5  A.        Correct.

6  Q.        Is there one foreman for every crew?

7  A.        Generally, yes.

8  Q.        So it would be fair to say two to three

9  minorities and -- that would leave maybe 17 to 18

10 Caucasians?

11 A.        I guess as a percentage it would be

12 about 10 percent, yes --

13 Q.        Okay.

14 A.        -- or more.

15 Q.        Who were those minorities?

16 A.        Donnie Mayle, Jeff Barnes, and Trevor

17 Small may have been a foreman at one point, but he

18 was later promoted to an area manager.

19 Q.        Do you recall when he was promoted?

20 A.        I can't, no.

21 Q.        Okay.  And Mr. Barnes and Mr. Small are

22 American Indian?

23 A.        That is correct.

24 Q.        Now, is Donnie Mailey -- "Mailey," am I

Page 31

1   mispronouncing that?

2   A.         Mayle.

3   Q.         Mayle.  When was he promoted?

4   A.         He was a foreman when I arrived, so I

5   can't -- I can't describe that.

6   Q.         Okay.  Prior to -- I forget when you

7   started, '90-something?

8   A.         '4.

9   Q.         '94.

10             What about Jeff Barnes?

11  A.         He was promoted when Trevor Small was

12  promoted to area manager.

13  Q.         Do you recall the year?

14  A.         If I'm going to give rough numbers,

15  between five and 10 years ago.

16  Q.         Okay.

17  A.         That's a pretty broad range, but --

18  Q.         Okay.  How many Caucasians were

19  promoted into foremen positions in 2003?

20  A.         I'm not certain of that.  I think you

21  have that information.

22  Q.         Do you recall?

23  A.         I can't.

24  Q.         Okay.  What about 2004?

Robin Sharrett                                            May 14, 2008

Page 32

1    A.          I can't recall.  I think we provided

2    that to you.

3    Q.          Okay.  What about 2005?

4    A.          Again, the same response.

5    Q.          Okay.  You just don't recall?

6    A.          I think.

7                MR. KELLY:  He may be --

8    A.          If you presented me the -- the

9    information that we provided, I probably could

10   recall.

11   Q.          Okay.  I just want to see what you

12   remember.

13   A.          Okay.

14   Q.          Were there any Caucasians promoted

15   between 2003 and 2005?

16   A.          No.

17   Q.          In 2005, which division did Charles

18   Boring work in?

19   A.          Thornville.

20   Q.          Okay.  You just testified that in '05

21   there were not any promotions into foremen

22   positions, correct?

23   A.          Can you repeat the question?

24   Q.          You just testified that in 2005 there

Page 33

1    were no promotions into foremen positions?

2    A.          No, I did not testify to that.

3    Q.          Oh, you didn't?  Were there?

4    A.          You asked me if there were minority

5    foremans promoted in that year.

6    Q.          Oh, I thought --

7    A.          And my response was no.

8    Q.          Okay.  Were there Caucasians promoted?

9    A.          I answered your question.  And I

10   couldn't recall unless I was provided the data

11   that I submitted already.

12   Q.          Okay.

13               MR. KELLY:  I think Rob verified the

14   discovery request, so if you have those.

15               MS. CUNNINGHAM:  Excuse me.

16               MR. KELLY:  I think Rob verified the

17   discovery responses that had that information.

18               MS. CUNNINGHAM:  Yeah, I was looking

19   for the EEO documents that talk about it.

20               MR. KELLY:  It might be -- well, I'm

21   not going to tell you how to do it.

22               MS. CUNNINGHAM:  Well, let's mark this.

23                         - - - - -

24               Thereupon, Deposition Exhibit 17 is marked

Page 34

1    for purposes of identification.

2                        - - - - -

3    Q.           I'm handing you what's been marked as

4    Plaintiff's Exhibit No. 17.

5    A.           Okay.

6    Q.           Okay.  Have you seen this document

7    before?

8    A.           No.

9    Q.           Oh, okay.  This document states that in

10   2005 and 2006 there were no promotions.

11                MR. KELLY:  You should be specific

12   about what the document represents.

13   Q.           During the past six months there's no

14   -- there's no data on it.  Do you know --

15   A.           Well, I think --

16                MR. KELLY:  You characterize -- go

17   ahead.  You can go ahead.

18   A.           I think the letterhead clarifies that

19   it is The Shelly Company Twinsburg Division.

20   Q.           Oh, okay.  I'm sorry.  So it's not

21   Thornville?

22   A.           Doesn't -- no, it's not.

23   Q.           Okay.  All right.  I have received a

24   response from your counsel pursuant to the Judge's

Page 35

1    order.  I can make that a part of the exhibit if

2    you would like.  Of course, I've written on it.

3                    - - - - -

4            Thereupon, Deposition Exhibit 18 is marked

5    for purposes of identification.

6                    - - - - -

7    Q.        I'm handing you what's been marked

8    Plaintiff's Exhibit 18.  Now, this is a document

9    that I received from your counsel in response to

10   the court's order to provide the promotion

11   information with the races from 2002 to 2003.

12            Have you seen this document prior to

13   today?

14   A.        Yes.

15   Q.        Okay.

16            MR. KELLY:  Actually, just for purpose

17   of the record it was '03 to '05.

18            MS. CUNNINGHAM:  I'm sorry.

19            MR. KELLY:  That's okay.

20   Q.        '03 to '05.  Is the information in this

21   document correct?

22   A.        Yes.

23   Q.        Okay.  All right.  Now, this document

24   has got that Brad Boyer left, but he was -- but

Page 36

```
 1    Ron Gutridge who replaced him who was Caucasian

 2    was not formally promoted into a foreman position

 3    until 2006.

 4    A.         That's correct.

 5    Q.         Why is that?

 6    A.         We like to try an interim period.

 7    Basically, Brad left the crew in midseason and so

 8    we needed someone -- what was most appropriate at

 9    that specific case was taking Mr. Gutridge, who

10    was on the crew who had worked with the other five

11    team members, and promote him to the leadership

12    role.

13               But for his own benefit and our

14    benefit, we wanted to go through an interim trial

15    period.  And so we maintained that he was still in

16    the union and a craft union employee for --

17    throughout 2005.  He wasn't paid salary; he was

18    paid hourly.

19               And then at the end of the season had a

20    meeting with Rod.  I know the operations manager

21    didn't.  I can't remember if I was in the meeting

22    or not, to discuss how things went, whether he was

23    satisfied with it, and whether we were satisfied

24    with his performance.
```

Page 37

```
 1                And then after that conclusion and both

 2    parties were interested, we promoted him to a full

 3    salary position in '06.

 4    Q.         Did Mr. Gutridge perform the job duties

 5    of a foreman?

 6    A.         Yes.

 7    Q.         This document also reflects during 2004

 8    Shelly Company promoted Dave Scott from a position

 9    of distributor manager, a foreman position, in the

10    Thornville Division.  Are you familiar with that

11    promotion?

12    A.         Yes.

13    Q.         Okay.  Can you explain how Mr. Scott

14    came to be chosen?

15    A.         He had, I think, seven years of asphalt

16    paving experience.  He had been with that crew,

17    working with those people on that crew for several

18    years.  And he showed the capabilities that we

19    were interested in as far as leadership and

20    safety, hard-working, and he was the most

21    appropriate candidate that we felt qualified for

22    that position.

23    Q.         Was that position posted?

24    A.         I don't believe it was.
```

Page 38

```
 1   Q.         Okay.  So you went through this process

 2   of talking with the superintendent, the foreman

 3   and the -- what was the title here?  Operations

 4   manager.  And the four of you came up with Dave

 5   Scott's name?

 6   A.         I wasn't really involved in that

 7   conversation.  They came to me and said, hey,

 8   we've -- we've had a foreman that quit, which was

 9   -- I think his name was Steve DeBoard and they

10   needed somebody.  Again, it was midseason.  And --

11   but very early.  He had been with us for a long

12   time.  They said, hey, asked me what I thought.  I

13   asked the appropriate questions as to, you know,

14   why they felt he was qualified, and they made the

15   decision to go ahead and promote him.

16   Q.         Were any minorities considered for the

17   position Mr. Scott filled?

18   A.         I'd have to refer that question to the

19   operations manager and the superintendent.

20   Q.         Who's the operations --

21   A.         They probably -- I would say they --

22   yes, there was.  If the crew members -- they

23   looked at the entire crew and felt that -- that is

24   usually the most appropriate way to promote a
```

Page 39

1    craftsperson into a foreman's position.  That he

2    knows the people that he's working with, he knows

3    their capabilities.  So it's -- for a new foreman

4    coming from craft, that's generally the way we

5    work it is they're taken from that crew who is a

6    very tight-knit group who work from April to

7    November together, generally six people with a

8    couple flaggers that kind of come and go.

9              And there's a lot of personalities, if

10   you will, there's a -- quite a team environment --

11   or mechanics to it.  And so if we can, we try to

12   select somebody that's already comfortable with

13   that team.  So if there was a minority on that

14   crew, I'd say they were looked at or considered.

15   If there wasn't a minority, then probably just the

16   people in that crew were considered.

17   Q.         Okay.  Do you have any documentation

18   that reflects who was in each crew?

19   A.         No, I don't.

20   Q.         Okay.  Does the company keep that type

21   of documentation?

22   A.         I think payroll records might be able

23   to -- you might be able to ferret it out through

24   payroll records, but I don't know if it's -- at

Page 40

```
 1   what level of detail.

 2   Q.          Do you know what crew Dave Scott was on

 3   in '04?

 4   A.          It became his crew.

 5   Q.          Okay.  But I would assume through

 6   payroll records you would identify that by the

 7   foreman, the previous foreman?

 8   A.          Uh-huh.

 9   Q.          And I'm sorry.  You gave his name, but

10   I didn't write it down.

11   A.          Either Steve or John DeBoard.  I'm not

12   certain.

13   Q.          How do you spell the last name?

14   A.          D-E-B-O-R-B -- D-E-B-O-A-R-D.

15   Q.          So it would be Steve DeBoard's crew?

16   A.          I believe that's correct.

17   Q.          Okay.  Could you look for that

18   information and provide it to your counsel?

19   A.          Okay.  And I'm sure one part of that --

20   that we may have left out was the interest level.

21   You know, Dave Scott would have had to want to be

22   a foreman as well.  You know, if they presented

23   him with it, he would have had to concur that,

24   yes, I do want to take on additional
```

Page 41

1    responsibility and agree to that.

2    Q.          Who was the superintendent over Steve

3    DeBoard's crew?

4    A.          Jim Pritchard, who is currently the

5    operations manager for Columbus Division.

6    Q.          And who's the -- who was the operations

7    manager of Steve DeBoard's crew?

8    A.          Tim Anderson.  There's only one for

9    Thornville construction.

10   Q.          Oh, I see.

11               What were Dave Scott's qualifications?

12   A.          Because I didn't make the selection, I

13   can't -- I can just convey what was conveyed to

14   me.

15   Q.          Okay.

16   A.          Which was hard-working, well-liked by

17   the crew, got along well with others, knew the

18   work very well, had been in the asphalt paving

19   portion, had been the -- I would say the lead man.

20   Usually there's a key person that, you know --

21   that shows a lot of initiative to -- and I would

22   say that's how he was characterized.

23   Q.          Okay.  What were Mr. Gutridge's

24   qualifications?

Page 42

1    A.          Very similar to Dave Scott's.

2    Q.          Okay.  And I may have asked you this

3    before, but it was the same situation where you

4    got together with these individuals and you --

5    they came up with Rod Gutridge's name?

6    A.          Correct.

7    Q.          And you said, okay?

8    A.          I didn't know Rod Gutridge, you know,

9    firsthand.  I did not know Dave Scott firsthand.

10   Q.          Okay.  On Mr. Boyer's crew in '05, were

11   there any minorities?

12   A.          I don't know that.  I would -- I don't

13   know.

14                    - - - - -

15        Thereupon, Plaintiff's Exhibit 19 is

16   marked for purposes of identification.

17                    - - - - -

18   Q.          I'm handing you what's been marked as

19   Plaintiff's Exhibit No. 19.  This is a letter from

20   you to Ms. Gales dated December the 18th of '06.

21   Do recall this letter?

22   A.          Yes, I do.

23   Q.          Now, it states in the middle of the

24   letter that -- it's got your name and that you're

Robin Sharrett                                          May 14, 2008

Page 43

1    responsible for hiring or discharge of all

2    nonunion employees, also responsible for promotion

3    of both union and no union employees.

4                So is this letter incorrect in that you

5    do not make the final decision?

6    A.          I do make the final decision.

7    Q.          Okay.  Okay.  So they just present the

8    name to you and then --

9    A.          I delegate authority and concur, or

10   once a decision -- you know, I ask for

11   recommendations.

12   Q.          Okay.  But you make the final decision?

13   A.          I give it the rubber stamp yes or no.

14   Q.          Okay.  All right.  How do you identify

15   -- this letter says these conveyances are verbal

16   and done when suitable positions become available.

17               How do you identify when a position

18   becomes available?

19   A.          Workload would dictate or turnover.

20   Q.          Okay.  So tell me what happens in the

21   beginning of a season.  February, March, you're

22   gearing up.  Tell me how you select foremans.

23   A.          Well, the same -- we like to -- we

24   don't make these foremen positions short term.  We

Page 44

1    try to retain those positions year to year.  And

2    so basically if they've been a foreman in the

3    past, they are salaried positions, so they're

4    still working for us come March.

5    Q.          Okay.  So you consider them year-round

6    employees, if you will?

7    A.          Yes.  They may take a short-term

8    layoff, some.  Some are required in the shop to

9    help out with winter maintenance, depending on

10   their location, where they live.

11   Q.          So if someone is a foreman, then

12   they're called back or either they're a continuous

13   employee?

14   A.          Correct.

15   Q.          So it would depend on the number of

16   jobs that you get?

17   A.          Yes.  I mean, we can -- we generally

18   keep them -- you know, even if we don't have maybe

19   a full crew for them to work, they may go out and

20   do something that's maybe not your standard

21   asphalt paving all day every day.

22   Q.          Uh-huh.  How many crews did you have in

23   2003?

24   A.          I think -- my best guess was -- as it

Page 45

```
 1    was before, somewhere between 18 and 20.  I don't

 2    know.

 3    Q.        Would it help you if you reviewed

 4    Exhibit 13 that talked about the contracts?

 5    A.        Sure.  I think -- I feel with certainty

 6    somewhere in the 18 to 20 number that I gave

 7    before is accurate.

 8    Q.        Okay.  And what about '04?

 9    A.        They didn't change more than a crew or

10    two.

11    Q.        Okay.  And then '05?

12    A.        Again, there's some --

13    Q.        Okay.

14    A.        -- variability.  But there's some

15    variation.

16    Q.        Okay.

17    A.        And some of those foremen may have been

18    foreman with seven employees one year and they may

19    have had three or two employees the following

20    year.

21    Q.        Okay.  Do you know Mr. Gibson?

22    A.        I do.

23    Q.        When did you first meet Mr. Gibson?

24    A.        I think it's in my earlier deposition.
```

Page 46

1    It's been a long time ago, and I can't recall the

2    actual date.

3    Q.        Okay.  Did he ever express an interest

4    in becoming a foreman?

5    A.        When he was rehired due to the

6    arbitrator's decision.  Only after he had been

7    disciplined and dismissed, then he came back after

8    the arbitrator's decision and sent in a request.

9    Q.        I'm sorry.  He what?  Settled a

10   request?

11   A.        Sent.

12   Q.        A request?

13   A.        Yes.

14   Q.        Okay.  But you're talking about his

15   discipline and termination, but the arbitration --

16   arbitrator essentially overruled the termination,

17   correct, and ordered that Shelly reinstate him and

18   pay him back pay?

19   A.        They didn't find enough grounds for

20   termination.  They did find him guilty of a

21   serious safety violation.

22   Q.        A serious safety violation?

23   A.        I think -- yes.

24   Q.        The arbitrator's decision reflected

Page 47

1    that there was an incident report for this alleged

2    serious violation in '03.  I've not been provided

3    a copy of that.  Do you have a copy of that?

4    A.          Are you -- you're referring to me?

5    Q.          Yeah.  Or the Shelly Company?

6    A.          It's in the court records for the first

7    case.

8    Q.          I've not been provided a copy of it.

9    Could you get a copy of that and give it to your

10   counsel?

11   A.          I certainly could.

12               MR. KELLY:  Whatever documents were

13   part of that were previously provided to you, to

14   the extent we have those documents so --

15               MS. CUNNINGHAM:  All I know is the only

16   time I have -- I have not seen any incident

17   reports regarding Mr. Gibson.  And the

18   arbitrator's decision reflects or discusses this

19   2003 incident report and I've never gotten a copy

20   of it.  And I've -- and I've tried to get

21   everything I can.  But anyway.

22   Q.          Okay.  So it's your testimony that he

23   did express an interest?

24   A.          Yes.

Robin Sharrett                                              May 14, 2008

Page 48

1    Q.          Was there a position open at that time?

2    A.          Not to my knowledge, no.

3    Q.          Okay.  Did Mr. Gibson express his

4    interest to you?

5    A.          He wrote me a letter.

6    Q.          Okay.  And did you get back with him?

7    A.          I wrote him a letter.

8    Q.          Okay.  What did you tell him?

9    A.          I told him -- I don't think he

10   specifically said that he wanted a foreman's job.

11   He inquired as to what he would need to do in

12   order to -- what the requirements are or what

13   steps would be -- it was more generic than just

14   him saying "I would like to be a foreman" is my

15   recollection.

16   Q.          Okay.

17   A.          And my response was similar to this one

18   that I wrote on Exhibit 19, that direct

19   supervisors are responsible for assessing the work

20   performance and make recommendations.  And

21   basically, you know, show some interest and do a

22   great job and you've got a high likelihood of

23   promotion when it becomes available.

24   Q.          Okay.  Just to back up.  On Rod

Robin Sharrett                                            May 14, 2008

Page 49

1    Gutridge when he was supposedly filling in for

2    Brad Boyer and then this formal promotion, are

3    there any documents that reflect that?

4    A.          Payroll records would.

5    Q.          Okay.  Just -- the payroll records are

6    going to show the dates and the salary?

7    A.          They would show that he was still an

8    hourly employee throughout 2005 and that he became

9    a salaried employee in 2006.  And he would have

10   changed fringe benefit packages, including

11   retirement.

12   Q.          Would you provide those payroll records

13   of Mr. Gutridge's to your counsel?

14               MR. KELLY:  Well, Rob doesn't have the

15   payroll records.

16               MS. CUNNINGHAM:  The company does.  The

17   company does.

18               MR. KELLY:  When you're done, you can

19   make some requests of me and we can deal with

20   that.  But Rob doesn't have these records, so Rob

21   is not going to find them and produce them.

22   That's something that you can work with me on.

23   Q.          Are there any other documents

24   reflecting his filling in and this promotion?

Robin Sharrett                                             May 14, 2008

Page 50

1   A.        No.

2   Q.        So would it be fair to say that when an

3   individual is promoted or filling in for a

4   foreman, there's no type of transfer document

5   created, it's not formalized in writing in any

6   way?

7   A.        We have an employee action form

8   currently.

9   Q.        Okay.

10  A.        I can't say what the -- definitely that

11  one was filled out.  But I'm not certain.  That

12  would have been the operations manager, how he got

13  Rod changed over from hourly union to salary.

14  Q.        But you don't know if that was being

15  used in 2005?

16  A.        The information was conveyed to

17  payroll, it had to be.  So how he did it, I don't

18  -- he could have written it on a note, he could

19  have done an employee action form, he could have

20  done some other method.  I'm not certain.

21  Q.        As I understand Ms. Gales' testimony on

22  these personnel files issue --

23  A.        Uh-huh.

24  Q.        -- there are no -- between 2003 and

Page 51

1    2005, there were no personnel files kept of union

2    employees?

3    A.          I would say that's -- that's an

4    accurate statement.

5    Q.          Okay.  And Mr. Gutridge was an union

6    employee --

7    A.          He was.

8    Q.          -- correct?

9                So when he was doing this fill-in, did

10   you go to the union and talk to them about this

11   agreement and having him fill in and perform

12   supervisory duties?

13   A.          No.  We have many in the other

14   divisions.  There's no -- the union doesn't --

15   they accept the fact that many management

16   positions can be filled by their employees or

17   under the collective bargaining agreement.

18   Q.          Okay.  So they had no problem with

19   Mr. Gutridge performing supervisory duties but

20   still being paid the union wage?

21   A.          That's correct.  Because many

22   competitors, that's the way they hire their

23   foremen.  Shelly & Sands is one competitor, our

24   other divisions up north, they're union foremen,

Page 52

```
 1   not salaried foremen.

 2   Q.          Okay.  But you don't have union

 3   foremen?

 4   A.          Not in Thornville.

 5   Q.          Okay.  All right.  Would it be fair to

 6   say you did not contact the union to even discuss

 7   this?

 8   A.          That's correct.

 9   Q.          Okay.  Did you discuss it with

10   Mr. Gutridge, the fact that he was a union

11   employee and performing supervisory duties?

12   A.          Oh, certainly.

13   Q.          And he was agreeable?

14   A.          Oh, yes.

15   Q.          Okay.  Are you familiar with the

16   foremen?

17   A.          I know most.

18   Q.          Do you know who they are?

19   A.          Yes.

20   Q.          Okay.  Do you know when Scott

21   Cooperrider was promoted?

22   A.          No, I don't.

23   Q.          I mean --

24   A.          Do you want ball park dates or --
```

Robin Sharrett                                                    May 14, 2008

Page 53

1            MR. KELLY:  She doesn't want you to

2    guess about anything.

3            THE WITNESS:  Okay.

4            MR. KELLY:  She's going to ask you what

5    your knowledge is.

6            THE WITNESS:  Okay.

7    Q.        Was it before you started?

8    A.        No.

9    Q.        Okay.  Was it when Mr. Gibson was

10   working there?

11   A.        What are those dates?

12   Q.        2000 -- well, we're only concerned here

13   with 2003 to 2005.

14           MR. KELLY:  For -- he was -- we might

15   as well be clear.  I think he was there, what, a

16   couple weeks in '03 and a couple weeks in '05.  I

17   don't want to have the question refer to his --

18           MS. CUNNINGHAM:  Well, the judge has

19   allowed us to inquire --

20           MR. KELLY:  Oh, right.  But your

21   question was when Mr. Gibson was employed there.

22   And he was employed there for a few weeks in '03

23   and a few weeks in '05.  So if your question is

24   during '03 and '05, that's fine.  But the question

Page 54

1    you asked him was when Mr. Gibson was employed.

2    Q.        Let me rephrase it.

3              It's my understanding Mr. Gibson worked

4    -- started in Shelly in 1998 and then he worked

5    until 2003 where there was this incident.  Was

6    Mr. Cooperrider promoted during that time

7    period --

8              MR. KELLY:  Hang on.  I'm going to --

9    Q.        -- 1998 to 2003.

10             MR. KELLY:  And I'm going to object to

11   the form of the question to the extent it suggests

12   that Mr. Gibson was continuously employed from

13   1998 to 2003.

14             MS. CUNNINGHAM:  We all know he was

15   seasonal.

16             MR. KELLY:  I don't even know that he

17   was that.  So to the extent you're --

18             MS. CUNNINGHAM:  That's why I'm just

19   saying it's my understanding.  Because as I recall

20   in your answer to the complaint, your client

21   stated it didn't really know the dates Mr. Gibson

22   was employed there.

23             MR. KELLY:  I --

24             MS. CUNNINGHAM:  I've got it here

Page 55

1    somewhere.

2              MR. KELLY:  I'm objecting to the form

3    of your question, that's all there is.  You can --

4    to the extent you're making assumptions, that's

5    okay.  But I don't want his answer to somehow

6    suggest or ratify that Mr. Gibson was continuously

7    employed, whether on a seasonal or other basis,

8    from 1998 to 2003 since that has not been

9    established as a fact.

10             MS. CUNNINGHAM:  Well, he worked there

11   when he did.

12   Q.        Was Mr. Cooperrider promoted during

13   that time period?

14             MR. KELLY:  During what time period?

15   Q.        1998 the 2003?

16   A.        But Ray wasn't employed for that whole

17   time.

18   Q.        The question is:  Was Mr. Cooperrider

19   promoted between 1998 and 2003?

20   A.        I don't know.

21   Q.        Okay.  So you have no idea?

22             MR. KELLY:  That would be assumed in "I

23   don't know."

24   Q.        Okay.  What about Richey Boring?

Robin Sharrett                                    May 14, 2008

Page 56

1   A.          Again, you're talking many years and --

2               MR. KELLY:  Your question is:  Was

3   Richey Boring promoted between '98 and '03?

4   Q.          Does he know when he was promoted?

5   A.          I don't know.  I don't know.

6   Q.          Okay.  And do you keep personnel files

7   on any of these individuals that would reflect

8   when they were promoted?

9   A.          I don't.  I don't know who would have

10  that information.

11  Q.          As I understand it, you don't have

12  personnel files on union employees but you have

13  personnel files on management?

14              MR. KELLY:  When you saw "you," are you

15  talking about Rob or the company?

16              MS. CUNNINGHAM:  He represents the

17  company.  He's the company rep.  He's the head --

18              MR. KELLY:  He's testifying here today

19  in his capacity as Rob Sharrett.  He's not here as

20  some sort of 30(b) company rep.  So just --

21              MS. CUNNINGHAM:  But he was sitting

22  there --

23              MR. KELLY:  Let me finish, please.

24              MS. CUNNINGHAM:  -- during Ms. Gales'

Robin Sharrett                                              May 14, 2008

Page 57

1    deposition, he was sitting there as a company rep

2    but now he's not?

3              THE WITNESS:  I --

4              MR. KELLY:  Hang on.  His testimony

5    here is as Rob Sharrett.  That's how he was

6    noticed for this deposition.  All I'm asking is,

7    when you ask a question where you say, do you keep

8    a personnel file, that you clarify, since he said

9    "I don't."

10             MS. CUNNINGHAM:  Okay.

11             MR. KELLY:  That was the point of it.

12             MS. CUNNINGHAM:  Let me rephrase it.

13             MR. KELLY:  Please.

14   Q.        Does The Shelly Company keep a

15   personnel file of management individuals?

16   A.        Again, not being smart, from the time

17   frame 2003 to 2005 or today?

18   Q.        Any time.

19   A.        Today they do.  Then they didn't.

20   Q.        Oh, okay.

21   A.        I -- I believe that is true.

22   Q.        Okay.

23   A.        The -- to the best of my knowledge.

24   Q.        Okay.  So today there would be a

Page 58

1   personnel file on managers, including foremen?

2   A.           Maybe me.  Yeah.  I filled out some

3   forms and signed some -- that I saw the affidavit

4   -- the -- affirmative action program, that I know

5   the safety policies, that I know the drug policy,

6   so, yes.  Were those policies in place during

7   Ray's time, probably not.

8   Q.           Okay.  So there may or may not be a

9   personnel file on Richey Boring?

10  A.           Probably not.

11  Q.           Okay.

12  A.           During his time -- during Ray's time.

13  But, today, yes, there probably is.

14  Q.           Did they start in 2008?

15  A.           We hired a vice president of human

16  resources who has streamlined and --

17  Q.           Okay.  So now --

18  A.           -- changed the process.

19  Q.           So they've filled out all the forms and

20  got the files going.  Okay.

21  A.           Yes.

22  Q.           I understand.

23               What about Brad Boyer, do you know when

24  he was promoted to a foreman?

Page 59

```
 1    A.          I don't know when he was promoted, no.

 2    Q.          Okay.  How about Jim Gilliam?

 3    A.          I've never heard of him.

 4    Q.          Don't know him?

 5                Scott Carroll?

 6    A.          Never heard of him.

 7    Q.          Okay.  Mark -- if I'm pronouncing this

 8    right -- Sweringen, S-W-E-R-I-N-G-E-N.

 9    A.          Never heard of him.

10    Q.          Never heard of him?  Gary Schlea,

11    S-C-H-L-E-A.

12    A.          Don't know him.

13    Q.          Jeffrey Gant, G-A-N-T?

14    A.          Don't know him.

15    Q.          Mark Potts?

16    A.          Yes.  I know Mark Potts.  I don't know

17    when he was promoted from crew member to foreman

18    or craft to foreman.

19    Q.          Is he Caucasian?

20    A.          He is, as far as I know.

21    Q.          Rick Kessler?

22    A.          He no longer works for the company.

23    Q.          When did he leave?

24    A.          2005, I believe, the fall.
```

Page 60

1    Q.          What was his position?

2    A.          Foreman.

3    Q.          Foreman.

4                Why did he leave?

5    A.          He left because he had inappropriate

6    behavior as a foreman or didn't fulfill the duties

7    of a foreman to the degree that I felt were

8    required.

9    Q.          Okay.  He's Caucasian?

10   A.          Yes, he is.

11   Q.          Who replaced Mr. Kessler?

12   A.          Brad Boyer filled in for him for the

13   last -- he was dismissed in I want to say October.

14   The season ends in November.  Maybe it was

15   September.  But basically Brad came in for the

16   last two months -- Brad was to come into the

17   office.  And because we had to let Rick Kessler

18   go, Brad went back out and took over that crew for

19   the last two months.

20   Q.          Okay.  Who was -- who's taking care of

21   that crew now?  Who's the foreman of that crew --

22   wait.  Strike that.

23               Who is the foreman for that crew in

24   2006?

Page 61

 1    A.          That crew was disbanded, I believe.

 2    Q.          Did you promote or hire an individual

 3    to fill that foreman's position?

 4    A.          No.  I think that crew was dis --

 5    basically dissolved or one less crew than the

 6    number we had the prior year.  I don't think that

 7    crew was -- no, it wasn't as far as my knowledge.

 8    Q.          Okay.  Were there any individuals hired

 9    or promoted in 2006 as foreman?

10    A.          I don't have that information in front

11    of me.  I can't recall.

12    Q.          Okay.  What about Roger Strauss, do you

13    know Mr. Strauss?

14    A.          I do.

15    Q.          Is he Caucasian?

16    A.          As far as I know.  I don't ask and I

17    would -- it would appear so.

18    Q.          Okay.  Do you know when he was

19    promoted?

20    A.          No.  He's been with the company a very

21    long time.

22    Q.          Was he a foreman when you came on board

23    in '94?

24    A.          I don't know.  He worked for the L.P.

Robin Sharrett                                                    May 14, 2008

Page 62

1    Cavett Company in Cincinnati.  And when that

2    division was sold off, parted out -- well, sold

3    off, he got incorporated into the Thornville

4    Division.

5    Q.          Okay.  So, again, there would be no

6    personnel file from Mr. Strauss until early '08?

7    A.          True.  Yeah, to the best of my

8    knowledge.

9    Q.          So it would be fair to say if I wanted

10   to find out when any of these individuals were

11   promoted, I would have to depose those

12   individuals?

13   A.          I'd say you'd have to maybe make a

14   request, let some people dig in.  And the

15   operations manager might have more information

16   than I do.  But the only way to be certain is

17   probably to ask them.

18   Q.          Okay.  Ms. Gales testified that you

19   provide -- you and other VPs provide information

20   that she passes on to the State and -- well, DAS

21   and ODOT regarding these contract compliance

22   reviews, correct?

23   A.          Okay.  Sure.

24   Q.          Did you -- did you provide Ms. Gales

Page 63

1    information to pass on to either DAS or ODOT, the

2    compliance reviews?

3    A.        Can you be more specific?

4    Q.        Do you provide them any information

5    regarding anything?  I mean --

6    A.        Yeah.

7    Q.        -- does Ms. Gales come to you and say,

8    hey, we're having a compliance review next month

9    and I need you to get whatever it is that you get

10   together?

11   A.        Yes.

12   Q.        What do you provide to Ms. Gales?

13   A.        She usually has specific questions like

14   numbers of promotions.  That's the one that I

15   recall.  Beyond that, I don't have any

16   recollection.

17   Q.        If you could turn to Exhibit No. 1.

18   A.        Okay.

19   Q.        If you could turn to page 8 of that

20   form.

21   A.        Recruitment.  Is that the page?

22   Q.        It says Training, page No. 8.

23   A.        Oh, okay.

24   Q.        Okay.  Now, in the first section under

Robin Sharrett                                        May 14, 2008

Page 64

1    B where it says "Training," the last section

2    discusses whether there's an evaluation process

3    conducted annually.  Do you see that sentence?

4    A.          Right down here?

5    Q.          Are you on the right form?

6    A.          I'm on page 8.  Is there an evaluation

7    process?  Yes, I've read it.

8    Q.          Did you provide -- now, this is marked

9    yes.  Did you provide this information to

10   Ms. Gales?

11   A.          If she requested it, I probably did.  I

12   -- I don't know that.

13   Q.          Okay.  Well, this is marked "yes."

14   A.          If I did, it would have been a

15   statement of fact or a written statement that says

16   that, yes, we did informal evaluation of all

17   employees.

18   Q.          Okay.  So is it a true statement that

19   there is an evaluation process conducted annually

20   of at least all minority and female personnel for

21   promotional opportunities to encourage those

22   employees to seek or prepare for such

23   opportunities?

24   A.          There is an ongoing work performance

Robin Sharrett                                                May 14, 2008

Page 65

1    evaluation for all our employees.

2    Q.         Is this --

3    A.             Indirect.

4    Q.             Indirect.  Is this the evaluation

5    process that we've discussed before?

6    A.             Right.

7    Q.             Between the foreman, the supervisor and

8    the -- I forget the --

9    A.             We communicate about the job

10   performance and whether they have potential.

11   Q.             Okay.  So is it fair to say there's no

12   formal evaluation process?

13   A.             That's correct.

14   Q.             Okay.  Do you provide documentation to

15   Ms. Gales?

16   A.             If -- via -- via e-mail maybe --

17   Q.             Okay.

18   A.             -- if she requests it.  I mean, if she

19   requests it by e-mail, I'll probably respond in

20   e-mail form.  If --

21   Q.             I understand.

22                  Under -- in the same exhibit right

23   below that it says, "Documentation provided."  And

24   do you see where the X's are marked?

Robin Sharrett                                                    May 14, 2008

Page 66

 1   A.          Uh-huh.

 2   Q.          Did you provide any of the documents

 3   listed in each category that's marked to

 4   Ms. Gales?

 5   A.          I'm not sure what that documentation

 6   would have been.  I assume for the second item it

 7   would have been payroll records, which I wouldn't

 8   have provided myself but probably the payroll

 9   department would have.  I would have provided a

10   list of employees promoted.  I can recall I have

11   done that before.

12   Q.          Okay.

13   A.          Copies of CR1 reports submitted -- I

14   think -- I wouldn't have done that one.  I think

15   Candace would have that information on the last

16   one.  And the top one, copies of EEO officers job

17   descriptions, and that would be Candace's forms.

18   Q.          Okay.  If you could turn to page 11 of

19   this exhibit, now, this talks about personnel

20   operations.

21   A.          Okay.

22   Q.          And we've already talked about this

23   annual review.  Do you see where that's marked

24   under "Required activity"?  Would it be fair to

Robin Sharrett                                      May 14, 2008

Page 67

1    say the only annual review is this verbal

2    interaction?

3    A.          That's correct.

4    Q.          Okay.  Now, the second one is marked

5    "yes."  "Is there encouragement of minority and

6    female employees to seek promotional

7    opportunities?"  Is there encouragement of

8    minority and female participants to seek

9    promotional opportunities?

10   A.          To the -- I can't identify -- I can't

11   speak for the foremen who they're reporting to.  I

12   can only offer up that I disseminate that same

13   information and I do encourage the supervisors and

14   the operations managers and the foremens in our

15   annual meetings or periodically that, you know,

16   look -- you know, we want to try and encourage

17   diversity in our company.

18              It's very difficult -- our -- the

19   county that our office is in is about 97 percent

20   white.  Most of the people that work for us are in

21   that area, and it's very difficult to try to get

22   people that -- to commute a long distance from

23   where maybe better qualified or more qualified

24   foremen would be that are minority.

Robin Sharrett                                          May 14, 2008

Page 68

1    Q.          Okay.  So if I wanted to find out

2    whether there was actual encouragement and what

3    that encouragement was, I would have to depose

4    those foremen and superintendents and operation

5    managers?

6    A.          I'd say yes, probably.

7    Q.          Was there a written policy regarding

8    this encouragement?

9    A.          I speak to again my management staff

10   periodically and certainly it's a topic of

11   discussion in the annual foremen's meeting, which

12   would be in the springtime before we call the

13   crews back and, you know, really promote as much

14   diversity as we can in our workforce.

15   Q.          Okay.  But it's all verbal, would that

16   be fair to say?

17   A.          I'd say -- well, we have written

18   policies, and those policies are presented, and

19   people acknowledge reading them, that we do

20   promote nondiscriminatory behavior and we won't

21   tolerate it, and that we want to -- but I'm not

22   sure if I write a letter saying, you know --

23   Q.          I'm not clear on which -- what steps

24   were taken to encourage promotions of minorities

 1    and female.

 2    A.        It's a fine -- most of our workforce

 3    are -- are very -- they do not have the desire, I

 4    -- and I'm -- that's an inference on my part that

 5    the foreman's positions are not highly desirable

 6    for most of our craftspeople, okay?  They're

 7    fairly happy being -- they're craftsmen in their

 8    own right.  They take a great amount of pride in

 9    operating equipment, providing -- building things

10    with their hands.  And many just do not have a

11    desire, deep-rooted desire to take on the

12    responsibilities of traffic control, safety,

13    quality.  It's a very -- it's a -- it's a very

14    tough job that, I mean -- and so to the extent

15    that they carry that forward and encourage people

16    to do it, I've done it before.  It's not a -- you

17    know -- I would like to see more people desire to

18    do it.

19    Q.        Okay.  The third box is there -- is

20    marked "yes."  And it states, "There are efforts

21    to assist minority and female employees to prepare

22    for promotion."

23              What steps does The Shelly Company take

24    to assist minority and female employees to prepare

Page 70

1    for promotion?

2    A.          Well, we offer tuition reimbursement

3    for all of our employees.  We have a tuition

4    reimbursement program.  It wouldn't just specify

5    -- we don't make it specific to minorities or

6    females.  We make it available to all our

7    employees.  That would be one.

8               Encouragement of union training, work

9    -- which would require like work zone traffic

10   supervisor.

11   Q.          I'm sorry.  What did you say?

12   A.          It's a specialized certification, makes

13   the employee, well, more marketable in that

14   they've been properly trained on the requirements

15   of traffic control.  We encourage all our

16   employees, again, to participant in the apprentice

17   -- or the training schedule throughout the winter

18   for the operators union, to learn new pieces of

19   equipment, to broaden their background.

20              But it's not identified -- we don't do

21   it just specifically for minorities.  We do it for

22   all our employees.

23   Q.          Okay.  All right.  Are you aware of EEO

24   charges that Mr. Gibson filed?

Page 71

1    A.        Yes.

2    Q.        Okay.  Did he file one in '05?

3    A.        I'm not certain.  He's filed at least,

4    I believe, three.

5    Q.        Okay.  All right.  The date of this

6    report is March 9th of '05.  If you will turn to

7    page 14.

8    A.        Okay.

9    Q.        Page 14 in the middle of the page

10   states, "Are there formal charges of

11   discrimination pending against the contractor?"

12   And it's marked "no."

13             Are you aware of whether or not there

14   was -- EEO charges were pending at the time this

15   was completed?

16   A.        I don't know.  No, I don't know.

17   Q.        Who would -- would you have provided

18   that information to Ms. Gales?  Or would that be

19   something that Ms. Gales would have been aware of?

20   A.        Ms. Gales would have been notified

21   through the EEOC.  Typically, that's where the

22   routing would go.

23   Q.        Okay.

24   A.        I know several -- well --

Page 72

1    Q.        I'm sorry.  What were you saying?

2              MR. KELLY:  You can wait for a

3    question.

4              THE WITNESS:  Okay.

5    Q.        Turn to Exhibit No. 2.

6    A.        2?

7    Q.        Yes.

8    A.        Okay.

9    Q.        And if you will turn to the sixth page,

10   or seventh, under Section 4.

11   A.        Okay.  Okay.

12   Q.        And you were here for Ms. Gales'

13   deposition, but this document is a DAS document.

14   It's a compliance review?

15   A.        Okay.

16   Q.        And question 25 asked:  "Does the

17   contractor maintain copies of each employee's

18   performance and other employment evaluations in

19   their personnel files?"  And it's marked "yes."

20   The date of this report is 2-20 of '03.

21              Isn't it true that that's not a correct

22   answer?

23   A.        The way it's worded, yes.

24   Q.        Who would have provided that

Page 73

1    information to Ms. Gales?

2    A.          I'm not certain.

3    Q.          Turn to Exhibit No. 5.  I'm sorry.

4    Exhibit No. 5.

5    A.          Oh, I -- okay.

6    Q.          Can you tell me which individuals

7    listed here are Caucasian and are foremen?

8    A.          I can distinguish who's a foreman.  I

9    can't -- again, I don't ask race, creed.  You

10   know, any assumptions I would make would be based

11   on visual operation -- or visuals.  So I don't

12   have -- I haven't asked these foremen as to what

13   -- we have not requested what their race or their

14   creed is, or I least I haven't.  It's something

15   that I -- you know, is basically not taken into

16   account.

17           But I can identify who the foremen are.

18   Scott Cooperrider, Robby Lloyd, Shane Neverra,

19   Rick Kessler, Dave Scott, Mike Wiley, Tom Lambert

20   may or may not have been in '04.  I'm not sure.

21   George Attis, Richey Boring, Dave Genteal, Wayne

22   Vickors or Delious Vickors, Mark Potts, Richard

23   Boring, Brad Boyer, Regan Sharrett, John Adams,

24   Ryan Packer, Erin Mullenkamp, Donald Mayle,

Page 74

1    Kenneth Untied, Jeff Barnes, and I think that's

2    it.

3    Q.        Okay.

4    A.        Oh, let me check the last people.  Yes,

5    that's it.

6    Q.        Okay.  Are there individuals listed on

7    here you know that are minority?

8    A.        I know that Donald Mayle is, Jeff

9    Barnes.  That's it.

10   Q.        Turn to Exhibit No. 11.  This is the

11   city contract compliance review form in 2003 that

12   I discussed with Ms. Gales.

13   A.        Okay.

14   Q.        In the center of the page where it

15   talks about how many non -- how many minority

16   employees were hired and how many were promoted,

17   did you provide this information to Ms. Gales?

18   A.        Not to my recollection.

19   Q.        Okay.  Are you familiar with any of

20   these stats?

21   A.        I don't think I was the general manager

22   at this time.

23   Q.        Okay.  I'm sorry.  When did you become

24   general manager?

Robin Sharrett                                              May 14, 2008

Page 75

```
 1   A.          2004 maybe.

 2               MS. CUNNINGHAM:  Let's take a break.

 3               (A short recess is taken.)

 4   Q.          Okay.  When you've testified about the

 5   foreman and the superintendent and the -- and I

 6   apologize, I keep forgetting the title, the other

 7   people that --

 8   A.          Superintendent.

 9   Q.          -- help --

10   A.          Superintendents and operations

11   managers.

12   Q.          Operations managers.  They evaluate and

13   look at the crews, and they all talk and that sort

14   of thing.  Would it be fair to say that crew

15   members stay on a given crew the entire season?

16   A.          It's really specific to the work type.

17   Q.          What do you mean?

18   A.          If it's an asphalt paving crew, then

19   generally yes, they are very tight-knit.  If it's

20   a construction crew, then it's a more broad -- the

21   needs with the resources become a lot more

22   dynamic, versatile.  So you might need three hoe

23   operators, excavator operators today.  Tomorrow

24   you've done that excavation activity, maybe you
```

Page 76

```
 1    need one, so that employee gets transferred to

 2    another construction crew that has a different

 3    need.

 4              But pretty much the foremen for the

 5    asphalt paving crews have the same need for

 6    resources, people, on a day-in-day-out basis.

 7    Q.        Would it be fair to say that some

 8    employees do not stay with the same crew all

 9    season?

10    A.        Yes.

11    Q.        And it's fair to say that some

12    employees move from crew to crew throughout the

13    season?

14    A.        Again, depending on -- the likelihood

15    of moving is really dependant on the type of work.

16    Q.        Okay.  So how do employees that are

17    moved from crew to crew or even several crews

18    throughout the season, how are they being

19    evaluated by these foreman and superintendents?

20    A.        Job site visits.  The superintendents

21    meet with the construction -- or with the foremen,

22    oh, I don't know if it's weekly.  It depends on

23    where they are.  But they're visited, there's

24    discussion, hey, how is it going, you know, what's
```

Page 77

1    -- oh, you've got so-and-so working for you.   How

2    is that going?  You know, that would be the

3    process, there's constant dialogue.

4    Q.          Right.

5    A.          And it's not documented, but it's

6    there.

7    Q.          Wouldn't it be fair to say that someone

8    who moves from crew to crew would not have an

9    opportunity to build up that same bond and that

10   team effort as someone who was on the same crew

11   throughout the season?

12   A.          Our -- one individual who I think is

13   identified here, Ed Wilson, under Exhibit 19, is

14   responsible for contacting employees, discharges.

15   He basically takes the craftspeople on a daily

16   basis and evaluates the needs and the resources

17   and allocates them to the foremen.  If the foremen

18   need additional resources or have an abundance of

19   people, they would call Ed and say, Ed, this is

20   what I need or this is what I've got, you know, in

21   the way of personnel.  And he would weigh that

22   with what other dynamics are going on, who else

23   has needs or excesses.

24               And then by that same token, those

Page 78

1    conversations are daily.  In that same

2    conversation, oh, you had so-and-so, how did that

3    go?  You know, is it -- you know, good guy, bad

4    guy, good woman, bad -- you know, performance and

5    so those are constant.  I mean, it's a very

6    interactive communication.

7    Q.          I understand that.

8                But that wasn't the question.  Could

9    you read back the question, please.

10               (The record is read as requested.)

11   A.          I'd say no to that question.

12   Q.          Why?

13   A.          Because some people, the longer they

14   stay with the crew, the more they don't build a

15   team bond.  They may degenerate one.  Just because

16   we spend time together doesn't necessarily

17   indicate that we're going to get along great, does

18   it?

19   Q.          So it's your testimony that if someone

20   was bounced around, they may have a better

21   opportunity to build a better rapport?

22   A.          I'd say that -- that happens, yes,

23   probably as likely as it happens the other way.

24   Q.          Okay.  Mr. Gibson was a roller

Page 79

1    operator?

2    A.          Uh-huh.

3    Q.          With this type of job, would he be

4    bounced around or would he stay with the same crew

5    all season?

6    A.          It generally works on tenure.  I mean,

7    if he had been with -- but roller needs change.

8    There's usually a third roller position on

9    different types of work.  The standard crew is two

10   roller operators, and we supplement depending on

11   the size of the job.

12              And so that person, again, calling in

13   to Ed saying, these are -- you know, I either have

14   a need or I can help someone else fulfill a need.

15   That's when that would deem itself.

16   Q.          So it would be fair to say that

17   Mr. Gibson would be moved around more often than

18   other employees?

19   A.          No, I wouldn't say that's fair to say.

20   Q.          Do you know whether or not Mr. Gibson

21   was moved around a lot?

22   A.          I do not.  We have a lot of employees

23   that get moved around and some -- at some point in

24   time pretty much everybody has been moved around

Page 80

```
 1   or displaced or not been with their -- maybe the

 2   crew that they're with a lot of the time.  But,

 3   again, the work type and when it happens and the

 4   workload dictates and changes all the time.

 5   Q.        Okay.  Do you know Richey Boring, Sr.?

 6   A.        Yes.

 7   Q.        Okay.  Did he retire?

 8   A.        He did.

 9   Q.        When did he retire?

10   A.        No.  I'm sorry.  Richey -- no, he is

11   not retired.

12   Q.        Okay.  Did he leave?

13   A.        No.

14   Q.        Did he move, change his teams or --

15   A.        No.  He's -- you made a good point that

16   he -- the reason I was confused is he has said

17   that this will be his last season.  But, no, he

18   hasn't retired as of yet.

19   Q.        What's his position?

20   A.        Foreman.

21   Q.        How long has he been a foreman?

22   A.        I can't give you a specific date.  But

23   a mid '90s, late '90s.  I don't know.

24   Q.        Okay.  Was there some point where he
```

Page 81

```
 1   was going to retire and then didn't?

 2   A.          Oh, I think he made some desire -- or

 3   he may have thought that he wanted to retire and

 4   then changed his mind.

 5   Q.          Do you recall an instance, though,

 6   where he had put in his notice he was going to

 7   retire?

 8   A.          Oh, absolutely not.  He did not notify

 9   us that he had a definite desire to retire.

10   Q.          Do you know Brad Turner?

11   A.          No.

12   Q.          In your opinion, is Mr. Gibson

13   qualified to perform a foreman job?

14   A.          No.

15   Q.          Why?

16   A.          His safety record would indicate that

17   he has poor habits when it comes to protecting

18   himself and others.

19   Q.          Okay.  When?

20   A.          Also, his alleged and investigated

21   behavior, which the company found to be factual,

22   that he engaged in sexual harassment or hostile

23   work environment would also indicate that he's

24   inappropriate for a foreman's position.
```

Page 82

1 Q.   When your company conducts

2 investigations such as the nature you've talked

3 about, Ms. Gales says sexual harassment

4 investigations, do they question the alleged

5 perpetrator?

6 A.   They may; they may not.

7 Q.   It just depends?

8 A.   Sure.

9 Q.   Why wouldn't they?

10 A.   If he wasn't available, that would be

11 one reason.

12 Q.   You wouldn't call him on the phone?

13 A.   If it was so obvious that his behavior

14 had occurred or the incident that had occurred, it

15 wouldn't necessarily be required that you ask a

16 person if they engaged in a behavior that was

17 cause for termination.

18 Q.   Isn't it true that the arbitrator found

19 there wasn't sufficient evidence of sexual

20 harassment in the 2003 termination?

21     MR. KELLY:  I'm going to object.

22     THE WITNESS:  Okay.

23     MR. KELLY:  I -- what does that have to

24 do with this case at all?  Because we're not

Page 83

1    relitigating the case.  It's already

2    been dismissed.

3                MS. CUNNINGHAM:  No, we're not, but he

4    was discussing that --

5                MR. KELLY:  Okay.  But --

6                MS. CUNNINGHAM:  Let me finish.  Let me

7    finish.

8                MR. KELLY:  -- we're not rehashing

9    issues for a case that has already been dismissed.

10   That's not the purpose of this deposition.

11               MS. CUNNINGHAM:  He just testified that

12   he didn't feel that Mr. Gibson was qualified

13   because of these alleged complaints of sexual

14   harassment.  So, therefore, my question was:

15   Isn't it true the arbitrator found there wasn't

16   sufficient facts to support that?

17               MR. KELLY:  I'll object to the form of

18   your question --

19               MS. CUNNINGHAM:  You can object.

20               MR. KELLY:  -- since you're

21   misrepresenting the arbitrator's findings.  That's

22   not the specific finding of the arbitrator at all.

23               MS. CUNNINGHAM:  That's my

24   recollection.

Page 84

1              MR. KELLY:  I understand.  That may

2      even be your interpretation, but it's not an

3      accurate portrayal, so I will object to the extent

4      that's the way you're going to portray the

5      arbitrator's findings.

6              MS. CUNNINGHAM:  That's fine.

7      Q.      You can answer the question.

8      A.         I think the company investigated it and

9      regardless of what the arbitrator's decision was,

10     that -- that the company had grounds to dismiss,

11     and that's my interpretation, Rob Sharrett's.

12     Q.      Okay.  But it's true that Mr. -- that

13     the arbitrator ordered that Mr. Gibson be

14     reinstated with back pay?

15     A.      That is true.

16     Q.      Okay.  These foremen and the

17     superintendents and the operations managers --

18     A.      Uh-huh.

19     Q.      -- are they all Caucasian?

20     A.      Not all.  Trevor Small would be a

21     Native American, as far as I know.  But the others

22     would appear to be Caucasian.

23     Q.      Okay.  So all of them except Trevor

24     Small?

 1   A.        There's only five or six, so, yeah, if

 2   that's the number.

 3   Q.        Okay.  Let's name the people, the five

 4   or six.

 5   A.        Ed Wilson.

 6   Q.        He's Caucasian?

 7   A.        As far as I know.

 8   Q.        Okay.

 9             MR. KELLY:  What time period?

10             THE WITNESS:  What time frame?

11             MS. CUNNINGHAM:  Let's go from 2003 to

12   2005.

13             MR. KELLY:  Are we going to go through

14   the minority foremen that he already identified

15   for you for that period?

16             MS. CUNNINGHAM:  He identified as there

17   being five or six of them, and I would like to

18   know their names and their races.

19             MR. KELLY:  Okay.  And -- but we've

20   already been through the 2003 to 2005 ones where

21   he identified the three minority ones before.  Are

22   we going through all of that again?

23             MS. CUNNINGHAM:  The question was not

24   just foremen.  It was foremen, superintendents,

Robin Sharrett                                May 14, 2008

Page 86

1    and operations managers.

2             THE WITNESS:  Repeat the question,

3    please.

4             MS. CUNNINGHAM:  Could you read that

5    back.

6             (The record is read as follows:  "These

7    foremen and the superintendents and the operations

8    managers, are they all Caucasian?")

9             MR. KELLY:  But you're not asking in

10   the present tense in the question.  Now you want

11   to know about '03 to '05; is that right?

12            MS. CUNNINGHAM:  Oh, I don't care about

13   '08.

14            MR. KELLY:  I'm just trying to

15   understand.  Your question says are they all --

16   Q.        We -- we talked -- we talked about the

17   time frame, and I said 2003 to 2005.

18   A.        Okay.  The question you said mentioned

19   foremen.  We've already covered that.

20   Q.        Okay.

21   A.        Are you just interested in the

22   superintendents/operations manager?

23   Q.        You testified that there were five to

24   six of them when I asked you, are the foremen,

Page 87

 1    superintendents and operations managers Caucasian?

 2    You said, oh, there's only five to six of them.

 3    A.        My reference was to the

 4    superintendents.

 5    Q.        Oh, okay, just that's where the

 6    confusion --

 7    A.        That's where the five or six came from.

 8    Q.        Okay.

 9    A.        I thought we had a breakdown in

10    communication.

11    Q.        The superintendents -- we've discussed

12    the foremen.  And the superintendents, there was

13    only one?

14    A.        Operations manager -- oh, you're right.

15    Correct.  Yes.  One.  Trevor Small.

16    Q.        Trevor Small?

17    A.        Uh-huh.

18    Q.        Who is a superintendent?

19    A.        Yes.

20    Q.        Who is a minority?

21    A.        Yes.

22    Q.        And he's American Indian?

23    A.        Correct.

24    Q.        And there is only one operations

1    manager who's Tim Anderson?

2    A.         Correct.

3    Q.         And he's Caucasian?

4    A.         As far as I know.

5    Q.         So it would be fair to say -- oh, Jeez.

6    During 2003 to 2005, do you know who the foremen

7    and the superintendents were of crews that

8    Mr. Gibson worked on?

9    A.         No.

10   Q.         Okay.  Would there be any documentation

11   that --

12   A.         I think the transcripts for the court

13   case would indicate who he worked for.

14   Q.         Oh, okay.  Okay.

15              MS. CUNNINGHAM:  Let's take another

16   break.

17              (A short recess is taken.)

18   Q.         I have no further questions.

19   A.         Okay.  Thank you.

20              MR. KELLY:  He'll read.

21                      - - - - -

22        Thereupon, the foregoing proceedings

23        concluded at 1:43 p.m.

24                      - - - - -

Page 89

1    State of Ohio      :      C E R T I F I C A T E

2    County of Franklin: SS

3       I, Stacy M. Upp, a Notary Public in and for the

4    State of Ohio, certify that Robin Sharrett was by

5    me duly sworn to testify to the whole truth in the

6    cause aforesaid; testimony then given was reduced

7    to stenotype in the presence of said witness,

8    afterwards transcribed by me; the foregoing is a

9    true record of the testimony so given; and this

10   deposition was taken at the time and place

11   specified on the title page.

12      Pursuant to Rule 30(e) of the Fed. R. Civ. P.,

13   the witness and/or the parties have not waived

14   review of the deposition transcript.

15      I certify I am not a relative, employee,

16   attorney or counsel of any of the parties hereto,

17   and further I am not a relative or employee of any

18   attorney or counsel employed by the parties hereto,

19   or financially interested in the action.

20      IN WITNESS WHEREOF, I have hereunto set my hand

21   and affixed my seal of office at Columbus, Ohio, on

22   _____, 2008.

23   _____

24   Stacy M. Upp, Notary Public - State of Ohio

Robin Sharrett                                                    May 14, 2008

Page 90

Witness Errata and Signature Sheet

Spectrum Reporting LLC                      Correction or Change Reason Code

333 East Stewart Avenue                     1 - Misspelling   2 - Word Omitted

Columbus, Ohio 43206                        3 - Wrong Word    4 - Clarification

Phone - 614-444-1000   Fax - 614-444-3340   5 - Other Correction (Please explain)

Email - admin@spectrumreporting.com         R        Sheet _____ of _____

Page/Line        Correction, Addition, or Change        Reason Code

_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____

I, Robin Sharrett, have read the entire transcript of my deposition taken in this matter,

or the same has been read to me.  I request that the changes noted on my errata sheet(s) be

entered into the record for the reasons indicated.

Date _____  Signature

_____

The witness has failed to sign his deposition within the time allowed.

Date _____  Signature

_____

Robin Sharrett                                                          May 14, 2008

Page 91

                        Witness Errata and Signature Sheet
        Spectrum Reporting LLC                    Correction or Change Reason
Code
        333 East Stewart Avenue                   1 - Misspelling  2 - Word
Omitted
        Columbus, Ohio 43206                      3 - Wrong Word   4 -
Clarification
        Phone - 614-444-1000   Fax - 614-444-3340     5 - Other Correction (Please
explain)
        Email - admin@spectrumreporting.com       R        Sheet _____ of
_____

        Page/Line        Correction, Addition, or Change        Reason Code
        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

        _____    _____    _____

            I, Robin Sharrett, have read the entire transcript of my deposition taken
in this matter,
        or the same has been read to me.  I request that the changes noted on my errata
sheet(s) be
        entered into the record for the reasons indicated.
        Date _____  Signature
_____

        The witness has failed to sign his deposition within the time allowed.
        Date _____  Signature
_____

```
1    State of Ohio      :        C E R T I F I C A T E

2    County of Franklin: SS

3        I, Stacy M. Upp, a Notary Public in and for the

4    State of Ohio, certify that Robin Sharrett was by

5    me duly sworn to testify to the whole truth in the

6    cause aforesaid; testimony then given was reduced

7    to stenotype in the presence of said witness,

8    afterwards transcribed by me; the foregoing is a

9    true record of the testimony so given; and this

10   deposition was taken at the time and place

11   specified on the title page.

12       Pursuant to Rule 30(e) of the Fed. R. Civ. P.,

13   the witness and/or the parties have not waived

14   review of the deposition transcript.

15       I certify I am not a relative, employee,

16   attorney or counsel of any of the parties hereto,

17   and further I am not a relative or employee of any

18   attorney or counsel employed by the parties hereto,

19   or financially interested in the action.

20       IN WITNESS WHEREOF, I have hereunto set my hand

21   and affixed my seal of office at Columbus, Ohio, on

22   _May 28_, 2008.

23   _____

24   Stacy M. Upp, RPR, Notary Public - State of Ohio
     My commission expires August 6, 2011.
```

Realtime - Videoconferencing - Trial Presentation - Video
Spectrum Reporting LLC