**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **RAYMOND L. GIBSON, JR.,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:07-cv-377** |
| | : | |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **SHELLY MATERIALS, INC.,** | : | **Magistrate Judge Abel** |
| **dba The Shelly Co.,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**OPINION & ORDER**</u>

## I. INTRODUCTION

This matter is before the Court on Defendant The Shelly Company's ("Shelly") Motion for Summary Judgment (doc. no. 20). Plaintiff, Raymond Gibson, sued Shelly for employment discrimination alleging racially discriminatory failure to promote under 42 U.S.C. § 2000e *et seq.* ("Title VII"), 24 U.S.C. §1981, and Ohio Rev. Code § 4112 *et seq*; and alleging a pattern and practice claim of racial discrimination under Title VII. Shelly seeks summary judgment on all counts. For the reasons explained below, Shelly's Motion for Summary Judgment is **GRANTED**.

## II. BACKGROUND

### A. Facts

Shelley is an Ohio company that paves roads and highways throughout the state. The paving season runs from roughly May 1 to November 1. During the season, Shelly employs construction work crews that carry out road paving projects. The construction crews work under hazardous conditions. They operate heavy equipment on active highways and roads where cars frequently pass at high speed.

When a paving project begins, Shelly selects a foreman to head the work crew. Shelly contracts with labor unions to supply its crew members, including heavy equipment operators. One such union is the International Union of Operating Engineers, Local 18 ("the Union"). On Shelly's request, the Union reviews its list of available workers and sends the requested number of employees to Shelly's job site. Plaintiff Raymond Gibson ("Gibson") is an African-American member of the Union. Between 2003 and 2005, Gibson worked as a Roller Operator on several Shelly work crews.

*1. Gibson's 2003, 2004, and 2005 Terminations*

During the rocky course of his relationship with Shelley, Gibson has been fired three times – in 2003, 2004, and 2005.[1] Gibson sued Shelly after each termination, culminating in a 2005 federal suit in which he claimed that the 2003, 2004, and 2005 terminations were all the product of race discrimination or retaliation in violation of Title VII, 42 U.S.C. § 1981, and Ohio discrimination law. *Gibson v. Shelly Co.*, No. 2:05-cv-888 (S.D. Ohio 2005). All of Gibson's claims were dismissed on summary judgment. The Sixth Circuit affirmed the dismissal on appeal concluding "Gibson failed to make out a prima facie case of discrimination . . . or retaliation." *Gibson v. Shelly Co.*, No. 07-3009, 2008 WL 3876432, *1 (6th Cir. Aug. 19, 2008). Despite these decisions against him, and without setting forth any additional evidence, Gibson states in his summary judgment opposition brief in this case that he believes each termination was unjustified and that he was treated differently than Caucasian employees. (Pl.'s S.J. Opp'n

---

[1] For a more detailed account of the events leading up to Gibson's terminations see the summary judgment order in Gibson's 2005 Title VII suit against Shelly, *Gibson v. Shelly Co.*, No. 2:05-cv-0888 (S.D. Ohio 2006) (doc. no. 30).

Mem. 9.) Although, the motivations for Gibson's various terminations are not at issue in this suit, his employment time-line and his undisputed history of safety violations are relevant.

On May 16, 2003, Shelly fired Gibson. Shelly claims he was terminated for violating safety rules and on suspicion of sexually harassing a female co-worker. At that time, Gibson was working on a paving project for Shelly's Thornville Division. Gibson was responsible for operating a 20,000 pound Dual Drum Roller, which is used to smooth asphalt on road surfaces. On May 13, 2003, according Gibson's project supervisor, Gibson drove the roller off of the job site and into an active lane of traffic three times. Each time, drivers passing by the work area had to slam on their brakes to avoid a collision. Gibson does not dispute that he drove the roller into traffic.

The next day a female member of the work crew reported that Gibson had sexually harassed her on the job site. Candace Gales, Shelly's EEOC officer investigated the claim and concluded (after Gibson's termination) that Gibson had violated Shelly's policy against creating a hostile work environment. After his 2003 termination, Gibson filed discrimination charges with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"). He also filed a grievance with his Union, which was submitted to arbitration ("the Arbitration") on March 18, 2004.

In June 2004, while the Arbitration was still pending, the Union sent Gibson to a Shelly job site in Zanesville, Ohio. At that time, Gibson was not eligible to work for Shelly because the company considered him a terminated employee and ineligible to work at Shelly job sites pending the resolution of the Arbitration. The Zanesville foreman was unaware of Gibson's status and permitted him to work. After approximately three days of working at the Zanesville

site, Shelly told the foreman to terminate Gibson because of the pending Arbitration.  Gibson

filed an OCRC complaint alleging that he was terminated in retaliation for filing his previous

charge of racial discrimination.

On December 4, 2004, the arbitrator issued a decision in the Arbitration.  The Arbitrator

found that the terms of Shelly's collective bargaining agreement with the Union required Shelly

to show just cause for Gibson's 2003 termination.  The arbitrator concluded that Shelly had not

done so based on Gibson's safety violation because Gibson had no prior disciplinary record, the

termination notice did not state that a "serious" safety violation occurred, and because Gibson's

supervisor did not warn Gibson that if he drove into traffic again he would be fired.  The

Arbitrator also found that Shelly's belief that Gibson may have sexually harassed female co-

workers was insufficient to constitute "just cause" under the agreement because his alleged

harassment did not rise to the level of creating a hostile workplace for female co-workers.  The

arbitrator ordered Shelly to reinstate Gibson with full back pay, benefits, and seniority to May

16, 2003.  The arbitrator further ordered that Gibson's record carry a reprimand for his May

2003 safety violation and include an admonishment that further conduct of a similar nature

would result in more serious punishment.

Gibson was reinstated at the beginning of the 2005 paving season.  On May 10, 2005,

Gibson went back to work at a Shelly paving project.  That afternoon Gibson was operating a

roller behind a paving machine on which his foreman, Richie Boring ("Boring") was riding.

Boring claims he saw Gibson drive his roller so that it approached the back end of the paver,

slowed down, and then sped up, coming within a few inches of a platform on which Boring was

standing.  (Boring Aff. ¶¶ 3-4.)  Boring reported that if the roller had come a few inches closer it

could have killed him. (*Id.* ¶5.) Boring reported the incident to Shelly's Safety Department and an investigation was performed the following day. (*Id.*)

On May 11, 2005, Boring reported a second safety violation committed by Gibson. Gibson admitted in his deposition testimony, and several crew member observed, that Gibson drove his roller off the road and slid down an embankment. (5/11/2006 Gibson Dep. 133-24); (Prouty Aff. Exs.) Gibson admits that this constituted a serious safety violation. (5/11/2006 Gibson Dep. 141.) Safety Representative Drake Prouty conducted an investigation of the May 10 and May 11 incidents. (Prouty Aff. ¶¶ 6-8.) Shelly's Safety Committee reviewed the results and concluded that Gibson had committed two serious safety violations. Consequently, Gibson was terminated on May 12, 2005. As with his prior terminations, Gibson filed an OCRC complaint alleging that his termination was motivated by racial discrimination and retaliation. He also filed another grievance with the Union which was resolved by a June 16, 2005 settlement agreement ("2005 Settlement Agreement").

### 2. *Foreman Promotions at Shelly*

During the period that Gibson worked for Shelly, the company did not maintain personnel files for its employees and did conduct formal performance evaluations. Work crew members were promoted to foremen via an informal process. Current foremen, superintendents, and the operations manager observed work crew members on the job site. They frequently discussed the capabilities of work crew members and discussed who they thought would make a successful foreman.

In the 2003-2005 period, there were 18-20 foremen, two or three of whom were minorities. (Sharrett Dep. 30-31.) In the same period, there were five or six superintendents.

(*Id*. 86-88.)  One superintendent, Trevor Small, was Native American. (*Id*. 87.)  The rest were Caucasian.  (*Id*. 84.)  At that time, there was one operations manager, Tim Anderson, who is Caucasian. (*Id*. 87-88.)  Gibson never worked for a minority supervisor and has never met Trevor Small. (Gibson Aff. ¶¶ 2-4.)

There was no fixed timing at Shelly for when new foremen would be promoted. Promotions occurred as dictated by needs of new paving projects or when current foremen left the job.  Once a need for a new foreman was identified, Robin Sharrett ("Sharrett"), Shelly's General Manager, requested a recommendation from the current foremen, superintendents, and operations managers.  Sharrett made the final decision of who would be promoted to foreman, but states that he essentially rubber stamped the recommendation he received.  (Sharrett Dep. 43.)  Sharrett is Caucasian.

Sharrett does not remember whether foreman position openings were posted or revealed to crew members between 2003 and 2005.  If a position was posted, it would have been posted in the central office or the shop.  Crew members only periodically went to those locations during a work season.  Crew members could request, verbally or in writing, to be promoted to foreman through their supervisors, operation mangers, or Sharrett himself.  (*Id*. 17.)   However, employees were not informed when they were hired that they could submit a request for a promotion.  (*Id*. 18.)

The qualifications for the foreman position are enshrined in a Foreman's Manual written in 1945.  The qualifications are: "leadership, a significant propensity for safety and the safety of his workers, selflessness, highly motivated to get to work on time, diligent, articulate, . . . some math skills, . . . understanding what motivates individual crew members."  (Sharrett Dep. 21-22.)

Between 2003 and 2006 only two employees were promoted to foreman at Shelly's Thornville division.  In 2004, Dave Scott, a Caucasian, was promoted to foreman.  (*Id*. 37.) Scott had seven years of paving experience and "showed the capabilities that [Shelly was] interested in as far as leadership and safety, hard-working." (*Id*.)  Scott was hired to replace a foreman who quit in the middle of the 2004 paving season.

In July of 2005 season, Brad Boyer, another foreman, left the company.  Nobody was formally promoted to replace Boyer until the 2006 season began.  Ron Gutridge, a Caucasian, filled in for Boyer and performed the duties of foreman for the duration of the 2005 season ("test position").  His job title did not change when he took the test position.  He was still a Union member and did not become a salaried foreman at that time.  At the end of the 2005 season, Gutridge's performance was assessed.  At the start of the 2006 season, Gutridge was promoted to foreman.  Gibson admitted at his deposition that Gutridge was not put into his test position until after Gibson had been fired for the 2005 season:

> Q.  Do you have any knowledge, any personal knowledge, that Mr. Gutridge started working in that test position prior to July of 2005?
>
> A.  No, I don't have any knowledge.
>
> Q.  Okay.  As of July 2005, you didn't work at The Shelly Company, right?
>
> A.  That's correct.
>
> Q.  Okay, So he wasn't put into that test position during your employment, correct?
>
> A.  That's correct.
>
> Q.  All right.  Again I don't understand how is it that you feel Mr. Gutridge's position–Mr. Gutridge was promoted during your employment?

A.  I can't say that he was promoted during my employment.

(5/13/08 Gibson Dep. 13.)

### 4.  Gibson's Interest in Promotion

According to Gibson, in early April 2005, he learned from a co-worker that Boring, a

Shelly foreman, would be leaving the company at the end of the 2005 season, opening up a

foreman position.  (5/14/2008 Gibson Dep. 9.)  Gibson signaled his interest in this position by

writing to Sharrett.  On April 12, 2005, Gibson sent a letter to Sharrett.  (5/14/2008 Gibson Dep.

8.)  In the letter, he requested vacation time for the upcoming 2005 paving season, informed

Sharrett that he could not work on Saturdays for religious reasons, and asked about the

requirements of the foreman position.  Specifically, Gibson stated "I would like to know the

requirements to be promoted upward from an operators' [sic] position, to a foreman's position

 . . . . Please send me the necessary information on how to become a supervisor so that my

employability is not limited to just an operator." (4/12/05 Gibson Letter.)  The letter does not

specifically mention Boring's position becoming available.  On April 15, 2005, Sharrett sent a

reply letter.  In response to Gibson's request for information regarding becoming a foreman,

Sharrett wrote:

> [t]he Shelly Company has no formal training program.  However, we constantly
> evaluate our employee's performance and potential for advancement.  When a job
> becomes available we first post the position internally and then look for external
> candidates.  Then the position is offered to the most qualified candidate.  If you
> have any other questions please feel free to contact me.

(*Id*., Ex. S, 4/15/2005 Sharrett Letter.)

Gibson also claims that he spoke to two Shelly foremen (Boring and Dave Gentile) about

being promoted.  He claims, "their responses are all the same: You know, they put in long hours,

and the paperwork is excruciating, and it's not something that they really want to do." (5/14/08 Gibson Dep. 24-25.) Gibson told Boring that he wanted to be considered for a foreman position. (*Id.* 25.) Gibson was never promoted to foreman while working for Shelly.

## B. Procedural History

Just under a year after his third termination from Shelly, Gibson filed his fourth complaint with the OCRC and the EEOC. [2] In this charge, Gibson alleged that he was denied a promotion because of his race and in retaliation for filing previous charges of discrimination. On February 1, 2007, the EEOC dismissed Gibson's claims and issued a Notice of Right to Sue.

Gibson then filed the present action against Shelly with this Court alleging that Shelly had discriminated against him on the basis of his race in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, 24 U.S.C. §1981, and Ohio Rev. Code § 4112 *et seq.* On January 8, 2008, Gibson filed an Amended Complaint. The Amended Complaint alleged that Gibson had discriminated against him by (1) failing to promote him to foreman (Counts I, III, IV); and (2) by engaging in a pattern and practice of discriminating against racial minorities in employment (Count II).

On July 11, 2008, Shelly filed a motion for summary judgment on all of Gibson's claims. Although the Amended Complaint does not specify which particular promotions he is challenging, Gibson's Memorandum in Opposition to Summary Judgment clarifies that his claim is premised on Scott and Gutridge's promotions to foreman. Shelly's motion for summary judgment is now before the Court.

---

[2] The previous three charges challenged Gibson's 2003, 2004, and 2005 terminations as being motivated by racial discrimination or retaliation. Each of those claims was dismissed. Those claims then became the basis for Gibson's 2005 federal lawsuit, *Gibson v. Shelley Co.*, No. 2:05-cv-888 (S.D. Ohio 2005), which was dismissed on summary judgment.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [and] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant therefore has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. When ruling on a motion for summary judgment, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, the Court may rely on the evidence called to its attention by the parties. *Id.*

### IV. LAW AND ANALYSIS

Gibson's Complaint alleges that Shelly discriminated against him on the basis of race by failing to promote him in violation of Title VII (Count I); 42 U.S.C. § 1981 (Count III); and Ohio Revised Code Chapter 4112 (Count IV). Title VII standards apply equally to each of Gibson's failure to promote claims; therefore, they will be discussed simultaneously. *Dews v. A.B. Dick*

*Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000) (Title VII standards apply to failure to promote claims under 42 U.S.C. § 1981 and Ohio Rev. Code § 4112).

There are two principal methods of proving employment discrimination under Title VII: disparate treatment or disparate impact. *Phillips v. Cohen*, 400 F.3d 388, 397 (6th Cir. 2005); *Int'l Broth. Of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977) (recognizing disparate treatment and disparate impact methods of proof). In a race-based disparate treatment claim, a plaintiff must show that the employer treats some employees less favorably than others on the basis of race. *Hughley v. General Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir. 1995). Proof of discriminatory motive is critical to disparate treatment claims. *Id.* In comparison, to recover for racial discrimination under a disparate impact theory, a plaintiff must show that an employer's "facially neutral employment practices . . . have a disproportionately negative effect" on a particular race and cannot be justified by business necessity. *Id.* To demonstrate disparate impact, a plaintiff must present "statistical evidence of systematic discrimination." *Id.* Although unclear from Gibson's Complaint, he asserts both disparate treatment and disparate impact theories of recovery in his Opposition Memorandum.

### A. Disparate Treatment

Title VII prohibits employment practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Traditionally, claims brought under 42 U.S.C. § 2000e-2(a)(1) are categorized as either single-motive claims or mixed-motive claims. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008). In a single-motive claim the plaintiff contends that "an illegitimate reason

-11-

motivated the employment decision." *Id.* In comparison, a plaintiff in a mixed-motive claim

argues that "both legitimate and illegitimate reasons motivated the employer's decision." *Id.*

Single-motive and mixed-motive claims are not only definitionally distinct; they are also

analyzed under different legal frameworks. *Id.* Where, as here, a single motive claim is based

on circumstantial evidence, it is subject to the *McDonnell Douglas/Burdine* burden-shifting

analysis. *Id.* at 391. Mixed-motive claims, however, are not subject to a burden-shifting

framework. *Id.* at 400. Instead,

> to survive a defendant's motion for summary judgment, a Title VII plaintiff
> asserting a mixed-motive claim need only produce evidence sufficient to convince
> a jury that: (1) the defendant took an adverse employment action against the
> plaintiff; and (2) race, color, religion, sex, or national origin was a motivating
> factor for the defendant's adverse employment action.

*Id.* (internal quotation marks omitted).

Gibson asserts both a single-motive and a mixed-motive claim in his Opposition

Memorandum and argues under both the *McDonell Douglass* burden-shifting analysis and the

mixed-motive analysis. (Pl.'s S.J. Opp'n Mem. 13-18.) Shelly argues that Gibson cannot

maintain a mixed-motive claim because he "neglected to include such a claim in his Complaint"

and, relying on *Tucker v. Union of Needletrades, Industrial & Textile Employees*, 407 F.3d 784,

788 (6th Cir. 2005) and *Wade v. Knoxville Utilities Board*, 259 F.3d 452, 458 (6th Cir. 2001),

argues that allowing Gibson to assert a new claim for the first time at the summary judgment

stage is improper. (Def.'s S.J. Reply 6-7.) In relation to his failure to promote claims, Gibson

only states that he is African-American, that he applied for and was denied a Foreman position,

that he was "rejected in favor of another person with similar qualifications who was a

Caucasian," and that "[b]y the foregoing acts, defendant discriminated against plaintiff by

treating him differently than similarly situated Caucasian employees because of his race." (Am. Compl. §24.) The general assertion in Gibson's Complaint is sufficient to embrace both a single-motive or a mixed-motive claim. As Gibson has not made a sufficient showing to withstand summary judgment under either type of claim, however, the Court need not resolve this issue.

### 1. Gibson's Single-Motive Claim

#### a. Prima facie Case

Gibson does not present any direct evidence of racial discrimination, his single-motive claim is analyzed under the *McDonnell Douglass/Burdine* framework. In that analytical framework, a plaintiff must first establish a prima facie case of discrimination. *White*, 533 F.3d at 391; *see McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981). To establish a prima facie claim of racial discrimination based on a failure to promote under Title VII a plaintiff must show that: (1) he is a member of a protected class; (2) he applied for and was denied a promotion; (3) that he was qualified for the job; and (4) other similarly situated employees who were not members of the protected class received promotions. *See, e.g., Anthony v. BTR Automotive Sealing Sys., Inc.,* 339 F.3d 506, 515 (6th Cir. 2003); *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004); *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000). If, however, "the employer does not notify its employees of the available promotion or does not provide a formal mechanism for expressing interest in the promotion," a plaintiff does not have to show that he applied for or was considered for the promotion . *Dews*, 231 F.3d at 1022.

Gibson satisfies the first prong of the prima facie case for failure to promote because he is African-American. Because Gibson has put forth evidence that there was no formal application process and that there were no job postings for the foreman position as the time he worked there, he need not show that he applied for the position under prong two. *Dews*, 231 F.3d at 1022. Gibson claims that he has satisfied the other elements as well. Gibson maintains that he was qualified for the foreman position because he was trained by a heavy equipment school to operate paving equipment, because he worked for Shelly without incident from 1998-2003, and because he worked for several other companies. He also states that because Shelly did not maintain personnel files, he was unable to compare his work history to that of Scott and Gutridge's to demonstrate that he was similarly-situated under prong four.

Shelly maintains, however, that Gibson has not made out a prima facie case on prongs three and four. First, Shelly points out that Gibson has not produced any evidence that similarly-situated, non-minority employees were promoted because he has not shown that *any* employees were promoted to foreman while he was employed at Shelly in 2003-2005. Second, Shelly claims that Gibson has not shown that he was qualified to work as a foreman. Third, Shelly argues that Gibson has not shown that similarly-situated Caucasian employees were treated more favorably because he has failed to provide evidence that he was similarly-situated to Scott and Gutridge because he has not produced evidence of their qualifications.

The Court finds that Gibson has failed to make out a prima facie case for failure to promote on prongs three and four. First and fatally, Gibson has produced no evidence that Shelly promoted anybody to foreman while he worked for Shelly in 2003-2005. When an employee cannot show that any employees received a promotion during the time period in which

he sought a promotion he has not established a prima facie case of discrimination. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 683 (7th Cir. 2000) (former employee could not establish a failure to promote claim where it was undisputed that no one was promoted to the relevant position within the limitations period); *Austin v. Progressive RSC, Inc.*, 265 F.App'x 836, 845 (11 Cir. 2008) (affirming summary judgment on failure to promote claim because plaintiff presented no evidence of similarly situated co-workers who were promoted.)

Gibson's failure to promote claims are limited to the 2003-2005 time period and specifically to the promotions of Scott and Gutridge. It is undisputed that no foremen were promoted in 2003. With regard to Scott's promotion, the record shows that Gibson only worked for Shelly for three days in June of 2004.[3] It is also undisputed that Scott was promoted *after* a foreman quit in the middle of the 2004 paving season. As the paving season ran May-November, this means Scott was promoted months after Gibson's three-day stint at Shelly in June 2004. Gibson does not contend otherwise.

Similarly, Gibson admits that Gutridge was not formally promoted to foreman until the start of the 2006 season, well after Gibson was fired for the last time. Gibson does point out, however, that Gutridge was placed in his test position, in which he performed the duties of foreman, during the 2005 season. But even if the Court assumes that this constituted a promotion, Gibson conceded in his deposition that Gutridge was not put into the test position until after he was fired and that "I can't say that he was promoted during my employment." (5/13/08 Gibson Dep. 13.)

---

[3] The record also shows that Gibson was only allowed to work those three days accidentally because Shelly considered Gibson ineligible for work that season due to his 2003 discharge and was unaware that the Union had dispatched Gibson to its job site.

Gibson argues that the Court may excuse the fact that he was not employed by Shelly when Scott and Gutridge's promotions because of the Sixth Circuit's ruling in *Harless v. Duck*, 619 F.2d 611 (6th Cir. 1980). In *Harless*, the court found that the employee plaintiffs' failure to apply for a position could be excused where they had shown "overwhelming evidence of pervasive discrimination in all aspects of [the employer's] internal employment practices," and that "any application would have been futile and perhaps foolhardy." *Id*. at 617-18. The evidence in the record, however, falls far short of that standard.[4] Moreover, *Harless* deals with

---

[4]  In support of his *Harless* argument, Gibson provides a list of several alleged racial discriminatory incidents. Specifically:

- In 2003, while on a Shelly job site after Gibson had spoken to two female African-American co-workers, a co-worker named Steven Lackey commented to Gibson that he was "trying to get some black pussy." No supervisors were present and Gibson did not report this incident to a supervisor. (5/11/2006 Gibson Dep. 30.)
- In 2003, while on a Shelly job site, Steven Lackey commented that his son had "a colored boy for a friend." No supervisors were present and Gibson did not report this incident to a supervisor. (*Id*. 34.)
- On an unspecified date, while on a Shelly job site, after Gibson gave directions to a Caucasian woman, a co-worker named Kenny told Gibson, "around here, we don't—we don't like your kind talking to our women." No supervisors were present and Gibson did not report this incident to a supervisor. (*Id*. 35.)
- On an unspecified date, while working for L.P. Cavett, a Shelly Affiliate, a co-worker named Ernie fired a gun while talking to Gibson and said that he wanted to see if Gibson was "gun shy." During this incident a supervisor was sitting across the street. When Gibson looked over at the supervisor, he was laughing. The supervisor, however, never said anything to Gibson which led Gibson to believe that the supervisor saw Ernie point the gun and pull the trigger. At the end of that day, Ernie pulled a rifle out of his trunk and pointed it at Gibson and stated "I just wanted to see if you were going to run. You know all blacks run." No supervisors were present at that time. Gibson did not report this incident to a supervisor. (*Id*. 38-45.)
- On an unspecified date, while working for L.P. Cavett, a Shelly Affiliate, a co-worker named Ernie asked Gibson to "tell [him] a white joke," and later told Gibson to bring his family to Ernie's neighborhood because there was a house for sale and it would sell because people would think Gibson's family was trying to move in. (*Id*. 45-46.)

These four incidents are insufficient to establish overwhelming evidence of pervasive discrimination in all aspects of Shelly's employment practices as required under *Harless*. First, two of these incidents (and arguably the most extreme incident) did not occur while Gibson was

the second prong of a prima facie case, i.e. when an employee can be excused for failing to apply for a promotion.  Nothing in *Harless* suggests that an employee need not have been *employed* at all when the challenged promotion occurred.  The Court is unaware of any case law suggesting that a company must consider employees it has previously fired or non-employee members of the general public who have not formally applied for a job to avoid Title VII liability for failure to promote.  As Gibson has no evidence that any Shelly employees were promoted to foreman while he worked there, he cannot show that Gibson's failure to promote him was discriminatory; all employees who aspired to the foreman position were treated alike.

Second, Gibson has not established the third prong of his prima facie case because he has not produced evidence indicating that he was qualified for the foreman position.  Gibson has put forth evidence that the qualifications for the foreman position are: leadership, safety, selflessness, motivation, diligence, communication skills, math skills, and the ability to work with different personalities.  (Sharrett Dep. 21-22.)  It is undisputed then that one of the required qualifications for the foreman position was a candidate's "a significant propensity for safety and the safety of his workers." (*Id.*)

Gibson claims that he has demonstrated that he was qualified for the foreman position because he graduated from a heavy equipment school where he learned how to operate paving

_____

working for Shelly; rather they occurred while he was working at an affiliate's job site.  Second, none of the incidents involved discriminatory comments or actions by supervisors or Shelly decision-makers.  Instead, each incident involved one of three paving crew-member employees.  Furthermore, Gibson did not report any of these incidents to supervisors.  Also, with the exception of one non-Shelly job site incident, there is no evidence that even suggests supervisors or decision-makers at Shelly had any knowledge of these incidents.  More importantly, while lamentable, none of these incidents suggests that Sharret and the other supervisors were motivated by racial animus in their promotional decisions.  *C.F. Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious)" cannot form the basis of a hostile work environment discrimination claim.)

-17-

equipment and because he had five years of paving experience. *(Id.* 15.) But, to demonstrate that he is qualified for a position, a plaintiff bears the burden of demonstrating that he "was meeting [his] employer's legitimate expectations and was performing to [his] employer's satisfaction." *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 729 (6th Cir. 1999). The record shows that while working at Shelly, Gibson repeatedly operated his roller in a manner that endangered fellow crew members, the public, and Shelly's equipment. In 2003 he was terminated after driving his roller into active lanes of traffic three times. His 2005 termination occurred after he had nearly collided with the vehicle on which his supervisor was riding and after he drove his roller over an embankment and into a ditch the very next day.

According to Sharrett, employees with multiple serious safety violations were not performing to Shelly's expectations. (Sharrett Aff. ¶ 14.) Gibson has not challenged this evidence nor has he presented evidence of his qualifications in other categories such as evidence of math skills. Given Gibson's undisputed record of safety violations on the job at Shelly, Gibson has not presented evidence from which a reasonable jury could find that he was qualified for the foreman position.[5]

Third and finally, even if Scott and Gutridge had been promoted while Gibson was employed, he has not come forward with any evidence that they were "similarly situated" employees. An employee does not have to show that there was exact correlation between himself and the person who received the promotion to establish the fourth prong of a failure to

---

[5] Gibson cites to *Wexler v. White's Fine Furniture*, Inc., 317 F.3d 564, 575 (6th Cir. 2003), for the proposition that a plaintiff can show that he is qualified by "presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for the relevant field." While this is true Gibson has not done so because safety is an objective criterion that he admits was a required qualification for the foreman position.

promote claim. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

The plaintiff must establish, however, that he and the person with whom he compares himself

were similarly situated in all *relevant* aspects. *Id.* The only evidence of Scott and Gutridge's

qualifications put forth by Gibson is Sharrett's testimony that they were hard-working, well-

liked by their crew, and had paving experience.[6] (Sharrett Dep. 41.) As discussed above,

however, Gibson has not disputed that safety was a requirement of the foreman position.

Therefore, Scott and Gutridge's safety records are relevant aspects of their situation. Gibson

asks the Court to excuse this failing because he claims he was "prevented from obtaining Mr.

Scott and Mr. Gutridge's work history in order to compare their qualifications because the

personnel files don't exist." (Pl.'s S.J. Opp'n Mem. 16.) The Court is unpersuaded by this

argument. Gibson had ample opportunity to gather this evidence during discovery by deposing

Scott and Gutridge or any other witnesses with knowledge.

    With essentially no evidence of Scott and Gutridge's qualifications for the foreman

position the Court is unable to "conduct an independent review of the relative qualifications of

the plaintiff and the person selected for the position . . . to determine whether the plaintiff has

satisfied the fourth prong of [his] prima facie burden." *White v. Columbus Metro. Hous. Auth.*,

---

[6] Quoted in full Sharret testified as follows.
Q. What were Dave Scott's Qualifications?
A. Because I didn't make the selection I can't—I can just convey what was conveyed to me.
Q. Okay
A. Which was hard-working, well-liked by the crew, got along well with others, knew the work very well, had been in the asphalt paving portion, had been the—I would say the lead man. Usually there's a key person that, you know—that shows a lot of initiative to—and I would say that's how he was characterized.
Q. Okay. What were Mr. Gutridge's qualifications?
A. Very similar to Dave Scott's.
(Sharrett Dep. 41-42.)

429 F.3d 223, 243 (6th Cir. 2005). Because Gibson has not presented any evidence suggesting that Scott or Gutridge has similar records of safety violations he has not created a genuine issue of material fact regarding whether he was similarly-situated to them in terms of their job qualifications. Therefore, he cannot make out a prima facie case of racial discrimination based on Shelly's failure to promote him to the foreman position.

<u>b. Nondiscriminatory Reason & Pretext</u>

Once a plaintiff establishes a prima facie case, an inference of discrimination is created and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision. *White*, 533 F.2d at 391. If the employer succeeds, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Id*. A plaintiff can show pretext by demonstrating that the proffered reason: (1) has no factual basis, (2) did not actually motivate the employer's conduct, or (3) was not sufficient to warrant the challenged conduct. *Manzer v. Diamond Shamrock Chems., Co.*, 29 F.3d *1078*, 1084 (6th Cir. 1994). The Court has already found that Gibson has not established a prima facie case and is therefore not entitled to an inference of discrimination. Even if Gibson's arguments were sufficient to make out a prima facie case, however, the Court would still grant summary judgment because Shelly has come forward with a non-discriminatory reason for its failure to promote Gibson and he has not provided evidence of pretext.

Shelly has come forward with two non-discriminatory reasons for its failure to promote Gibson to foreman: (1) the fact that it made no promotions during his employment; and (2) Gibson's record of safety violations. Gibson does not explicitly identify a pretext argument in his Opposition Memorandum. Nor does he attack the factual basis of Shelly's asserted reasons,

i.e., he does not argue that promotions occurred while he was working or that he did not commit multiple safety violations. Instead, he points out that the Arbitrator found that Shelly wrongfully terminated Gibson in 2003 and ordered Shelly to pay back pay from 2003-2004. From that fact he concludes cryptically that Shelly "cannot take advantage of [its] own wrong." (Def.'s S.J. Opp'n Mem. 16.)

This argument is insufficient to establish pretext for several reasons. First, the Supreme Court has directed that in civil rights cases, like this one, federal courts should not afford res judicata or collateral-estoppel effect to an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement. *McDonald v. City of West Branch, Mich.*, 466 U.S. 284, 292 (1984); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) (Title VII context). Furthermore, even if the Court did examine the Arbitrator's ruling as evidence of pretext, it does not suggest that Shelly's asserted reasons for failing to promote Gibson are pretextual.

The Arbitrator was not presented with Gibson's claims of racial discrimination. The Arbitrator's "wrongful termination" ruling was not based on his finding that Shelly's termination was motivated by racial animus. Instead, he found that Shelly had not established "just cause" for the termination under the terms of the collective bargaining agreement. Specifically, the Arbitrator concluded that Shelly's suspicions of sexual harassment were insufficient to warrant his termination under the collective bargaining agreement because Gibson's alleged sexual harassment of female co-workers was not so pervasive that it created a hostile work environment. (Arbitrator's Op. 22.) With regard to Gibson's May 13, 2003 safety violations, the Arbitrator concluded that Gibson's record should reflect a reprimand for the violation but

that he should not have been terminated for that violation absent a warning that he would be fired if he drove his roller into traffic again.  (*Id*. 23-29.)

The crux of a disparate treatment claim is that the defendant's employment decision was discriminatorily motivated.  *Hughley*, 52 F.3d at 1370.  The fact that the Arbitrator believed that Gibson's 2003 termination was premature under the terms of a collective bargaining agreement does not create an inference that Shelly's claim that it did not promote Gibson based on his safety record and because he was not working for Shelly when promotions occurred was a pretext for racial discrimination.  Moreover, both the District Court for the Southern District of Ohio and the Sixth Circuit Court of Appeals have ruled that there was no evidence that Gibson's 2003 termination was racially motivated.

In support of his mixed-motive analysis, Gibson argues that he has raised material questions of fact regarding what motivated defendant to select Caucasians for promotions.  He notes that:  (1) Shelly did not post vacancies or notify crew members that they could apply for promotions; (2) Gibson did not maintain personnel files; and (3) Gibson engaged in a subjective promotion policy and practice.[7]  He further alleges that an "all Caucasian management group selected which Caucasian they thought should be promoted and then asked those Caucasians if they wanted to be promoted."  Based on this evidence and two out-of-circuit cases, *Holsey v. Armour & Co.*, 743 F.2d 199 (4th Cir. 1984); *Cunningham v. J.C. Penny Co.*, 642 F.Supp. 1517, 1529 (N.D. Miss. 1986), Gibson contends that he should be afforded an inference of discrimination.  Gibson ignores the fact, however, that the Shelly employees involved in making promotion decisions were not "all Caucasian."  The record shows that foremen, superintendents

_____

[7]At oral argument on the summary judgment motion, Gibson's counsel explained that Gibson also believes these facts provided evidence of pretext.

and the operations manager were involved in discussion regarding which crew members would be promoted. Sharrett testified that in the 2003-2005 time period two or three foremen and one superintendent were (non-African-American) minorities. (Sharrett Dep. 30-31, 87.) Moreover, Gibson's safety record is an objective criterion. Therefore the cases cited by Gibson are inopposite.[8]

Although the Court agrees that some aspects of Shelly's promotional process were subjective and even suspect, rather than objective,[9] this alone is insufficient to establish pretext. "Questioning [an employer's] hiring criteria is not within the province of this court, even if [the employer's] hiring process was entirely subjective." *Browning v. Dept. of Army*, 436 F.3d 692, 698 (6th Cir. 2006). Gibson has offered no evidence to establish that Shelly, used its subjective criteria with a discriminatory motive or to disguise discriminatory action and, therefore, summary judgment is warranted. *See Conner v. State Farm Mut. Auto. Ins. Co.*, 273 F.App'x. 438, 443 (6th Cir. 2008).

### 2. Mixed-Motive Claim

Using the same facts asserted under his single-motive argument, Gibson also argues that he has established a mixed-motive claim. To survive summary judgment on a mixed-motive claim Gibson must demonstrate that: (1) the defendant took an adverse employment action against the

---

[8] Moreover, in *Holsey*, the court found that the district court could infer discrimination where defendant's personnel were selected by a white managerial staff, applying subjective standards *and* there was testimony that an employee was informed by her manager that black people were not hired in sales. 743 F.2d at 205. Similarly, in *Cunningham*, the court found that evidence that employer had subjective promotion policy, that appraisals were made by all white supervisory staff, *and* that less qualified white employees were promoted before black employees supported a finding of racial discrimination. 642 F.Supp. at 1529, 1531.

[9] For example the requirement that a foreman possess leadership and personal skills.

plaintiff; and (2) race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008). Gibson has not done so. As discussed above, Gibson has not shown that an adverse employment action took place because he has not shown that any Shelly employees were promoted to foreman while he was employed. Also for the same reasons discussed above, Gibson has not provided any evidence that his race was a motivating factor in any employment decision.

### B. Disparate Impact

Unlawful discrimination occurs when an employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity . . . ." 42 U.S.C. § 2000e-2(k)(1)(A)(I). To establish a prima facie case under a disparate impact theory a plaintiff must: (1) identify a specific employment practice to be challenged; and (2) present relevant statistical analysis that proves the challenged practice has an adverse impact on a protected group. *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005). Gibson argues that he is entitled to discovery under a disparate impact theory of recovery because Shelly engages in a neutral policy of "supervisory evaluations and selection of individuals for promotions" but does not perform formal evaluations, does not maintain personnel files, does not post vacancies, and "uses an all white managerial staff to subjectively select employees to be promoted." (Pl.'s S.J. Opp'n 19.) These assertions, however, are insufficient to avoid summary judgment because Gibson has not produced *any* statistical evidence regarding the effect of Shelly's facially neutral promotion practices on

African-Americans.  *See, e.g., Hughley*, 52 F.3d at 1370 (plaintiff has burden to produce statistical evidence showing the disproportionately negative effect of the challenged policy on the protected group).  As Gibson has utterly failed to present statistical evidence of disparate impact, summary judgment is warranted on this claim.  *See Butts v. McCullough*, 237 F.App'x 1, 7 (6th Cir. 2007) (affirming grant of summary judgment on plaintiff's ADEA disparate impact claim because plaintiff completely failed to produce statistical evidence).

### C.  Pattern-or-Practice

Count II of Gibson's complaint alleges that Gibson engaged in a pattern and practice of race discrimination.  The Sixth Circuit has definitively held, however, that the pattern-or-practice method of proof is not available to individual plaintiffs.  *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004) (pattern-or-practice method of proof is confined to class actions and unavailable to individual plaintiffs).  Consequently, summary judgment is warranted on this claim.

### D.  EEOC Exhaustion & Request for Reinstatement and Lost Wages

Shelly also argues that Gibson's pattern-or-practice and disparate impact claims should be dismissed because Gibson failed to raise those claims in his EEOC charge.  (Def.'s S.J. Reply 9.)  Shelly further contends that Gibson's request for reinstatement and lost wages are barred by the 2005 Settlement Agreement resolving his grievance to the Union regarding his 2005 termination.  As the Court has already concluded that Shelly is entitled to summary judgment on the merits of Gibson's claims, it need not address these arguments.

## V. CONCLUSION

For the reasons stated above, Shelly's Motion for Summary Judgment (doc. no. 20) is **GRANTED**. The Clerk is directed to enter judgment in favor of the defendant on plaintiff's claims.

**IT IS SO ORDERED.**

__s/Algenon L. Marbley__
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: March 30, 2009**